## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF<br>    BALTIMORE<br>100 N. Holliday Street, Suite 101<br>Baltimore, MD 21202,<br><br>       *Plaintiff*,<br><br>   vs.<br><br>DONALD J. TRUMP, in his official capacity<br>    as President of the United States of<br>    America,<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500,<br><br>U.S. DEPARTMENT OF STATE,<br>2201 C Street NW<br>Washington, DC 20520, and<br><br>MICHAEL R. POMPEO, in his official<br>    capacity as U.S. Secretary of State,<br>2201 C Street NW<br>Washington, DC 20520,<br><br>       *Defendants.* | Case No. |

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

JURISDICTION AND VENUE .................................................................. 3

PARTIES ................................................................................................... 3

FACTS ...................................................................................................... 6

    I.     The Consular Visa Process. ....................................................... 6

          A.     Immigrant visa applicants. ............................................ 7

          B.     Nonimmigrant visa applicants. ..................................... 9

          C.     Provisional unlawful presence waivers........................... 9

    II.    The "Public Charge" Ground of Inadmissibility. .................... 10

          A.     The State Department's Foreign Affairs Manual...................... 12

               1.     Prohibition on the consideration of non-cash benefits received by visa applicants and their family members. ................ 13

               2.     Affidavits of Support. ............................................... 14

          B.     INS's Notice of Proposed Rulemaking...................................... 15

          C.     INS's 1999 Field Guidance........................................... 18

    III.   President Trump and His Administration's Beliefs About Immigrants............... 22

    IV.   The Trump Administration's Crusade to Change the Definition of "Public Charge." ................................................................................... 28

    V.    The Foreign Affairs Manual Change. .................................... 34

          A.     The change drastically expands the scope of the FAM's "public charge" provision. .................................................. 35

               1.     Considering the receipt of non-cash benefits by visa applicants. . 35

               2.     Considering the receipt of non-cash benefits by members of the visa applicant's household. ................................... 36

               3.     Changes to consideration of the Affidavit of Support. ................. 37

          B.     Despite the FAM change's scope, the State Department provided virtually no notice or explanation, let alone opportunity for comment. ... 40

    VI.   The Foreign Affairs Manual Change Deters Immigrants, Their Family Members, And Their Sponsors From Accepting Public Benefits........................ 42

    VII.  Baltimore Is Harmed By The Foreign Affairs Manual Change........................... 48

          A.     The Foreign Affairs Manual change deters immigrants from accepting Baltimore's public benefits........................................ 50

                1.     Health benefits. ....................................................... 51

                2.     Housing benefits. ..................................................... 53

                3.     Low-income assistance programs. ................................... 54

                4.     Educational benefits.................................................. 56

5.    Other programs. .......................................................................... 56

B.    The Foreign Affairs Manual change forces Baltimore to expend resources to encourage immigrants to accept public benefits.................. 58

C.    The Foreign Affairs Manual change imposes financial costs on Baltimore's programs and the city as a whole. ......................................... 61

CLAIMS FOR RELIEF ............................................................................................... 65

Count One (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)) ....... 65

Count Two (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)) ...... 68

Count Three (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D)) .... 68

Count Four (Violation of the Fifth Amendment – Equal Protection, U.S. Const. amend. V) ........................................................................................ 69

REQUEST FOR RELIEF .............................................................................................. 70

Plaintiff Mayor and City Council of Baltimore, Maryland hereby sues Defendants Donald J. Trump, in his official capacity as President of the United States of America, the U.S. Department of State, and Michael R. Pompeo, in his official capacity as U.S. Secretary of State, and alleges as follows:

1.      This case concerns President Trump's ongoing, unlawful attempts to make it harder for underprivileged immigrants—from countries he has vilified—to come to the United States. Since President Trump took office, his administration has repeatedly tried to alter the longstanding rules regarding public charge, a provision of immigration law intended to prevent those who may become primarily dependent on public assistance from entering the country. The Trump Administration has done so despite expressly recognizing, as have past administrations and multiple federal agencies, that expanding the meaning of public charge threatens to deter immigrants, millions of whom are lawfully present in the United States or are naturalized citizens, from obtaining food, housing, medical care, and other necessities for which they and their families are indisputably eligible through public programs.

2.      In particular, the Trump Administration recently began to enforce a set of changes it made to the State Department's Foreign Affairs Manual ("FAM") in January 2018, a set of instructions which dictate how consular officers are to determine whether a visa applicant is likely to become a public charge if admitted to the United States. The Trump Administration's changes to the FAM put a thumb on the scale in favor of barring immigrants from the country if they have used any of a host of federal, state, or local programs—making it much harder for immigrants to reunite with their families. Specifically, those changes dramatically expand the range of benefits that may be considered by consular officials, referring to "public assistance of any kind"; they permit consular officers to look at the receipt of those benefits by the applicant's

entire household; and they decrease the weight a consular officer is permitted to give to a financial sponsor's agreement to support the applicant. With respect to all of these changes, Defendants offered virtually no explanation for discarding the decades-old understanding of public charge.

3.      Simultaneously, the Trump Administration has initiated a parallel rulemaking at the Department of Homeland Security ("DHS") to change the definition of public charge for other immigration determinations. That proposed rule has yet to take effect; recognizing the significance of these changes, DHS provided the public with notice, an explanation, and an opportunity for comment, as the law requires.

4.      In contrast, Defendants met *none* of those requirements for the FAM changes. Defendants barely even alerted the public once the changes had been implemented. Yet those changes are in effect right now—directing how consular officers make visa decisions across the globe. That is the essence of procedurally infirm, arbitrary and capricious agency action. It is also unconstitutional: the Trump Administration's demonstrated hostility toward the immigrants affected by the FAM change, and the discriminatory effects of that change, constitute a violation of the U.S. Constitution's equal protection guarantees.

5.      Defendants' unlawful changes to the FAM have harmed cities across the country, including Plaintiff Mayor and City Council of Baltimore, Maryland ("Baltimore"). Baltimore strives to be a welcoming city to the immigrants who have chosen to live there, providing them with access to the same programs and services it provides to all of its residents. As multiple federal agencies have repeatedly recognized, interpreting and applying public charge rules more stringently will deter, and in fact, is deterring, immigrants from accepting the public benefits Baltimore makes available to all of its residents. That dynamic frustrates an essential component

of Baltimore's mission; it forces Baltimore to devote additional resources to managing its

programs; and it paradoxically encourages immigrants to consume other city services as they are

deterred from enrolling in more appropriate federal programs. And the FAM change is

counterproductive to boot: public benefits often put immigrants and their families on the path to

self-sufficiency and success. Ultimately, the FAM change hurts the entire community;

Baltimore's residents, immigrant and not, will be less healthy and less well-off as a consequence

of Defendants' unlawful actions.

6.      For these reasons, the Court should hold unlawful and set aside Defendants'

changes to the FAM.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 because this action arises under federal law.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because

Defendants are agencies and officers of the United States and Plaintiff Mayor and City Council

of Baltimore, Maryland is located in Maryland.

## PARTIES

9.      Plaintiff Mayor and City Council of Baltimore, Maryland ("Baltimore") is a

municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution,

and entrusted with all of the powers of local self-government and home rule afforded by those

articles. Baltimore is the largest city in Maryland and the thirtieth largest city in the United

States, with a population of over 600,000, according to 2016 Census estimates.

10.     "Over the course of the 20th century, Baltimore has welcomed many immigrants from all around the world."[1] More recently, Baltimore has become yet another "story of large influxes of immigrants bringing new vibrancy to America's storied, yet aging cities."[2] As of 2016, more than 48,000 foreign-born immigrants called Baltimore home,[3] with over half of that population arriving since 2000.[4] Specifically, Baltimore maintains large Latin American and Asian immigrant populations throughout the city.[5]

11.     Baltimore views it as "crucial that the City recognizes, expands, and develops new strategies to welcome immigrants and help facilitate an easy transition to life as Baltimoreans so these immigrants choose to make Baltimore their permanent home."[6] Especially given their high rates of education (41.6% of immigrants in Baltimore had a Bachelor's degree or higher in 2016) and entrepreneurship (7.2% of all immigrants in the city of Baltimore were entrepreneurs in 2016),[7] "attracting additional immigrants to the city would make a significant difference in the city's future economic prospects."[8]

12.     Baltimore strives to show these communities that it is a welcoming city by promoting community wellbeing, economic development, and the integration of immigrant

---

[1]   *The Role of Immigrants in Growing Baltimore*, City of Baltimore 4 (Sept. 2014) [hereinafter *The Role of Immigrants*], https://www.abell.org/sites/default/files/publications/cd-roleimmigrants914.pdf.

[2]   *Id.*

[3]   *Selected Characteristics of the Native and Foreign-Born Populations*, *2012-2016 American Community Survey 5-Year Estimates*, U.S. Census Bureau, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.

[4]   *The Role of Immigrants*, at 5.

[5]   *Id.*

[6]   *Id.*

[7]   *NAE Cities Index*, New Am. Econ. 11, http://www.newamericaneconomy.org/wp-content/uploads/2018/09/NAE-Cities-Index-Complete-Data.pdf.

[8]   *The Role of Immigrants*, at 6.

communities. Baltimore does so by facilitating the development and progress of immigrants in the workforce and increasing their access to entrepreneurial opportunities, thereby meeting the needs of employers and promoting the growth of the city at the same time. In addition, as a welcoming city, Baltimore seeks to enhance the service capacity and receptivity of City agencies, nonprofits, and community-based organizations to better address the needs of immigrants and facilitate inclusion and mutual understanding among immigrant communities, service providers, and receiving communities.

13.     Baltimore is particularly aware that immigrants may not choose to accept public benefits and services—even if they need them—if they fear immigration consequences. In 2012, then-Mayor Stephanie Rawlings-Blake issued an executive order stating that "[t]he City of Baltimore remains committed to ensuring public safety, public health, and vital services on which the entire community depends."[9] For that reason, she directed that "[n]o City Department, agency, officer or employee shall condition the provision of City services or benefits on the immigration status of the individual seeking those services or benefits unless such conditions are lawfully imposed by federal or state law."[10]

14.     For its efforts, Baltimore received the second-highest score in the country in one study of the integration of immigrants into local communities.[11]

15.     Defendant Donald J. Trump is sued in his official capacity as President of the United States of America.

---

[9]     *Baltimore City Executive Order: Advancing Public Safety and Access to City Services*, City of Baltimore 1,
https://content.govdelivery.com/attachments/MDBALT/2012/03/01/file_attachments/97683/exec001.pdf.

[10]    *Id.* at 2.

[11]    *NAE Cities Index*, New Am. Econ., https://www.newamericaneconomy.org/interactive-index/.

16.     Defendant the U.S. Department of State is a federal agency headquartered in Washington, D.C., at 2201 C Street NW, Washington, DC 20520.

17.     Defendant Michael R. Pompeo is sued in his official capacity as U.S. Secretary of State.

## FACTS

### I.     The Consular Visa Process.

18.     This case involves the process by which non-citizens may apply for a visa to enter the United States, and the Trump Administration's attempts to restrict that process for non-citizens who may use public benefits.

19.     There are two general categories of visas: immigrant visas, for non-citizens who intend to become permanent residents in, and potentially citizens of, the United States, and nonimmigrant visas, for those that do not seek to reside in the United States permanently. For both categories of visas, a determination that an individual is a "public charge" generally renders the individual inadmissible and ineligible to receive a visa.

20.     The vast majority of foreign nationals seeking either immigrant or nonimmigrant visas, including nearly all individuals abroad seeking immigrant visas, all individuals abroad seeking nonimmigrant visas, and many individuals already present in the United States seeking immigrant visas, must go to a U.S. consulate to apply for a visa—a process known as "consular processing."[12]

---

[12]   Only certain individuals seeking immigrant visas who are already present in the United States on a valid visa, or who entered with inspection and are immediate relatives of a United States citizen, can use the procedure known as "adjustment of status," whereby they may remain in the United States and attend a green card interview at a USCIS office without having to submit to consular processing.

21.     Consular processing involves submitting all necessary forms and supporting documentation to a U.S. consulate abroad, presenting for biometric and any required medical screening, and, in most instances, attending an interview at that consulate. Visa applicants may only enter the United States once the U.S. consulate has processed and approved their applications and granted their visas.

22.     As explained below, the nature of consular processing depends on whether the applicant seeks an immigrant or a nonimmigrant visa. Moreover, an immigrant who has resided in the United States unlawfully for some time—referred to as "accruing unlawful presence"—is subject to additional requirements before they may obtain a visa.

**A.     Immigrant visa applicants.**

23.     Individuals seeking immigrant visas must be the beneficiaries of either an approved family-based visa petition, filed by a relative; an approved employment-based visa petition, filed by a U.S. employer; or a winning diversity visa application, selected in the diversity visa lottery.

24.     Once the National Visa Center has received the immigrant visa application, processed the fees, and reviewed financial and other documentary submissions, the Center transfers the visa applicant's file to the appropriate consulate abroad for consular processing.

25.     During consular processing, visa applicants must fill out additional forms and paperwork and undergo a medical exam. Visa applicants who are the beneficiaries of family-based petitions must have a family member sponsor who completes and signs an Affidavit of Support, labeled Form I-864, which provides information about a sponsor's, and in some cases a

joint sponsor's or sponsors', ability to financially support the visa applicant in question.[13] An Affidavit of Support may only be filed by a lawful permanent resident or a U.S. citizen.

26.     The information provided on the Affidavit of Support is intended to allow the consular official to determine whether the visa applicant has adequate means of financial support in the United States. The form itself is considered a contract between the visa applicant and the sponsor, as well as between the sponsor and the United States government, in which the sponsor promises to support the applicant if he or she is unable to do so on his or her own. That promise is essential; an immigrant who can depend on a reliable source of support from a sponsor is dramatically less likely to need any public benefits.

27.     If an individual sponsor's income is less than 125% of the federal poverty line for the relevant household, then two joint sponsors whose income meets the threshold may submit Affidavits of Support. Any joint sponsors will be held jointly liable with the main sponsor for support of the applicant. Neither the Affidavit of Support form, nor the relevant regulations, requires a joint sponsor to be related to the petitioning sponsor or the applicant.

28.     The final step in consular processing for an immigrant visa applicant is to attend a consular interview, during which a consular officer will verify the contents of an individual's application and check the individual's medical, criminal, and financial records to determine whether the individual is inadmissible to the United States.

29.     Visa applicants who are already present in the United States, but who are required to undergo consular processing abroad, must leave the country. The applicant must then be prepared to remain outside the United States for as long as the consulate requires to interview the

---

[13]   Individuals who are the beneficiaries of approved employment-based immigrant visa petitions must also submit an Affidavit of Support if a family member owns five percent or more of the entity that filed the visa petition.

applicant and process the application—a process that can take weeks or even months. Indeed, such applicants must also be prepared to remain outside the United States indefinitely in the event that their visa applications are denied or put into administrative processing.

**B.      Nonimmigrant visa applicants.**

30.      Individuals abroad seeking nonimmigrant visas first fill out the Nonimmigrant Visa Application, Form DS-160. The relevant requirements for a nonimmigrant visa will depend on which nonimmigrant visa the individual seeks, but generally involve additional forms and documentation to establish the individual's eligibility to obtain the visa.

31.      After submitting the application, visa applicants must similarly go through consular processing: they must contact the embassy or consulate at which they wish to apply to confirm whether they need to be interviewed by a consular officer and to schedule an interview if necessary. If an interview is required, the visa application process will not be completed until the visa applicant appears for the interview with a consular office.

**C.      Provisional unlawful presence waivers.**

32.      Under federal law, non-citizens who have been unlawfully present in the United States who seek admission again are presumptively barred from the country for a set period of time, depending on the length of their unlawful presence. 8 U.S.C. § 1182(a)(9)(B)(i). However, the Attorney General (or his designee) may waive the non-citizen's unlawful presence if he or she finds that "refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien." *Id.* § 1182(a)(9)(B)(v).

33.      Of course, a non-citizen who presents at a consulate abroad for consular processing to apply for a visa might not know in advance whether his or her unlawful presence will be waived—potentially leaving him or her stuck outside the United States. Even if the

individual eventually obtains a waiver, the process alone prolongs their separation from their relatives.

34.     Instead of taking that risk, a non-citizen may file an Application for Provisional Unlawful Presence Waiver, Form I-601A, which allows such individuals to request a provisional waiver of the unlawful presence ground of inadmissibility before they leave the United States to appear at a consulate abroad.

35.     The availability of a provisional waiver was intended to provide a visa applicant with some level of assurance that if he or she was otherwise admissible and eligible for lawful permanent resident status, he or she would be able to leave the country to attend the consular interview and return without being barred from reentry due to the accrual of unlawful presence. Permitting non-citizens to obtain a provisional waiver in advance, rather than putting the process on hold while the non-citizen applies for a waiver at the consulate, is also more efficient for the agency.[14]

## II.     The "Public Charge" Ground of Inadmissibility.

36.     In determining whether an applicant is eligible for a visa, consular officers apply the grounds of inadmissibility specified in the Immigration and Nationality Act. *See* 8 U.S.C. § 1182. In particular, the INA stipulates that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A).

---

[14]   Letter from Am. Immigration Lawyers Ass'n et al. to David Newman, Director, Office of Legal Affairs, U.S. Dep't of State, at 6 (Aug. 28, 2018) [hereinafter "Letter to David Newman"], https://www.aila.org/File/DownloadEmbeddedFile/77213.

37.     In assessing whether a non-citizen is likely to become a public charge, the INA directs the adjudicator to consider the applicant's (1) age, (2) health, (3) family status, (4) assets, resources and financial status, and (5) education and skills. *Id.* § 1182(a)(4)(B)(i); *see also* 22 C.F.R. § 40.41(a) ("Any determination that an alien is ineligible under INA 212(a)(4) must be predicated upon circumstances indicating that … the alien is likely to become a public charge after admission."). As previously described by DHS, this inquiry amounts to a "totality of the circumstances" test, *see, e.g.*, 8 C.F.R. § 245a.4(b)(1)(iv)(B)—a description likewise adopted by the State Department in the FAM's public charge provisions. *See infra* ¶ 47.

38.     The INA, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), also provides that a consular officer or the Attorney General "may consider any affidavit of support" for purposes of the public charge ground of inadmissibility. 8 U.S.C. § 1182(a)(4)(B)(ii).

39.     Although the phrase "public charge" is not defined by statute, the State Department, the Immigration and Nationality Service ("INS"),[15] and the Department of Homeland Security have historically interpreted "public charge" to mean a person likely to become "primarily dependent" on cash-based benefits for income maintenance or likely to require long-term institutionalization. In other words, simply receiving a public benefit of some form at some point in time has not historically meant that a non-citizen is automatically inadmissible on public charge grounds.

---

[15]   The Immigration and Naturalization Service ceased to exist under that name as of March 1, 2003 when most of the Service's functions were transferred to U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP") within the newly created Department of Homeland Security.

40.     Over the last several decades, these agencies have all similarly concluded that the past, current, or anticipated future receipt of *non-cash* benefits, such as the Supplemental Nutrition Assistance Program ("SNAP," commonly referred to as "food stamps"), the Special Supplemental Program for Women, Infants, and Children ("WIC"), and Medicaid, by the non-citizen or a member of the non-citizen's household, shall not be considered for purposes of the public charge determination—reasoning that such an approach bolsters overall public health, nutrition, and economic growth. Similarly, these agencies have agreed that the past, current, or anticipated future receipt of non-cash based benefits by affiants, or members of their household, does not disqualify or render irrelevant an otherwise validly-filed affidavit of support.

41.     Both the State Department and the INS have detailed their interpretations of the public charge ground of inadmissibility in several official documents, each discussed below.

**A.      The State Department's Foreign Affairs Manual.**

42.     The FAM is "a single, comprehensive, and authoritative source for the Department's organization structure, policies, and procedures that govern the operation of the State Department, the Foreign Service, and, when applicable, other federal agencies."[16] The FAM "convey[s] codified information to Department staff and contractors so they can carry out their responsibilities in accordance with statutory, executive, and Department mandates."[17] Scholars have described the FAM as representing "the official policies of the Department of State" and constituting "binding authority on consulates, as well as on all other agencies within the Department of State."[18]

---

[16]   *Foreign Affairs Manual and Handbook*, U.S. Dep't of State, http://fam.state.gov/.

[17]   *Id.*

[18]   Victoria Degtyareva, *Defining Family in Immigration Law: Accounting for Nontraditional Families in Citizenship by Descent*, 120 Yale L.J. 862, 872 (2011).

43.     The FAM has long codified several requirements for consular officers assessing whether an individual is or is likely to become a public charge.

### 1.     *Prohibition on the consideration of non-cash benefits received by visa applicants and their family members.*

44.     For decades, and until January 3, 2018, the FAM had defined "public charge" to mean a non-citizen who "is likely to become primarily dependent on the U.S. Government for subsistence" either from "[r]eceipt of public cash assistance for income maintenance" or "[i]nstitutionalization for long-term care." 9 FAM § 302.8-2(B)(1). The FAM explicitly prohibited consular officers from considering a visa applicant's past, current, or future use of non-cash benefits: "Neither the past nor possible future receipt of such non-cash or supplemental assistance may be considered in determining whether an alien is likely to become a public charge." *See id.*

45.     The FAM provided a non-exclusive list of non-cash benefit programs that should be excluded from consideration. That list includes:

a.     The Food Stamp Program;

b.     The Medicaid Program (other than payments under Medicaid for long-term institutional care);

c.     The Child Health Insurance Program ("CHIP");

d.     Emergency medical services;

e.     The Women, Infants and Children Program;

f.     Other nutrition and food assistance programs;

g.     Other health and medical benefits;

h.     Child-care benefits;

i.     Foster care;

j.  Transportation vouchers;

k.  Job training programs;

l.  Energy assistance, such as the low-income home energy assistance program;

m.  Educational assistance, such as Head Start or aid for elementary, secondary, or higher education;

n.  Job training;

o.  In-kind emergency community services, such as soup kitchens and crisis counseling;

p.  State and local programs that serve the same purposes as the Federal in-kind programs listed above; and

q.  Any other Federal, State, or local programs in which benefits are paid in-kind, by voucher or by any means other than payment of cash benefits to the eligible person for income maintenance.

*Id.*

46.  Because the FAM prohibited any consideration of the receipt of non-cash benefits, consular officers also could not consider the past, current, or anticipated future receipt of non-cash benefits by family members in the visa applicant's household. *Id.*

### 2. *Affidavits of Support.*

47.  The FAM also clarified how consular officers were required to weigh a *sponsor's* receipt of certain benefits against his or her otherwise valid Affidavit of Support. For decades, the FAM instructed that "[a] properly filed, non-fraudulent Form I-864 in those cases where it is

required, should normally be considered sufficient to meet the INA 212(a)(4) requirements and satisfy the totality of the circumstances analysis." 9 FAM § 302.8-2(B)(3).[19]

48.     While consular officers were initially required to consider the sponsor's use of means-tested[20] benefit programs (as well as his or her family's use of such programs) for the purpose of excluding them from the sponsor's household income, using those programs did not disqualify or render irrelevant an otherwise valid Affidavit of Support, given that it remained a contract obligating the sponsor to provide for the non-citizen's support. *See id.* § 302.8-2(B)(3).

49.     The FAM also clarified, in keeping with both the text of the INA and DHS regulations, that a joint sponsor "can be a friend or a non-relative who does not reside in and is not necessarily financially connected with the sponsor's household." 9 FAM § 302.8-2(C)(7); *cf.* 8 U.S.C. § 1183a (defining the requirements of a "sponsor" but not including a requirement that a joint sponsor have a familial relationship to the alien); 8 C.F.R. § 213a.2 (same).

### B.     INS's Notice of Proposed Rulemaking.

50.     In 1999, INS published in the Federal Register a Notice of Proposed Rulemaking (the "1999 NPRM") to define the public charge ground of inadmissibility. *Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28,676, 28,676 (May 26, 1999).

---

[19]   *See also* Letter to David Newman at 1.

[20]   A "means-tested public benefit" is not defined in the INA. DHS regulations define "means-tested public benefit" as "either a Federal means-tested public benefit, which is any public benefit funded in whole or in part by funds provided by the Federal Government that the Federal agency administering the Federal funds has determined to be a Federal means-tested public benefit under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Public Law 104–193, or a State means-tested public benefit, which is any public benefit for which no Federal funds are provided that a State, State agency, or political subdivision of a State has determined to be a means-tested public benefit." 8 C.F.R. § 213a.1. More generally, a "means-tested" benefit refers to a benefit that is only available to individuals below a certain income level. *See* Amelia Josephson, *What Does "Means Tested" Mean*, SmartAsset (Aug. 20, 2018), https://smartasset.com/insights/what-does-means-tested-mean.

51.     Long before the 1999 NPRM, the text of the INA and longstanding practice had

established that the term "public charge" did not include the episodic use of non-cash benefits.

However, INS determined that the 1999 NPRM was necessary to reduce public confusion about

the meaning of public charge in the wake of the 1996 welfare reform laws and subsequent abuse

by federal and state agencies, noting that it had been contacted by "many State and local

officials, Members of Congress, immigrant assistance organizations, and health care providers

who are unable to give reliable guidance to their constituents and clients on this issue." *Id.* As the

INS explained,

> Although Congress has determined that certain aliens remain eligible for some
> forms of medical, nutrition, and child care services, and other public assistance,
> numerous legal immigrants and other aliens are choosing not to apply for these
> benefits because they fear the negative immigration consequences of potentially
> being deemed a "public charge." This tension between the immigration and
> welfare laws is exacerbated by the fact that "public charge" has never been
> defined in statute or regulation. Without a clear definition of the term, aliens have
> no way of knowing which benefits they may safely access without risking
> deportation or inadmissibility.

*Id.*

52.     Moreover, INS stressed that when non-citizens are deterred or prevented from

using a wide array of public benefits, local communities bear the costs. It explained:

> According to Federal and State benefit-granting agencies, this growing confusion
> is creating significant, negative public health consequences across the country.
> This situation is becoming particularly acute with respect to the provision of
> emergency and other medical assistance, children's immunizations, and basic
> nutrition programs, as well as the treatment of communicable diseases.
> Immigrants' fears of obtaining these necessary medical and other benefits are not
> only causing them considerable harm, but are also jeopardizing the general public.
> For example, infectious diseases may spread as the numbers of immigrants who
> decline immunization services increase. Concern over the public charge issue is
> further preventing aliens from applying for available supplemental benefits, such
> as child care and transportation vouchers, that are designed to aid individuals in
> gaining and maintaining employment.

*Id.* at 28,676-77.

53.    INS thus concluded that the rulemaking was necessary because, "[i]n short, the absence of a clear public charge definition is undermining the Government's policies of increasing access to health care and helping people to become self-sufficient." *Id.*

54.    INS proposed to define "public charge" to mean an individual "who is likely to become … primarily dependent on the Government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at Government expense." *Id.* at 28,677. That definition was consistent with how the FAM had historically defined public charge as well. *See supra* ¶ 44.

55.    INS based this interpretation on the definition of "charge," which is commonly understood to mean "'a person or thing committed or entrusted to the care, custody, management, or support of another.'" *Id.* (quoting Webster's Third New Int'l Dictionary of the English Language 377 (1986)). In other words, someone who received a small benefit on a single occasion plainly would not have been understood as "entrusted to the care" of the government. Indeed, "[t]his primary dependence model of public assistance was the backdrop against which the 'public charge' concept in immigration law developed in the late 1800s." *Id.*

56.    INS further determined that this definition was "consistent with the facts found in the deportation and admissibility cases." *Id.* (citing *In re C-R-*, 7 I. & N. Dec. 124 (BIA 1956) (deportation based on public mental hospital institutionalization); *In re Harutunian*, 14 I. & N. Dec. 583 (R.C. Int. Dec. 1974) (receipt of old age assistance for principal financial support was an important factor in denying admission)).

57.    Finally, INS concluded that its definition was consistent with the advice provided by federal benefit-granting agencies, including the U.S. Department of Health and Human Services ("HHS"), the U.S. Department of Agriculture, and the Social Security Administration.

*Id.* Each concurred that "receipt of cash assistance for income maintenance is the best evidence of primary dependence on the Government" because "non-cash benefits generally provide supplementary support … to low-income working families to sustain and improve their ability to remain self-sufficient." *Id.* at 28,677-78.

58.     INS never finalized the 1999 NPRM.

**C.      INS's 1999 Field Guidance.**

59.     In addition to publishing the 1999 NPRM, INS also published its "Field Guidance" on the public charge issue, "which both summarize[d] longstanding law with respect to public charge and provide[d] new guidance on public charge determinations." *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689, 28,689 (May 26, 1999).

60.     The Field Guidance was published alongside the 1999 NPRM to "help alleviate public confusion over the meaning of the term 'public charge' in immigration law and its relationship to the receipt of Federal, State, and local public benefits" and to "provide aliens with better guidance as to the types of public benefits that will and will not be considered in public charge determinations." *Id.* In promulgating the Field Guidance, INS intended to adopt its definition of public charge "immediately, while allowing the public an opportunity to comment on the proposed rule." *Id.*

61.     To that end, the Field Guidance adopted the same definition of public charge proposed in the NPRM. Specifically, INS defined a "public charge" as "an alien who has become … or who is likely to become … primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense." *Id.* INS promulgated the same

definition in both documents to ensure the "accurate and uniform application of law and policy in this area." *Id.*

62.     In publishing the 1999 NPRM and the Field Guidance, INS expressly took "into account the law and public policy decisions concerning alien eligibility for public benefits and public health considerations, as well as past practice by the Service and the Department of State." *Id.* at 28,692. Moreover, INS specifically acknowledged that its definition of public charge conformed to the policy "codif[ied] … in the Foreign Affairs Manual," and described it as "taking a similar approach." *Id.* Once again, INS defended its parallel interpretations as adopting "uniform standards." *Id.*

63.     INS also clarified that "[i]t has never been Service policy that any receipt of services or benefits paid for in whole or in part from public funds renders an alien a public charge, or indicates that the alien is likely to become a public charge." *Id.* Instead, INS stressed that "[t]he nature of the public program must be considered." *Id.* "For instance, attending public schools, taking advantage of school lunch or other supplemental nutrition programs, or receiving emergency medical care would not make an alien inadmissible as a public charge, despite the use of public funds." *Id.*

64.     INS gave four reasons for deciding to adopt the definition of public charge in both the 1999 NPRM and the Field Guidance:

a.     ***First,*** INS noted that "confusion about the relationship between the receipt of public benefits and the concept of 'public charge'" had "deterred eligible aliens and their families, including U.S. citizen children, from seeking important health and nutrition benefits that they are legally entitled to receive." *Id.* As INS explained, this "reluctance to access

19

benefits has an adverse impact not just on the potential recipients, but on public health and the general welfare." *Id.*

b.   **Second,** INS observed that non-cash benefits "are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family." *Id.* Thus, by focusing only on cash assistance for income maintenance, the Service could "identify those who are primarily dependent on the government for subsistence without inhibiting access to non-cash benefits that serve important public interests." *Id.*

c.   **Third,** INS acknowledged that "federal, state, and local benefits are increasingly being made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general public health and nutrition, promoting education, and assisting working-poor families in the process of becoming self-sufficient." *Id.* INS therefore concluded that "participation in such non-cash programs is not evidence of poverty or dependence." *Id.*

d.   **Fourth,** INS observed that in light of the "complex" rules governing eligibility for federal, state, and local public benefits, "INS Officers are not expected to know the substantive eligibility rules for different public benefit programs." *Id.* Limiting the types of programs considered for public charge purposes would therefore produce "simpler and more uniform" public charge determinations, "while simultaneously providing greater predictability to the public." *Id.*

65.     INS did not anticipate that adopting the NPRM's definition of "public charge" would "substantially change the number of aliens who will be found deportable or inadmissible as public charges" primarily because "under the stricter eligibility rules of the welfare reform laws, many legal aliens are no longer eligible to receive certain types of public benefits." *Id.*

66.     INS directed officers to "not initiate or pursue public charge deportation cases against aliens who have not received public cash benefits for income maintenance or who have not been institutionalized for long-term care." *Id.* at 26,869. INS further instructed officers to "not place any weight on the receipt of non-cash public benefits (other than institutionalization) or the receipt of cash benefits for purposes other than for income maintenance with respect to determinations of admissibility or eligibility for adjustment on public charge grounds." *Id.*

67.     INS then provided a non-exclusive list of non-cash benefit programs and stated in no uncertain terms that "past, current, or future receipt of these benefits should not be considered in determining whether an alien is or is likely to become a public charge." *Id.* at 28,693. That list includes the same benefit programs previously identified in the FAM as excluded from consideration for purposes of the public charge determination. *Compare id. with supra* ¶ 45.

68.     As for the Affidavit of Support, INS acknowledged that the Form I-864 "asks whether the sponsor or a member of the sponsor's household has received means-tested benefits within the past 3 years." 64 Fed. Reg. at 28,693. INS clarified, however, that "[t]he purpose of this question is not to determine whether the sponsor is or is likely to become a public charge, but to ensure that the adjudicating officer has access to all facts that may be relevant in determining whether the 125-percent annual income test is met." *Id.* INS therefore specified that "[a]ny cash benefits received by the sponsor cannot be counted toward meeting the 125-percent

income threshold," but that the "receipt of other means-tested benefits, such as Medicaid, is not disqualifying for sponsorship purposes." *Id.*

### III.   President Trump and His Administration's Beliefs About Immigrants.

69.     Throughout his campaign and time in office, President Trump has made clear his intent to limit the number of immigrants from Latin American, African, and Asian countries. Most notably, President Trump asked, "Why do we want all these people from 'shithole countries' coming here?,"[21]  a remark Senator Lindsey Graham described as "incredibly disappointing."[22] Similarly, Trump has described immigrants from those countries as "infesting" the United States.[23]

70.     President Trump's view on limiting immigration from "shithole countries" is in turn based on his discriminatory belief that immigrants from such countries are poorer and consequently drain taxpayer resources. During a meeting in the Oval Office, Trump complained that immigrants from Haiti "all have AIDS" and that once immigrants from Nigeria had seen the United States, they would never "go back to their huts."[24] At the same time, Trump "suggested that the United States should instead bring more people from countries such as Norway," while

---

[21]   Eli Watkins & Abby Phillip, *Trump Decries Immigrants from 'Shithole Countries' Coming to US*, CNN (Jan. 12, 2018), https://www.cnn.com/2018/01/11/politics/immigrants-shithole-countries-trump/index.html.

[22]   Emma Dumain, *A Day Later, Lindsey Graham Breaks Public Silence on Trump's 'Shithole' Remarks*, McClatchy (Jan. 12, 2018), https://www.mcclatchydc.com/news/politics-government/congress/article194434204.html.

[23]   Donald J. Trump (@realDonaldTrump), Twitter (June 19, 2018, 9:52 AM), https://twitter.com/realDonaldTrump/status/1009071403918864385.

[24]   Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html?_r=0.

he was "open" to immigrants from some Asian countries thought to be economically beneficial.[25]

71.     Trump has made no secret of his views that immigrants drain public resources. Just weeks before the filing of this Complaint, Trump promoted an article titled "Shock report: US paying more for illegal immigrant births than Trump's wall."[26] Trump has also stated:

e.      "ObamaCare gives free insurance to illegal immigrants."[27]

f.      "Your tax dollars well spent. Over 1.295M ObamaCare enrollees will also be illegal immigrants."[28]

g.      "It's a national embarrassment that an illegal immigrant can walk across the border and receive free health care."[29]

h.       "We will soon be at a point with our incompetent politicians where we will be treating illegal immigrants better than our veterans."[30]

---

[25]   Josh Dawsey, *Trump Derides Protections for Immigrants from "Shithole" Countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?noredirect=on&utm_term=.bd24836c5250.

[26]   Donald J. Trump (@realDonaldTrump), Twitter (Oct. 22, 2018, 1:52 PM), https://twitter.com/realDonaldTrump/status/1054430376557535232.

[27]   Donald J. Trump (@realDonaldTrump), Twitter (Feb. 28, 2012, 2:08 PM), https://twitter.com/realDonaldTrump/status/174571702091644928.

[28]   Donald J. Trump (@realDonaldTrump), Twitter (July 7, 2014, 3:54 PM), https://twitter.com/realDonaldTrump/status/486236729083719680.

[29]   Donald J. Trump (@realDonaldTrump), Twitter (July 18, 2015, 2:16 PM), https://twitter.com/realDonaldTrump/status/622469994220273664.

[30]   Donald J. Trump (@realDonaldTrump), Twitter (July 20, 2015, 10:25 AM), https://twitter.com/realDonaldTrump/status/623136748718137344.

i.      "How crazy - 7.5% of all births in U.S. are to illegal immigrants, over 300,000 babies per year. This must stop. Unaffordable and not right!"[31]

j.      "Notice that illegal immigrants will be given ObamaCare and free college tuition but nothing has been mentioned about our VETERANS #DemDebate."[32]

k.      "Do you believe that Hillary Clinton now wants Obamacare for illegal immigrants? She should spend more time taking care of our great Vets!"[33]

l.      "When illegal immigrant households receive far more in federal welfare benefits - than []native American households - there is something CLEARLY WRONG with the system!"[34]

m.      "According to the National Academy of Sciences, our current immigration system costs America's taxpayers many billions of dollars a year."[35]

n.      "We also believe that those seeking to immigrate into our country should be able to support themselves financially and should not be able to use

---

[31]   Donald J. Trump (@realDonaldTrump), Twitter (Aug. 21, 2015, 9:56 AM), https://twitter.com/realDonaldTrump/status/634725641972248576.

[32]   Donald J. Trump (@realDonaldTrump), Twitter (Oct. 13, 2015, 10:33 PM), https://twitter.com/realDonaldTrump/status/486236729083719680.

[33]   Donald J. Trump (@realDonaldTrump), Twitter (Mar. 18, 2016, 8:40 PM), https://twitter.com/realDonaldTrump/status/486236729083719680.

[34]   *Trump: I'll Fix Welfare System that Helps Illegal Immigrants More than Americans*, Fox News Insider (May 11, 2016), http://insider.foxnews.com/2016/05/11/trump-rips-welfare-system-gives-illegal-immigrants-more-americans.

[35]   Michelle Ye Hee Lee, *Trump's Claim that Immigrants Cost Taxpayers "Many Billions of Dollars a Year*," Wash. Post (Mar. 7, 2017), https://www.washingtonpost.com/news/fact-checker/wp/2017/03/07/trumps-claim-that-immigrants-cost-taxpayers-many-billions-of-dollars-a-year/?utm_term=.ede94af91a0f.

welfare for themselves or the household for a period of at least five years."[36]

o.    "The RAISE Act prevents new migrants and new immigrants from collecting welfare … They're not going to come in and just immediately go and collect welfare. That doesn't happen under the RAISE Act. They can't do that." [37]

p.    "Current immigration policy imposes as much as $300 billion annually in net fiscal costs on U.S. taxpayers."[38]

q.    "According to the Center for Immigration Studies, the $18 billion wall will pay for itself by curbing the importation of crime, drugs, and illegal immigrants who tend to go on the federal dole."[39]

r.    "[T]hey're not sending their finest. We're sending them the hell back."[40]

s.    "That's why Democrats want to give illegal aliens free welfare, free health care and free education." "Give them a driver's license, next thing you

---

[36]   Michelle Ye Hee Lee, *President Trump's Claim About Immigrants 'Immediately' Collecting 'Welfare,'* Wash. Post (Aug. 24, 2017), https://www.washingtonpost.com/news/fact-checker/wp/2017/08/04/president-trumps-claim-about-immigrants-immediately-collecting-welfare/?noredirect=on&utm_term=.f0522d2868b4 (quoting a July 5, 2017 speech in Youngstown, Ohio).

[37]   *Id.* (quoting an Aug. 2, 2017 press conference).

[38]   Miriam Valverde, *Do Immigrants Cost U.S. Taxpayers $300 Billion Annually?*, PolitiFact (Jan. 23, 2018), https://www.politifact.com/truth-o-meter/statements/2018/jan/23/donald-trump/does-immigration-policy-impose-300-billion-annuall/.

[39]   Donald J. Trump (@realDonaldTrump), Twitter (Mar. 13, 2018, 11:24 AM), https://twitter.com/realDonaldTrump/status/973580538358374402.

[40]   *Trump: 'We're Sending Them the Hell Back,'* NBC News (June 20, 2018), https://www.nbcnews.com/video/trump-we-re-sending-them-the-hell-back-1260491331685?v=raila&.

know, they'll want to buy them a car. Then they'll say the car's not good

enough—how about a Rolls Royce."[41]

t.      "So-called Birthright Citizenship, which costs our Country billions of

dollars and is very unfair to our citizens, will be ended one way or the

other."[42]

u.      "We're the only country in the world where a person comes in and has a

baby, and the baby is essentially a citizen of the United States ... with all

of those benefits."[43]

v.      "Hundreds of thousands of children born to illegal immigrants are made

automatic citizens of the United States every year, … [a]nd they're all

made instantly eligible for every privilege and benefit of American

citizenship. … They're full citizens. And it's costing us many, many

billions of dollars a year."[44]

72.    Similarly, one of President Trump's senior advisors on immigration policy,

Stephen Miller, has misleadingly claimed that America's current immigration system "cost[s]

taxpayers enormously because roughly half of immigrant head of households in the United States

---

[41]   Jonathan Allen, *Trump: 'Anybody Who Votes for A Democrat Now Is Crazy,'* NBC News (Oct. 19, 2018), https://www.nbcnews.com/politics/politics-news/trump-anybody-who-votes-democrat-now-crazy-n922361.

[42]   Donald J. Trump (@realDonaldTrump), Twitter (Oct. 31, 2018, 9:25 AM), https://twitter.com/realDonaldTrump/status/1057624553478897665.

[43]   Jonathan Swan & Stef W. Kight, *Exclusive: Trump Targeting Birthright Citizenship with Executive Order*, Axios (Oct. 30, 2018), https://www.axios.com/trump-birthright-citizenship-executive-order-0cf4285a-16c6-48f2-a933-bd71fd72ea82.html (omission in original).

[44]   Greg Sargent, *Trump Floats a New Absurdity to Support His Latest Hate Narrative*, Wash. Post (Nov. 2, 2018), https://www.washingtonpost.com/blogs/plum-line/wp/2018/11/02/trump-floats-a-new-absurdity-to-support-his-latest-hate-narrative/?utm_term=.1fbd08d12b69.

receive some type of welfare benefit," and that "a recent study said that as much as $300 billion

a year may be lost as a result of our current immigration system in terms of folks drawing more

public benefits than they're paying in."[45] When Miller discovered that an agency had drafted a

report describing the benefits of refugees to the economy, he "swiftly intervened," and the report

was "shelved in favor of a three-page list of all the federal assistance programs that refugees

used."[46] Within the Trump Administration, Miller has forcefully advocated for expanding the

definition of public charge, even directing federal agencies to "prioritize" those changes over

"other efforts."[47]

73.    Former Attorney General Jeff Sessions—the Attorney General during many of the

Trump Administration's public charge efforts, including the FAM change—had also voiced

concerns over immigrants using public benefits, asserting that "[n]o great and prosperous nation

can have both a generous welfare system and open borders. Such a policy is both radical and

dangerous."[48] As a senator, Sessions "obsessed over immigrants using the safety net," and

argued that "[e]ncouraging self-sufficiency must be a bedrock for our immigration policy."[49]

---

[45]   *Press Briefing by Press Secretary Sarah Sanders and Senior Policy Advisor Stephen Miller*, The White House (Aug. 2, 2017), https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sarah-sanders-senior-policy-advisor-stephen-miller-080217/.

[46]   Shear & Davis, *Stoking Fears*.

[47]   Tal Kopan, *Sources: Stephen Miller Pushing Policy to Make It Harder for Immigrants Who Received Benefits to Earn Citizenship*, CNN (Aug. 7, 2018), https://www.cnn.com/2018/08/07/politics/stephen-miller-immigrants-penalize-benefits/index.html.

[48]   *Attorney General Sessions Delivers Remarks to the Largest Class of Immigration Judges in History for the Executive Office for Immigration Review (EOIR)*, U.S. Dep't of Justice (Sept. 10, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-largest-class-immigration-judges-history.

[49]   Arthur Delaney, *Trump Considering Crackdown On Welfare for Legal Immigrants*, HuffPost (Feb. 2, 2017), https://www.huffingtonpost.com/entry/trump-immigration-welfare_us_58938368e4b06f344e409174.

74.     Upon information and belief, these incorrect or misleading statements reveal the Trump Administration's animus toward immigrants, particularly those from Latin American, Asian, and African countries, and those who accept public benefits. Indeed, the Ninth Circuit recently concluded that the plaintiffs challenging the Trump Administration's decision to rescind the Deferred Action for Childhood Arrivals Program had sufficiently "allege[d] a history of animus toward persons of Hispanic descent evidenced by both pre-presidential and post-presidential statements by President Trump." *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, No. 18-15068, 2018 WL 5833232, at *30 (9th Cir. Nov. 8, 2018). Judge Owens, concurring, even concluded that the "litany of statements by the President and high-ranking members of his Administration that plausibly indicate animus toward undocumented immigrants from Central America" meant that the plaintiffs were likely to succeed on their claims on the merits. *Id.* at *34.[50]

75.     That same hostility animates much of the Trump Administration's individual immigration policies, including its changes to the definition of public charge contained in the Foreign Affairs Manual.

**IV.     The Trump Administration's Crusade to Change the Definition of "Public Charge."**

76.     In keeping with these views, President Trump and his administration, including the other Defendants, have strived to vastly expand the longstanding definition of "public charge" as set forth in the FAM, the INS 1999 NPRM, and the INS Field Guidance, in order to

---

[50]   Moreover, "[o]ne of the individuals who helped craft Trump's expanded public-charge regulation, policy analyst Ian Smith, was forced to resign from the Department of Homeland Security because of his ties to white nationalists." Chris Richardson, *Trump Has Found a New Way to Make Immigrant Families Suffer*, Nation (Oct. 26, 2018), https://www.thenation.com/article/trump-public-charge-abolish/.

make it harder for immigrants who use any of a wide swath of public benefits to obtain legal status.

77.     Shortly after President Trump's inauguration in January 2017, a draft of an Executive Order entitled "Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote Accountability and Responsibility" was obtained by the media.[51] The Executive Order instructed DHS to "rescind any field guidance" and "propose for notice and comment a rule that provides standards for determining which aliens are inadmissible or deportable on public charge grounds"—*i.e.*, if a non-citizen is "likely to receive" or does receive non-cash public benefits.[52] The Order also directed the State Department "to amend the Foreign Affairs Manual to ensure that its public-charge provisions are consistent with the goals of this Order."[53] The draft Executive Order was never released or signed by President Trump.

78.     Even though the draft Executive Order was never released, it had a palpable chilling effect on immigrant families' use of public benefits and health care services. Shortly after news of the leaked Executive Order was reported, many health care clinics, food pantries, and other service providers reported missed appointments by patients and a drop in participation in their programs.[54] Many immigrants were unsure whether the proposed changes to the public charge test were already being implemented, or anticipated that they would be, and therefore

---

[51]    *See* Memorandum from Andrew Bremberg Regarding Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote Accountability and Responsibility (Jan. 23, 2017), https://www.nafsa.org/uploadedFiles/NAFSA_Dojo/Professional_Resources/Browse_by_Interest/International_Students_and_Scholars/DraftEOtaxprograms.pdf.

[52]    *Id.* at 3.

[53]    *Id.* at 4.

[54]    *See, e.g.*, J.B. Wogan, *Trump's Leaked Immigration Rule Already Having Impacts*, Governing (Mar. 2, 2018) [hereinafter Wogan, *Trump's Leaked Immigration Rule*], http://www.governing.com/topics/public-justice-safety/gov-leaked-immigration-trump-benefits.html.

decided against using benefits that might affect their ability to adjust their status and remain or reunite with their family members.

79.     In December 2017, DHS listed in the Unified Agenda of Federal Regulatory and Deregulatory Actions—which identifies an agency's regulatory priorities for the upcoming year—notice of its intent to publish a Notice for Public Rulemaking ("NPRM") regarding the public charge ground of inadmissibility. The Agenda specifically indicated that DHS planned to publish new regulations on public charge in July 2018. It did not describe any potential changes by State to the definition of "public charge" contained in the Foreign Affairs Manual.

80.     In February 2018, Reuters reported on,[55] and Vox News published, the text of a draft of a new public charge NPRM. Under that draft, immigrants would be considered likely to become a public charge if they depend not only on "any government assistance in the form of cash, checks, or other forms of money transfers, or instrument," but also on  "non-cash government assistance in the form of aid, service, or other relief."[56] In other words, the draft public charge NPRM proposed to expand the types of public assistance programs that could be considered in the public charge test, including non-cash benefits like SNAP, WIC, and Medicaid. The rule described in the draft public charge NPRM therefore represented a significant departure from the INS 1999 NPRM and Field Guidance.

---

[55]   Yeganeh Torbati, *Exclusive: Trump Administration May Target Immigrants Who Use Food Aid, Other Benefits*, Reuters (Feb. 8, 2018), https://www.reuters.com/article/us-usa-immigration-services-exclusive/exclusive-trump-administration-may-target-immigrants-who-use-food-aid-other-benefits-idUSKBN1FS2ZK.
[56]   *Staff-Level Draft: Inadmissibility on Public Charge Grounds*, U.S. Dep't of Homeland Security 233 (Feb. 2018), https://cdn.vox-cdn.com/uploads/chorus_asset/file/10188201/DRAFT_NPRM_public_charge.0.pdf.

81.     In March 2018, a more detailed version of the draft public charge NPRM was published by the media.[57] This version mirrored the February draft in many ways, but also included an almost 200-page preamble that outlined DHS's purported rationale for proposing changes to the public charge test. That preamble specifically noted that the changes would limit the number of immigrants who could obtain lawful resident status in the United States.[58] Experts estimated at the time that the rule change would have a sweeping impact, affecting up to 20 million children in immigrant families.[59]

82.     The proposed public charge rule was sent to the Office of Information and Regulatory Affairs ("OIRA") within the Office of Management and Budget ("OMB") in March 2018. That proposal was sent back to the agency in June 2018.

83.     Just four months later, on October 10, 2018, the DHS published a notice of proposed rulemaking in the Federal Register titled *Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114 (Oct. 10, 2018) (the "DHS Proposed Rule").

84.     The DHS Proposed Rule, which will be administered by the U.S. Citizenship and Immigration Service ("USCIS"), applies to individuals who are seeking admission to the United States, an extension of their approved period of stay, a change of their visa status, or an adjustment of status to lawful permanent resident. *Id.* at 51,118.

---

[57]     *Read the Trump Administration's Draft Proposal Penalizing Immigrants Who Accept Almost Any Public Benefit*, Wash. Post (Mar. 2018), http://apps.washingtonpost.com/g/documents/world/read-the-trump-administrations-draft-proposal-penalizing-immigrants-who-accept-almost-any-public-benefit/2841/.

[58]     *Id.* at 13-14 [tbl. 1] ("DHS anticipates a likely increase in the number of denials for adjustment of status applicants based on public charge determinations[.]").

[59]     *See, e.g.*, Samantha Artiga & Anthony Damico, *Nearly 20 Million Children Live in Immigrant Families that Could Be Affected by Evolving Immigrant Families*, Kaiser Family Found. (Apr. 18, 2018), https://www.kff.org/disparities-policy/issue-brief/nearly-20-million-children-live-in-immigrant-families-that-could-be-affected-by-evolving-immigration-policies/.

85.     In large measure, the DHS Proposed Rule does three things: it (1) proposes a new definition of "public charge" under the INA; (2) proposes a new definition for "the types of public benefits that are considered in public charge inadmissibility determinations"; and (3) rescinds the INS's 1999 NPRM. *Id.* at 51,114.

86.     Under the DHS Proposed Rule, "public charge" is redefined as "an alien who receives one or more public benefits." *Id.* at 51,157. This constitutes a radical departure from the INS's 1999 NPRM and Field Guidance—one that would greatly expand the definition of "public charge" beyond the longstanding meaning of that term as one who is likely to become "primarily dependent" on public benefits. *See id.* at 51,163.

87.     The DHS Proposed Rule also seeks to define "public benefit." Consistent with the 1999 NPRM and Field Guidance, the DHS Proposed Rule defines "public benefit" to include direct cash benefits, whether provided by federal, state, local, or tribal governments. *Id.* at 51,158-59. But the DHS Proposed Rule also sharply departs from that past understanding by proposing to "incorporate consideration of a limited list of non-cash benefits in the public charge inadmissibility determination context." *Id.* at 51,159-60. This "limited list" includes the following:

     a.     Nonemergency Medicaid;

     b.     Premium and Cost Sharing Subsidies for Medicare Part D;

     c.     Supplemental Nutrition Assistance Program (SNAP);

     d.     Benefits provided for institutionalization for long-term care at government expense; and

     e.     Housing programs, including Section 8 Housing Assistance under the Housing Choice Voucher Program, Section 8 Project-Based Rental

Assistance (including Moderate Rehabilitation), and Subsidized Public

Housing. *Id.*

88.     Under the DHS Proposed Rule, non-cash benefits are relevant to the "public

charge" assessment in the following situations: (1) where the benefits can be monetized, and

therefore assigned a cash value, and the use of such benefits exceeds 15 percent of the Federal

Poverty Guidelines ("FPG");[60] (2) where the benefits are not of a kind that can be monetized,

and those benefits are used "for more than 12 months in the aggregate within a 36-month

period"; (3) where an individual's use of monetizable non-cash benefits stops short of the 15

percent FPG threshold, but they have also used non-monetizable non-cash benefits for at least 9

months, in the aggregate, within a 36-month period. *Id.* at 51,158.

89.     As in the past, DHS will also consider an "Affidavit of Support," which it

reiterated is "a contract between the alien's sponsor and the U.S. Government that imposes on

the sponsor a legally enforceable obligation to support the alien." *Id.* at 51,220. The submission

of an Affidavit of Support is required in certain cases, and for those cases, failure to submit an

affidavit is fatal to the non-citizen's application. *Id.* at 51,198. But under the proposed rule, the

presence of a sufficient affidavit "does not eliminate the need to consider all of the mandatory

factors in the totality of the circumstances." *Id.* at 51,198.

90.     Although the DHS Proposed Rule speculates that "it is likely that [the State

Department] will amend its guidance" (*id.* at 51,135), the State Department has not announced

any plans to amend the FAM. Unless and until it does, individuals who must seek approval from

---

[60]   Based on 15 percent of the FPG "for a household of one within a period of 12 consecutive
months based on the per-month FPG for the months during which the benefits are received." *Id.*
at 51158.

both USCIS and a State Department consular affairs office abroad, will need to satisfy differing

standards. This is potentially a massive number of people:

> Nearly sixty percent of the 2.7 million immediate relatives, family-sponsored, employment-based, and diversity visa-based immigrants who obtained lawful permanent resident status in the United States between fiscal years 2014 and 2016 consular processed immigrant visa applications overseas prior to being admitted to the United States as lawful permanent residents at a port-of-entry. Fifty-one percent of immediate relatives, ninety-two percent of family-sponsored immigrants, and ninety-eight percent of diversity visa immigrants obtained an immigrant visa at a consular post overseas before securing admission as a lawful permanent resident at a port-of-entry between fiscal years 2014 and 2016.

*Id.* at 51,134.

91.     The DHS Proposed Rule is currently open for public comment until December 10,

2018. *Id.* at 51,114.

**V.      The Foreign Affairs Manual Change.**

92.     Despite the ongoing rulemaking process at DHS, the State Department on January

3, 2018 published an amendment to the FAM (the "FAM change") that radically expanded the

meaning of "public charge" to be applied by consular officers in multiple ways. While the DHS

Proposed Rule is somewhat narrower than the earlier leaked drafts, the FAM change remains

broad—in some respects, going even farther than the DHS Proposed Rule, without any of the

required rulemaking procedures.

93.     Specifically, for visa applicants and members of their households, the FAM now

directs consular officers to look for any past or current use of any benefit programs, including

non-cash benefit programs, as evidence that the applicant will likely become a "public charge" in

the future. For affiants and members of their household, the FAM similarly now instructs

consular officers to consider past, current, or anticipated future receipt of means-tested public

benefits—including several non-cash benefit programs—as disqualifying, rendering an otherwise

validly-filed affidavit of support irrelevant. In addition, Defendants changed the weight given to

a properly filed Affidavit of Support, and have imposed new requirements on joint sponsors.

94.     None of these alterations were made with proper notice, explanation, or

opportunity for comment to the public.[61] *Cf. State of N.J., Dep't of Envtl. Prot. v. U.S. Envtl.*

*Prot. Agency*, 626 F.2d 1038, 1045 (D.C. Cir. 1980) ("[N]otice-and-comment rule-making is a

primary method of assuring that an agency's decisions will be informed and responsive.").

**A.     The change drastically expands the scope of the FAM's "public charge" provision.**

95.     A redline comparison of the FAM's public charge provisions before and after the

January 3, 2018 amendments is attached as an exhibit to this Complaint. *See* Ex. 1. Specific

changes are detailed below.

### *1.     Considering the receipt of non-cash benefits by visa applicants.*

96.     Under the FAM change, the State Department now requires consular offices to

consider a visa applicant's receipt of non-cash benefits as part of the totality of the circumstances

test.

97.     The FAM previously stated: "There are many forms of U.S. Government

assistance that an alien may have accepted in the past, or that you may reasonably believe, an

alien might receive after admission to the United States that are of a non-cash and/or

supplementary nature and would not create an inadmissibility under INA 212(a)(4)." Ex. 1 at 3-

4. The provision went on: "Certain programs are funded with public funds for the general good,

such as public education and child vaccination programs, etc., and are not considered to be

benefits for the purposes of INA 212(a)(4)." *Id.*

---

[61]   *See* Letter to David Newman.

98.     That same provision now reads: "There are many forms of public assistance that an applicant may have accepted in the past, or that you may reasonably believe, an alien might receive after admission to the United States that are of a non-cash and/or supplementary nature and should not be considered to be benefits when examining the applicant under INA 212(a)(4), *and may only be considered as part of the totality of the applicant's circumstances in determining whether an applicant is likely to become a public charge.*" *Id.* (emphasis added). In other words, while the ultimate inquiry continues to focus on whether an applicant is likely to use cash benefits, the FAM now directs consular officers to consider, as part of that inquiry, their current or past use of *non-cash* benefits.

99.     The next provision previously read: "Although the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 prohibit aliens from receiving many kinds of public benefits, it specifically exempts from this prohibition several of the public benefits indicated below. Neither the past nor possible future receipt of such non cash or supplemental assistance may be considered in determining whether an alien is likely to become a public charge." *Id.* at 4.

100.    In the revised provision, the State Department struck the second sentence. *Id.*

### 2.     *Considering the receipt of non-cash benefits by members of the visa applicant's household.*

101.    Under the FAM change, the State Department also now requires consular officers to consider the receipt of non-cash benefits by family members of the visa applicant.

102.    The FAM previously stated: "Past or current receipt of cash benefits for income maintenance by a family member of the visa applicant may be factored into the applicant's case only when such benefits also constitute(d) the primary means of subsistence of the applicant. Past or current receipt of other types of benefits … must not be considered." *Id.* at 23.

103.    The revised provision now states: "Past or current receipt of public assistance *of any type* by the visa applicant *or a family member in the visa applicant's household* is relevant to determining whether the applicant is likely to become a public charge in the future." *Id.* at 8 (emphasis added).

104.    The revised FAM also added a provision to underscore the importance of the use of public benefits by an applicant's dependents to the public charge determination, stating that "[a] dependent family member's receipt of public benefits is a heavily negative factor in the totality of the circumstances." *Id.* at 9.

### 3.    Changes to consideration of the Affidavit of Support.

105.    Defendants also made several changes to the way consular officers are required to weigh and consider Affidavits of Support. The FAM now instructs that a properly filed Affidavit of Support is only considered a "positive," as opposed to a determinative, factor in the public charge analysis. *See* 9 FAM § 302.8-2(B). State Department officials have "confirmed that the I-864 is now just one part of the holistic determination, which includes family ties, work history, health issues and other factors."[62]

106.    Moreover, upon information and belief, the State Department now considers the past or current receipt of non-cash, means-tested benefits by sponsors or their family members to be disqualifying.

---

[62]   Cyrus Mehta, *State Department's Change to Public Charge Guidance in Foreign Affairs Manual Will Result in Many More Visa Refusals*, The Insightful Immigration Blog (May 29, 2018) [hereinafter Mehta, *State Department's Change*], http://blog.cyrusmehta.com/2018/05/state-departments-change-to-public-charge-guidance-in-foreign-affiars-manual-will-result-in-many-more-visa-refusals.html; *see also* Letter to David Newman at 1.

107.     In contrast, for decades the FAM made clear that "[t]here is no provision in the law to indicate that the receipt of means-tested benefits by the sponsor would, in itself, result in a finding of inadmissibility for the applicant under INA 212(a)(4)." *See* Ex. 1 at 23. The FAM simply stated that such use would be "an important factor in considering whether the applicant might have to become a public charge." *Id.* The FAM thus previously instructed that "[i]f the sponsor or any member of his or her household has received public means-tested benefits within the past three years, you must review fully the sponsor's current ability to provide the requisite level of support, taking into consideration the kind of assistance provided and the dates received." *Id.* at 23-24.

108.     However, the revised provisions related to the Affidavit of Support no longer acknowledges that "[t]here is no provision in the law to indicate that the receipt of means-tested benefits by the sponsor would, in itself, result" in a public charge finding for the applicant. *Id.* at 23. On information and belief, that change in language reflects the State Department's changed treatment of Affidavits of Support.

*   *   *

109.     Together, these changes reflect a stark shift in the State Department's approach to the public charge ground of inadmissibility—a shift which has had an immediate and binding effect on the immigrant community.

110.     Unlike the DHS Proposed Rule, the FAM change has "already gone into effect, and practitioners are starting to see more visa denials based on public charge inadmissibility at the consular interview."[63] Practitioners have seen results including a "[f]inding of public charge

---

[63]    Ariel Brown, *Consular Processing Practice Alert on Public Charge and Affidavit of Support Issues*, Immigrant Legal Resource Ctr. 1 (July 2018) [hereinafter Brown, *Consular Processing*

inadmissibility notwithstanding a qualifying Affidavit of Support"; a "[f]inding of public charge inadmissibility notwithstanding a qualifying Joint Sponsor Affidavit of Support"; and/or the "[r]evocation of a previously approved Provisional Unlawful Presence Waiver."[64]

111.    Upon information and belief, consular officers have relied on the FAM's public charge amendments to deny visa applications because of the past or current receipt of non-cash benefits by visa applicants and members of their households.

112.    Upon information and belief, consular officers have relied on these amendments to the public charge provisions of the FAM to deny visa applications because of the past or current receipt of non-cash, means-tested benefits by U.S. citizens or lawful permanent residents, and members of their households, who file an Affidavit of Support.

113.    Upon information and belief, the rate of visa denials based on the public charge ground of inadmissibility is significantly higher this year, after the FAM amendments took effect, than in years prior.

114.    According to multiple sources, practitioners have specifically observed "an increase in denials on public charge grounds … out of Ciudad Juarez (CDJ), which processes all of the immigrant visas in Mexico"[65]—a major source of Hispanic immigration. Practitioners have also reported increased denials for disabled immigrants.

---

*Practice Alert*],
https://www.ilrc.org/sites/default/files/resources/consul_process_pract_alert_pub_charge_affid-20180702.pdf.

[64]    *Id.*; *see also* Mehta, *State Department's Change* ("Those who already got approved I-601A provisional waivers … are now finding themselves being found inadmissible for likely becoming a public charge under INA 212(a)(4).").

[65]    Lindsay Gray, *Keeping Families Apart: Trump's Update to the Public Charge Provision*, Whitlock & Gray Immigration Law Blog (May 24, 2018) [hereinafter Gray, *Keeping Families Apart*], http://www.whitlockgray.com/2018/05/24/public-charge/; Arelis R. Hernández, *A Mexican Businesswoman Went to Visit Her Parents in Maryland. Border Agents Confiscated*

**B.      Despite the FAM change's scope, the State Department provided virtually no notice or explanation, let alone opportunity for comment.**

115.    The State Department announced the public charge changes in a memorandum posted on the agency website on January 4, 2018.

116.    The State Department removed the memorandum within weeks of first posting it.

117.    The State Department has never re-posted the memorandum on its website, nor issued any other press release or public statement about the changes to the FAM's provisions regarding the public charge ground of inadmissibility.

118.    In the memorandum, the State Department provided nothing more than a bare description of only two of the changes it made to the FAM's public charge provisions: (1) that a consular officer "may consider 'past or current receipt of public assistance of any type' in determining whether an applicant is likely to become a public charge," and (2) that an Affidavit of Support "by itself may not satisfy the INA 212(a)(4) public charge requirement."[66]

119.    But what the memorandum left out is striking:

a.      The memorandum did not address the fact that the revised FAM now requires consular officers to consider the use of non-cash benefits by the visa applicant, his or her family members, and his or her sponsor's family.

---

*Her Visa*, Wash. Post (Aug 14, 2018), https://www.washingtonpost.com/local/social-issues/a-mexican-business-executive-went-to-visit-her-parents-in-md-border-agents-confiscated-her-visa/2018/08/14/321c4136-9cc7-11e8-843b-36e177f3081c_story.html ("The American Immigration Lawyers Association says it has seen a spike since April in visa application denials citing public-charge grounds at the U.S. Consulate in Juarez, Mexico.").

[66]   *See* Memorandum from U.S. Dep't of State Regarding Update to 9 FAM 302.8 Public Charge-INA 212(A)(4) (Jan. 4, 2018), https://www.lexisnexis.com/legalnewsroom/immigration/b/immigration-law-blog/posts/39-public-charge-39-update-to-9-fam-302-8-jan-4-2018.

b.   The memorandum omits the fact that the revised FAM provisions will apply retroactively, even though the revisions specifically require consideration of *past* use of non-cash benefits.

c.   The memorandum failed to acknowledge that the changes to the FAM's public charge provisions amounted to a reversal of the decades-old understanding of the public charge ground of inadmissibility, codified in prior versions of the FAM and by INS in the 1999 NPRM and Field Guidance.

d.   The memorandum did not acknowledge that the State Department's approach to public charge diverged from the way DHS was continuing in January 2018 to approach the public charge determination for adjustment-of-status applications (or that applicants would have to navigate between differing agency standards).

e.   The memorandum failed to disclose that DHS would be proposing for public comment similar changes to the public charge determination, in recognition of the fact that the changes marked such a substantial shift in settled law that they could not legally be effectuated in sub-regulatory guidance.

f.   And the memorandum failed to provide *any* explanation as to why the State Department was changing its policy and approach to the public charge ground of inadmissibility, nor reasons for the new approach.

120.    In sum, the State Department provided no notice, acknowledgment, or

explanation of the sweeping changes it was making to the public charge determination for visa

applications.

## VI.    The Foreign Affairs Manual Change Deters Immigrants, Their Family Members, And Their Sponsors From Accepting Public Benefits.

121.    Like all of the Trump Administration's efforts to change the longstanding

meaning of public charge, the FAM change deters immigrants, their family members, and their

sponsors from accepting public benefits—benefits for which they are legally eligible and which

are designed to promote public health and economic self-sufficiency. "Many immigrants …

believe that receiving public benefits will lead to a 'public charge' label that could affect their

ability to gain lawful permanent residency status, become citizens, or sponsor new

immigrants."[67] The FAM change is no less of a deterrent than the DHS rule, which "almost

certainly would convince large numbers of immigrants here lawfully and their children, many of

them U.S. citizens, to forgo benefits or tax credits for which they're eligible."[68]

122.    The Administration has already admitted as much: in the DHS Proposed Rule,

DHS recognized that barring immigrants from the country for taking public benefits would lead

to "the disenrollment or foregone enrollment of individuals in public benefits programs." 83 Fed.

Reg. at 51,260. As DHS explained, "[r]esearch shows that when eligibility rules change for

public benefits programs there is evidence of a 'chilling effect' that discourages immigrants from

---

[67]    Kinsey Alden Dinan, *Federal Policies Restrict Immigrant Children's Access to Key Public Benefits*, Nat'l Ctr. for Children in Poverty 7 (Oct. 2005), http://www.ailadownloads.org/advo/CenterForChildrenInPoverty-FederalPoliciesRestricting.pdf.

[68]    Robert Greenstein, *Trump Rule Would Threaten Low-Wage Legal Immigrants in the U.S. if Their Families Receive Any of Wide Array of Benefits, Including Earned Income Tax Credit*, Ctr. on Budget & Pol'y Priorities (May 1, 2018) [hereinafter Greenstein, *Trump Rule*], https://www.cbpp.org/research/poverty-and-inequality/trump-rule-would-threaten-low-wage-legal-immigrants-in-the-us-if.

using public benefits programs for which they are still eligible." *Id.* at 51,266. And DHS

recognized that "there may also be additional reductions in transfer payments from states to

individuals who may choose to disenroll from or forego enrollment in a public benefits

program"—or from local governments, as is the case here. *Id.* at 51,268.

123.    In reaching that conclusion, DHS relied on studies conducted after Congress

enacted the Personal Responsibility and Work Opportunity Act in 1996 ("PRWORA"). *Id.* at

51,266. While the Act principally rendered many legal immigrants ineligible for certain benefits,

the Act also deterred "many immigrants *entitled* to public benefits and services from using them

due to confusion about eligibility criteria and fears that users would be unable to sponsor family

members in the future."[69] As a result, "benefits-use rates fell sharply even among groups such as

… U.S.-citizen children whose eligibility was unchanged."[70] A U.S. Department of Agriculture

study found that the number of children living with legal immigrant parents claiming food

stamps fell by 37 percent, versus 15 percent for children living with native-born parents.[71]

Similarly, an Urban Institute study found that "the steeper declines in noncitizens' than citizens'

---

[69]    Jeanne Batalova et al., *Chilling Effects: The Expected Public Charge Rule and Its Impact on Legal Immigrant Families' Public Benefits Use*, Migration Pol'y Inst. 14 (June 2018) [hereinafter Batalova et al., *Chilling Effects*] (emphasis added), https://www.migrationpolicy.org/research/chilling-effects-expected-public-charge-rule-impact-legal-immigrant-families; *see also* Sharon Parrott et al., *Trump "Public Charge" Rule Would Prove Particularly Harsh for Pregnant Women and Children*, Ctr. on Budget & Pol'y Priorities 2 (May 1, 2018) [hereinafter Parrott et al., *Trump "Public Charge" Rule*], https://www.cbpp.org/sites/default/files/atoms/files/5-1-18pov2.pdf  ("In the late 1990s, widespread confusion and fear about how public charge rules could impact families' ability to adjust their status among immigrants with children eligible for and in need of federal benefits such as SNAP and Medicaid resulted in many being deterred from applying for benefits.").

[70]    Batalova et al., *Chilling Effects*, at 2.

[71]    Office of Analysis, Nutrition, and Educ., *Who Is Leaving the Food Stamp Program? An Analysis of Caseload Changes from 1994 to 1997*, U.S. Dep't of Agric. 3 (Mar. 1999), https://fns-prod.azureedge.net/sites/default/files/cdr.pdf.

use of welfare, food stamps, and Medicaid owe more to the 'chilling effect' of welfare reform."[72] These studies demonstrate that, unsurprisingly, efforts to impose consequences on immigrants who seek to use public benefits deter them from doing so.

124.    These studies also corroborate the findings advanced by INS in its 1999 NPRM and Field Guidance regarding public charge. As explained above, INS concluded that immigrants choose not to apply for public benefits when they "fear the negative immigration consequences of potentially being deemed a 'public charge.'" 64 Fed. Reg. at 28,676; *see supra* ¶¶ 50-68.

125.    Based on these studies and others, DHS concluded that its proposed public charge rule could deter hundreds of thousands of individuals, including U.S. citizens, from taking federal public benefits. 83 Fed. Reg. at 51,268. Other studies have concluded that the effect is likely to be far higher, and that the DHS Proposed Rule could result in "a decline of between 20 percent and 60 percent" in immigrants using federal benefits.[73] While the rate of decline may be less steep, the FAM change undeniably produces a similar deterrent effect and, consequently, a similar reduction in immigrants' willingness to take public benefits.[74]

126.    The chilling effects of the Trump Administration's public charge policies have already been observed nationwide—and the FAM change is, to date, the only change to public

---

[72]   Michael E. Fix & Jeffrey S. Passel, *Trends In Noncitizens' and Citizens' Use of Public Benefits Following Welfare Reform, 1994-97*, Urban Inst. 4 (Mar. 1, 1999), https://www.urban.org/sites/default/files/publication/69781/408086-Trends-in-Noncitizens-and-Citizens-Use-of-Public-Benefits-Following-Welfare-Reform.pdf.

[73]   Batalova et al., *Chilling Effects*, at 4.

[74]   Courts, too, have recognized that fear of immigration consequences deters immigrants from accessing necessary public benefits and services. *See, e.g.*, *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 297-300, 341 (E.D. Pa. 2018) (accepting testimony that "immigrants would be less likely to avail themselves of City services, such as substance abuse and treatment services, if they feared that their immigration status would be revealed to ICE"); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 862 (N.D. Ill. 2018) (recognizing Chicago's "longstanding City policy of ensuring access to essential city services regardless of a resident's citizenship status").

charge to take effect. Service providers report that "[f]amilies are already choosing to opt out of

benefits for their children," including SNAP, WIC, Medicaid, and other forms of public

assistance.[75] "Statistics on participation in state and local efforts show fewer people are using an

array of food programs, including [WIC] as well as [SNAP], formerly known as food stamps[,]

and food banks."[76] One analyst noted "stories of women returning breast pumps to WIC … and

disenrolling from Medicaid for cancer treatments."[77] And the Center for Law and Social Policy

found that "[e]arly childhood education programs reported drops in attendance and applications

as well as reduced participation from immigrant parents in classrooms and at events," alongside

"an uptick in missed appointments at health care clinics."[78]

      127.    Providers are observing chilling effects in Baltimore specifically, where

immigrant patients "are not willing to risk having their families stay together for food stamps."[79]

---

[75]  Victoria Pelham, *Generation of Sicker Kids Feared Under Immigration Proposal*, Bloomberg Law (Aug. 30, 2018), https://news.bloomberglaw.com/health-law-and-business/generation-of-sicker-kids-feared-under-immigration-proposal/.

[76]  Emily Baumgaertner, *Spooked by Trump Proposals, Immigrants Abandon Public Nutrition Services*, N.Y. Times (Mar. 6, 2018) [hereinafter Baumgaertner, *Spooked by Trump Proposals*], https://www.nytimes.com/2018/03/06/us/politics/trump-immigrants-public-nutrition-services.html; *see also* Helena Bottemiller Evich, *Immigrant Families Appear to Be Dropping Out of Food Stamps*, Politico (Nov. 14, 2018), https://www.politico.com/story/2018/11/14/immigrant-families-dropping-out-food-stamps-966256 ("Immigrant households legally eligible for food-stamp benefits stopped participating in the program at a higher-than-normal rate in the first half of this year, a preliminary study released this week indicates.").

[77]  Natasha Lennard, *Trump's Plan to Deny Green Cards to People on Medicaid or Food Stamps Is a Full-Blown Attack on the Immigrant Poor*, Intercept (Sept. 26, 2018), https://theintercept.com/2018/09/26/public-charge-immigration-green-card/.

[78]  Wogan, *Trump's Leaked Immigration Rule*.

[79]  Kathleen Page, *Cutting Off Immigrants from Public Benefits Means American Children Will Pay the Price*, Baltimore Sun (Sept. 25, 2018), http://www.baltimoresun.com/news/opinion/oped/bs-ed-op-0926-public-charge-20180924-story.html.

One Maryland health clinic operator reported "seeing three to four people a week who are not applying for WIC and are canceling their appointments to re-enroll in Medicaid."[80] Because Baltimore has an especially large immigrant population, it is no surprise that the deterrent effect of the FAM change would hit Baltimore especially hard.

128.    The impact of the Administration's public charge efforts, including the FAM change, is "broadly felt across the two largest racial/ethnic groups among immigrants in the United States," Hispanic and Asian American and Pacific Islander immigrants, and in states, like Maryland, with "large immigrant populations and … generous benefits policies."[81] By comparison, analysts estimate that the DHS Proposed Rule —and, by extension, the FAM change—would "have disproportionate effects based on national origin and ethnicity, blocking 71% of applicants from Mexico and Central America, 69% from Africa, and 52% from Asia— but only 36% from Europe, Canada, and Oceania."[82] In other words, the FAM change, like other changes to public charge rules, makes it "more likely that the U.S. government would deny admission of immigrants from the developing world, including Latin America and Asia."[83]

---

[80]   Christina Jewett et al., *Under a Trump Proposal, Lawful Immigrants Might Shun Medical Care*, Nat'l Pub. Radio (May 10, 2018) [hereinafter Jewett et al., *Under a Trump Proposal*], https://www.npr.org/sections/health-shots/2018/05/10/609758169/under-a-trump-proposal-lawful-immigrants-might-shun-medical-care.

[81]   *Id.* at 5; *see also id.* at 29 (listing Maryland among the states with the highest immigrant populations).

[82]   *The Public Charge Rule, Explained*, Boundless (Sept. 23, 2018), https://www.boundless.com/blog/public-charge-rule-explained/; *see also* Randy Capps et al., *Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration*, Migration Pol'y Inst. 9 (Nov. 2018), https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration (explaining that the DHS Proposed Rule would "likely place individuals from Mexico and Central America at a higher risk of denial," over twice as high as immigrants from Europe, Canada, Australia, and New Zealand).

[83]   Kevin R. Johnson, *Immigration and Civil Rights in the Trump Administration: Law and Policy Making by Executive Order*, 57 Santa Clara L. Rev. 611, 657 (2017).

129.    Immigration practitioners have therefore been obligated to advise their clients of the potential immigration consequences of accepting public benefits.[84] Because of that advice and other public reporting regarding the FAM change, affected communities are necessarily aware of the change and are adapting their behavior accordingly. As one practitioner put it, "[a]ll of these policies as a whole have created massive fear in the immigrant community for interacting with any government official and that has all types of implications"—with clients even voicing that "they are hesitant to enroll their children in public school."[85]

130.    At present, the FAM change is the only regulatory action that has yet taken effect. The leaked draft executive order was never formally issued. The DHS Proposed Rule has yet to take effect, and even when it does, it does not apply retroactively[86]—meaning that it, too, could not deter immigrants from taking public benefits at this point in time.  Moreover, although the FAM change applies to a smaller group of immigrants, it applies to a far broader list of public benefits—encompassing any "public assistance" an immigrant, their child, their sponsor, or their sponsor's child might receive. *See supra* ¶¶ 98, 103, 108. In any event, because "the

---

[84]   *See, e.g.*, Brown, *Consular Processing Practice Alert*; Gray, *Keeping Families Apart*; Van. R. Ngo, *New "Public Charge" Guidance Will Lead to More Visa Denials*, U.S. Consultancy Group, LLC (Feb. 8, 2018), https://uscg.attorneyngo.com/blog/new-public-charge-guidance-will-lead-to-more-visa-denials/.

[85]   Bob Hennelly, *Warn U.S. Immigration Crackdown May Yield Greater Health Risks*, The Chief (Aug. 20, 2018), http://thechiefleader.com/news/news_of_the_week/warn-u-s-immigration-crackdown-may-yield-greater-health-risks/article_513da722-a22a-11e8-b2d8-474316eb8b97.html.

[86]   *See* 83 Fed. Reg. at 51,206 (excluding from consideration receipt of "public benefits … that were previously excluded under the 1999 Interim Field Guidance if received before effective date of the final rule").

administration has failed to harmonize DHS's new rule" with the FAM change, the resulting "discord would create chaos in the legal immigration system."[87]

131.    The FAM change also deters immigrants from traveling abroad to complete their adjustment-of-status applications through consular processing because they are unwilling to take the risk that they will be stuck abroad if a consular officer finds them to be a public charge. That chilling effect will leave more immigrants in unlawful status, afraid to deal with government agencies or engage fully in the community.

132.    For these reasons, the FAM change "places at higher risk the many U.S. citizen children who have one or both parents seeking or hoping to seek lawful immigration status in the United States," "essentially forc[ing] millions of American families to choose between seeking lawful immigration status and going without necessary food, shelter, healthcare, and education services for their U.S. citizen children."[88]

## VII.    Baltimore Is Harmed By The Foreign Affairs Manual Change.

133.    As a major city that provides benefits to thousands of its immigrant residents, Baltimore is harmed by the Foreign Affairs Manual change. The FAM change contributes to profound confusion about the immigration consequences of accepting Baltimore's public benefits, not to mention federal and state benefits, leaving immigrants unable to discern whether accepting one benefit or another will jeopardize their status in the United States. That lack of clarity discourages immigrants from taking necessary public benefits, frustrating Baltimore's

---

[87]    David Bier, *The $1/Day Standard & Other Problems With DHS's Public Charge Rule*, Cato at Liberty (Apr. 19, 2018), https://www.cato.org/blog/1day-standard-other-problems-dhss-public-charge-rule.

[88]    Jennifer Howard, *Another Brick in the Wall: New Public Charge Guidance Bodes Ill for American Families and Communities*, Joseph Law Firm (June 27, 2018), https://www.immigrationissues.com/immigration-news/brick-wall-public-charge-guidance-bodes-ill-american-families-communities.

programs and, paradoxically, draining Baltimore's budget as immigrants are forced off of more appropriate federal and state programs. Baltimore is left to sort through the mess Defendants have made.

134.     Take Medicaid, for example. If an immigrant fears that enrolling in Medicaid will jeopardize their ability to stay in the United States, they may use Baltimore's free or reduced-cost public health clinics as a substitute, imposing additional costs on the city. More likely, however, immigrants may worry that even going to Baltimore's health clinics will yield a conclusion that they are a public charge—and, instead, go without health care at all. While doing so may decrease Baltimore's costs in the short term (by, for example, reducing consumption of preventive healthcare), it frustrates a core component of Baltimore's mission, and makes Baltimore sicker and less wealthy as a city.

135.     Ultimately, Baltimore's primary interest is in ensuring that its residents can access the benefits and services they need. If an immigrant is eligible for Medicaid, the city would prefer that they enroll in Medicaid, rather than drain the resources of Baltimore's health clinics. But if an immigrant is ineligible for Medicaid, Baltimore would vastly prefer that they seek care at the city's facilities, rather than decline services entirely and risk further harm to themselves and others. Examples abound: city residents with communicable diseases will go untreated, the city's children will go unvaccinated, and health problems will become more severe in the absence of treatment, imposing further costs down the line. In other words, the FAM change hurts Baltimore by making it immensely more difficult for Baltimore residents to access the services necessary and appropriate for them.

136.     As outlined below, the FAM change harms Baltimore in three distinct ways. It obstructs Baltimore's attempts to provide benefits and social services to its immigrant residents;

it forces Baltimore to devote time and money to adapting its programs and reaching out to

immigrant communities; and it imposes significant downstream costs on Baltimore's budget and

on the city as a whole. A decision invalidating the FAM change and enjoining its continued

application would redress all of these harms.

**A.     The Foreign Affairs Manual change deters immigrants from accepting Baltimore's public benefits.**

137.    Most importantly, the Foreign Affairs Manual change harms Baltimore's right

and responsibility to act as a welcoming city: a city that provides benefits to its residents without

regard to their immigration status and that enables those residents to function as healthy,

productive members of the community.

138.    Courts have long recognized that providing for the health and safety of its

residents is an essential aspect of a city's mission. *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243,

270 (2006) (explaining that state and local governments possess "great latitude under their police

powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all

persons"); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) ("[H]ealth and safety are primarily,

and historically, matters of local concern.") (cleaned up); *Stieberger v. Heckler*, 615 F. Supp.

1315, 1338 (S.D.N.Y. 1985) (noting "the unique and legitimate interest of such localities in

insuring the appropriate and lawful administration" of benefits programs).

139.     "By making the receipt of a wider range of federal, state, and local benefits

potentially disqualifying factors in immigration decision-making," the FAM change is

"fundamentally at odds with the right of state and local governments to determine the

investments they make in their own residents."[89] Nobody would dispute that a law that banned

---

[89]    Batalova et al., *Chilling Effects*, at 30.

Baltimore from offering benefits to its residents would profoundly interfere with the city's

prerogatives. The obstruction is no less powerful because Defendants have elected to carry it out

by imposing serious consequences on immigrants and others who decide to take those benefits.

140.    Indeed, Baltimore provides a number of benefits that might potentially fall within

the FAM change's broad focus on "public assistance"—and which the FAM change thereby

deters immigrants, their sponsors, and their families from taking.

### 1.    Health benefits.

141.    The Baltimore City Health Department operates a number of programs for

uninsured and indigent residents, including immigrants. Specifically, it operates specialty clinics

out of two principal facilities, including clinics for reproductive health, sexually transmitted

diseases, dental and oral health care, and immunizations.[90] The Department also subsidizes a

Men's Health Center, which operates out of space provided at one of the Department's own

facilities.[91] Baltimore's public schools also provide a robust range of health programs, like vision

and dental screenings, to Baltimore students.[92]

142.    Aside from clinics, the Department funds a visiting-nurse program that makes

house calls for individuals who tend to use ambulance services frequently, including those with

chronic health conditions like diabetes, hypertension, asthma, and mental health disorders. The

Department also funds a number of other programs focused on specific health conditions,

including a Community Asthma Program, a Tuberculosis Control Program, a Childhood Lead

---

[90]    *Health Clinics & Services*, Baltimore City Health Department,
https://health.baltimorecity.gov/programs/health-clinics-services.
[91]    *Men's Health Center*, Baltimore City Health Department,
https://health.baltimorecity.gov/health-clinics-services/mens-health-center.
[92]    *Student Health Services*, Baltimore City Public Schools,
https://www.baltimorecityschools.org//site/Default.aspx?PageID=25226.

Poisoning Prevention Program, and programs for substance abuse.[93] And the Department subsidizes a number of other entities that provide services to Baltimore residents, including the Baltimore Family League and Health Care Access Maryland. Finally, the Baltimore City Fire Department provides ambulance services to all individuals, including immigrants, whether or not they are able to pay.[94]

143.    However, "[e]ven before the publication of th[e] [DHS] rule, there have been reports of immigrants avoiding health care for concern of being considered a public charge."[95] Like the DHS rule, the FAM change "could convince immigrants to forgo health coverage or nutrition assistance for themselves or for their infants, preschoolers, and school-age children and families to forgo tax credits like the EITC for which they are eligible."[96] By the same token, immigrants have likely decided not to use Baltimore's health clinics or services given fear of the immigration consequences.

---

[93]   *See, e.g.*, *Asthma*, Baltimore City Health Department, https://health.baltimorecity.gov/node/454; *Health Clinics & Services*, Baltimore City Health Department, https://health.baltimorecity.gov/programs/health-clinics-services; *Lead Poisoning*, Baltimore City Health Department, https://health.baltimorecity.gov/lead/lead-poisoning; *Substance Use and Misuse*, Baltimore City Health Department, https://health.baltimorecity.gov/programs/substance-abuse; *Tuberculosis*, Baltimore City Health Department, https://health.baltimorecity.gov/node/164.

[94]   *See Welcome to the Baltimore City Fire Department*, Baltimore City Fire Department, https://fire.baltimorecity.gov/bcfd-mission-and-vision.

[95]   Mitchell H. Katz & Dave A. Chokshi, *The "Public Charge" Proposal and Public Health: Implications for Patients and Clinicians*, J. Am. Med. Ass'n Viewpoint 3 (Oct. 1, 2018), https://jamanetwork.com/journals/jama/fullarticle/2705813.

[96]   Parrott et al., *Trump "Public Charge" Rule*, at 3; *see also* Samantha Artiga et al., *Potential Effects of Public Charge Changes on Health Coverage for Citizen Children*, Kaiser Family Found. 5 (May 2018), http://files.kff.org/attachment/Issue-Brief-Potential-Effects-of-Public-Charge-Changes-on-Health-Coverage-for-Citizen-Children ("Due to increased fears, it is likely that fewer eligible individuals would enroll themselves and their children in health coverage and individuals currently enrolled in programs would disenroll themselves and their children despite remaining eligible for coverage.").

## 2. Housing benefits.

144. Three separate Baltimore City entities provide housing benefits and services to Baltimore residents, including immigrants. Specifically, the Baltimore City Department of Housing and Community Development focuses on "vitalizing and redeveloping communities and ensuring access to adequate and affordable housing opportunities in safe, livable and decent neighborhoods."[97] The Department's Leading Innovation for a Green and Healthy Tomorrow ("LIGHT") Program conducts assessments of residents and their homes to ascertain the programs for which they might be eligible from a range of over 200 federal, state, and local programs.[98] LIGHT employees have seen clients come in to start the application process and voice concern over the potential immigration consequences of doing so.

145. The Department administers and/or funds a number of programs used by immigrants, including a new Down Payment and Closing Cost Assistance Program, a Lead Hazard Reduction Program, a range of Energy Conservation Services programs, and a weatherization program, which also addresses heating issues.[99] And the Department's Office of Rehabilitation also operates seven distinct programs aimed at helping city residents make necessary improvements to their homes or redress code violations.[100] These programs typically prioritize elderly or disabled residents when allocating resources.

---

[97]  *About Us*, Baltimore City Dep't of Hous. & Cmty. Dev., http://dhcd.baltimorehousing.org/about_dhcd.

[98]  *LIGHT Program*, Baltimore City Dep't of Hous. & Cmty. Dev., http://dhcd.baltimorehousing.org/ghsh_light.

[99]  *Division of Green, Healthy and Sustainable Programs*, Baltimore City Dep't of Hous. & Cmty. Dev., http://dhcd.baltimorehousing.org/ghsh.

[100]  *Rehabilitation Services*, Baltimore City Dep't of Hous. & Cmty. Dev., http://dhcd.baltimorehousing.org/rehabilitation.

146.    Moreover, the Baltimore Mayor's Office of Human Services operates a Homeless

Services Program, which "works to implement federal, state, and local policy and best practices

in addition to administering and monitoring homeless services grants" for the benefit of over

25,000 individuals and families.[101] For individuals at risk for homelessness, including

immigrants, the city offers street outreach programs, emergency shelters, transitional housing,

rapid rehousing, permanent supportive housing, housing opportunities for persons with

HIV/AIDS, and meal programs.[102]

147.    Finally, the Housing Authority of Baltimore City aims to "create and provide

quality affordable housing opportunities in sustainable neighborhoods for the people we

serve."[103] To that end, it manages 9,134 public housing units in fifteen developments. It also

administers the Housing Choice Voucher Program, HUD's Rental Assistance Demonstration

Program, and other rental assistance programs.[104] While the Housing Authority was created by

state law and is federally funded, the mayor of Baltimore retains the authority to appoint

members of the Board of Commissioners and the Housing Authority's director.

### 3.    Low-income assistance programs.

148.    The City operates a Community Action Partnership, run by the Mayor's Office of

Human Services, which works "to reduce poverty by offering opportunities for low-income

households through education, financial empowerment, housing and energy services, food

---

[101]  *Homeless Services Program*, Mayor's Office of Human Servs., https://human-services.baltimorecity.gov/homeless-services.

[102]  *See id.*

[103]  *About the Housing Authority of Baltimore City (HABC)*, Hous. Auth. of Baltimore City, http://habc.baltimorehousing.org/about_habc.

[104]  *Id.*

resources and capacity building."[105] Specifically, the Partnership offers multiple programs that help city residents defray the costs of various utilities and other necessities, including a Low Income Water Assistance Program, a Low Income Senior Citizen Water Discount Program, Home Energy Programs, an oil assistance program, and a program designed to help elderly residents retrofit their homes. To help city residents with budgeting and planning, the Partnership also administers workshops and counseling programs, as well as a VITA tax assistance program. And the City offers "Eat Healthy, Shop Smart" workshops to assist residents in making healthy and budget-conscious eating decisions.[106]

149.    The Baltimore City Department of Housing and Community Development also administers a Summer Food Service Program, available to all city minors regardless of immigration status.[107] Many of the Baltimore's public schools also act as School Food Pantries, through a partnership with the Maryland Food Bank.[108]

150.    Many of these services are akin to other services immigrants are known to be avoiding in the wake of the Trump Administration's public charge efforts, like the food and income assistance programs described above. *See supra* ¶¶ 126-27. It is therefore reasonable to infer that immigrants have been similarly unwilling to pursue these programs as well.

---

[105] *Programs*, Mayor's Office of Human Servs., https://human-services.baltimorecity.gov/community-action-partnerships/programs.

[106] *Id.*

[107] *Summer Food Service*, Baltimore City Dep't of Housing & Cmty. Dev., http://dhcd.baltimorehousing.org/food/.

[108] *School Food Pantries*, Baltimore City Public Schools, https://www.baltimorecityschools.org//site/Default.aspx?PageID=24454.

#### 4.    *Educational benefits.*

151.    Baltimore operates Head Start programs using federal funding, which are available to immigrants.[109] Enrollment in those programs has decreased, even sharply decreased, among immigrants; for example, enrollment has virtually ceased among the city's African immigrant population in the last few months. Of course, Baltimore also has a robust public school system, available to all of the city's children regardless of their immigration status. Those schools also offer after-school programs without regard to immigration status. While Baltimore's school system is run by a separate agency, Baltimore City Public Schools, the Mayor retains authority to appoint members of its Board of School Commissioners, and the city provides funding for the agency, especially when it faces budget shortfalls. And for secondary education, Baltimore offers in-state tuition rates to undocumented immigrants in the city's separately-administered community college system.

#### 5.    *Other programs.*

152.    Baltimore facilitates a number of other programs as well. As part of the SAFE Cities Network, Baltimore subsidizes legal assistance for immigrants facing deportation.[110] Paradoxically, therefore, immigrants may fear the very consequences those legal services are intended to avert. The Baltimore City Department of Social Services, a branch of Maryland state government, also provides a number of state-administered benefits. While Baltimore does not

---

[109]  *Head Start*, Mayor's Office of Human Servs., https://human-services.baltimorecity.gov/head-start.

[110]  Talia Richman, *Baltimore Among 11 Jurisdictions that Will Provide Legal Help for Immigrants in Deportation Cases*, Baltimore Sun (Nov. 9, 2017), http://www.baltimoresun.com/news/maryland/baltimore-city/bs-md-ci-safe-city-20171109-story.html.

provide those benefits directly, it appoints the Director of the City Department, and therefore has an interest in the proper administration of those benefits.

153.    Baltimore also has a Department of Public Works that provides access to water, wastewater treatment, and trash removal services.[111] It offers senior citizen and hardship discounts in connection with water services. The department also provides rat reduction, mowing (for vacant properties), illegal dumping, and water testing programs for city residents. Finally, the Office of Sustainable Energy provides grants to organizations that provide food, shelter, health care, and community centers to Baltimore residents, including immigrants.

154.    Of course, like any other city, Baltimore also maintains police and fire services, as well as a 311 number that residents can call to report code violations and other hazards. Defendants presumably do not consider these services to count as "public assistance," even though the language of the FAM change does not contain any such express limitation. Regardless, immigrants may understandably be concerned that using such services could result in adverse immigration consequences, and decide instead to play it safe. While Defendants' definition of public charge may not be clear, the danger it presents to Baltimore and its residents is abundantly so.

*   *   *

155.    In sum, the FAM change has chilled immigrants from accepting Baltimore's public benefits, profoundly frustrating and interfering with the city's mission. It is difficult to discern the full magnitude of the FAM change's effects on Baltimore given how onerous and time-consuming it would be to track the number of immigrants who use every city program.

---

[111]  *Baltimore City Department of Public Work*s, City of Baltimore, https://publicworks.baltimorecity.gov/.

Indeed, given the Trump Administration's repeated demands for immigration information from cities across the country,[112] Baltimore is reluctant to do so. Even in cases where Baltimore tracks usage numbers, "[i]mmigrants who have withdrawn from these services are reluctant to speak out about their plight owing to fears that identifying themselves publicly could result in legal repercussions."[113] Thus, the programs and effects described above provide only a glimpse of the harm the FAM change is inflicting upon Baltimore.

      **B.**     **The Foreign Affairs Manual change forces Baltimore to expend resources to encourage immigrants to accept public benefits.**

156. In managing the programs listed above, Baltimore also has spent or will soon be forced to spend time and money addressing the effects and legal ramifications of the FAM change. Those effects include, but are not limited to, familiarizing city officials with the FAM change, training staff and promulgating guidance, engaging in outreach to immigrant communities, and advising immigrants about the potential consequences of taking benefits.

157. To start, Baltimore has devoted substantial time and energy to analyzing the FAM change and understanding how it may affect Baltimore's programs. The DHS Proposed Rule itself acknowledges the cost of "familiarization with the rule for those entities that are not directly regulated but still want to understand the changes in federal and state transfer payments." 83 Fed. Reg. at 51,260. For example, entities "might choose to read the rule in order to provide information to those foreign-born non-citizens and associated households that might be impacted by a reduction in federal transfer payments." *Id.* at 51,270. Specifically, Baltimore

---

[112] *Justice Department Demands Documents and Threatens to Subpoena 23 Jurisdictions as Part of 8 U.S.C. 1373 Compliance Review*, U.S. Dep't of Justice (Jan. 24, 2018), https://www.justice.gov/opa/pr/justice-department-demands-documents-and-threatens-subpoena-23-jurisdictions-part-8-usc-1373.

[113] Baumgaertner, *Spooked by Trump Proposals*.

has had to ascertain which city benefits and services might be encompassed within the FAM change, which immigrant populations might be affected, and what changes it might have to make to its programs in response. When Baltimore considers new programs, it must also assess whether the FAM change and similar public charge changes will decrease usage. Each of these complex, time-intensive inquiries has drained Baltimore's resources.

158.    Baltimore must also provide guidance and training to city employees, as well as any partners and contractors, to ensure that staff are aware of the potential ramifications of the FAM change. These, again, are costs that the DHS Proposed Rule recognized, noting that local governments "may need to update and rewrite guidance documents or would need to update forms used," and that "it will also be necessary to prepare training materials and retrain staff"— all of which "will require staff time and have associated costs." *Id.* at 51,270. Baltimore is not unique in this regard: across the country, "local agencies have begun planning training to help their staff navigate what could be ahead: interactions with immigration enforcement agents, increasingly anxious clients and final regulations."[114] These observations are equally true of the FAM change, which has already gone into effect and forced the city to advise its staff.

159.    Given that immigrants are, understandably, worried about the potential effects of the FAM change, Baltimore must also devote additional staff time and resources to encouraging those immigrants, their sponsors, and their families to take public benefits and services where such benefits and services are not encompassed within the FAM change. *See Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 606 (E.D. Pa. 2017) (recognizing that cities "specifically perform outreach to immigrant communities" to encourage them to accept benefits).

---

[114]  Baumgaertner, *Spooked by Trump Proposals*.

160.    Reaching out to affected communities is, and has always been, a priority for Baltimore. Baltimore maintains a Mayor's Office of Immigrant Affairs, recommended by the city's New Americans Task Force, which acts "to promote community wellbeing, economic development, and the integration of immigrant communities by identifying needs and opportunities that immigrants bring to our city, while developing public-private partnerships to strengthen the development of these communities."[115] Among other things, that office provides a guide titled *Welcome to Baltimore: A Guide for New Americans*, "designed to help New Americans (immigrants & refugees) in Baltimore City access critical resources."[116] The city also has a Mayor's Office on Disabilities, charged with providing assistance to people with disabilities[117]—another population particularly affected by changes in public charge rules.

161.    Finally, Baltimore may also need to "communicate additional information to potential benefits recipients about the new, expanded liabilities associated with using the public benefits programs they administer."[118] When immigrants ask whether taking a given benefit will expose them to potential immigration consequences as a result of the FAM change, city officials and staff will have to consider what to say. Ultimately, Baltimore may not be able to reassure city residents that their use of public benefits will not result in immigration consequences. These decisions may present still more drains on the city's resources and the time of its employees.

---

[115] *Mayor's Office of Immigrant Affairs*, City of Baltimore, https://mima.baltimorecity.gov/.

[116] *Welcome to Baltimore: A Guide for New Americans*, City of Baltimore, https://mima.baltimorecity.gov/wg.

[117] *Mayor's Office on Disabilities*, City of Baltimore, https://mcd.baltimorecity.gov/.

[118] Batalova et al., *Chilling Effects*, at 30.

**C.     The Foreign Affairs Manual change imposes financial costs on Baltimore's programs and the city as a whole.**

162.    Aside from the cost of adapting its programs in response to the FAM change, Baltimore faces a number of downstream financial costs and consequences that do significant harm to the city. Those harms principally include increased demands on city programs not encompassed within the FAM change, including the city's health, housing, food, education, and other programs. But they also include the general cost of managing a population that is increasingly unhealthy, hungry, and less stable and secure.

163.    As discussed above, there is a tremendous amount of confusion about whether particular programs are encompassed within the FAM change. However, to the extent immigrants believe that certain city programs will not result in immigration consequences, those programs can expect to see *increased* demand. That demand will impose greater drains on the City's budget. As the DHS Proposed Rule recognizes, changes to public charge rules impose "costs to various entities that the rule does not directly regulate, such as hospital systems, state agencies, and other organizations that provide public assistance to aliens and their households." 83 Fed. Reg. at 51,260. Those costs necessarily include costs to cities like Baltimore that provide a robust array of social services and benefits to their residents.

164.    This phenomenon is most visible in the context of health care. Analysts have recognized that "[i]mmigrants' withdrawal from subsidized health insurance programs could lead to higher levels of unsubsidized care and higher unreimbursed costs."[119] "[H]ealth care providers such as federally qualified health centers and public hospitals" would be hit especially hard.[120]

---

[119]  Batalova et al., *Chilling Effects*, at 31.

[120]  Krista M. Perreira et al., *A New Threat to Immigrants' Health – The Public-Charge Rule*, 901 New Eng. J. Med. 903, 903 (Sept. 12, 2018).

"[T]he financial health and viability of many hospitals" would suffer "due to the significant increase [the DHS Proposed Rule] would produce in people who lack health insurance and come to emergency rooms for their medical care."[121] "Such dramatic increase in the number of uninsured children and families would negatively impact the financial stability of families as well as local governments and services."[122]

165.     As explained above, Baltimore maintains a number of health services for the uninsured population that may, paradoxically, be facing increased demand as a result of the FAM change. *See supra* ¶¶ 141-43. Each of these clinics or programs provides services on a free or reduced-fee scale and therefore serves as an essential resource for the uninsured and underinsured populations.[123] By increasing the number of immigrants, families, and sponsors that lack health coverage, the FAM change will necessarily result in costs that the city would not otherwise have borne.

166.     The same is true of many of Baltimore's other programs, given the profound fear and confusion in the immigrant community created by the Trump Administration's public charge efforts, including the FAM change. If an immigrant is afraid to take SNAP, WIC, or [Temporary Assistance for Needy Families ("TANF")], then he or she may instead look to Baltimore's summer food services program or its public school-administered pantries. If an immigrant is afraid to take a Section 8 housing voucher, then he or she may instead become reliant on

---

[121] Greenstein, *Trump Rule*; *see also* Jewett et al., *Under a Trump Proposal* ("Health advocates say such a policy could frighten a far broader group of immigrants into avoiding government-supported health coverage, creating public health problems that could be dire in the long run — for those patients and for U.S. hospitals.").

[122] *Change in "Public Charge" May Impact Immigrant Families*, Intercmty. Justice & Peace Ctr. (June 11, 2018), https://ijpccincinnati.org/featured/public-charge/.

[123] *See, e.g.*, *Family Planning & Reproductive Health Clinic*, Baltimore City Health Department, https://health.baltimorecity.gov/health-clinics-services/family-planning-reproductive-health.

Baltimore's homeless services programs. Or an immigrant may choose to defray the hit to their budget from losing one source of public assistance by consuming another service provided by Baltimore. In other words, by forcing immigrants off of federal or other programs, the FAM change effectively forces them onto programs administered by Baltimore, increasing Baltimore's costs.

167.     More broadly, the FAM change does significant harm to Baltimore as a community. As the DHS Proposed Rule notes, "reductions in federal and state transfers under federal benefit programs may have downstream and upstream impacts on state and local economies, large and small businesses, and individuals." 83 Fed. Reg. at 51,118. So too with the FAM change. "For individuals, families, and local communities, reduced program participation could result in higher poverty levels, reduced access to health care, and an increase in severe and chronic health issues."[124] In other words, Baltimore's immigrant population will increasingly be poorer and less healthy as a result of the FAM change. *See Philadelphia*, 309 F. Supp. 3d at 341 (recognizing the "potential risks to public health if immigrants did not feel safe seeking care at City clinics").

168.     Indeed, the Trump Administration described exactly these harms of the FAM change in the DHS Proposed Rule when discussing the effect of changing public charge rules:

- Worse health outcomes, including increased prevalence of obesity and malnutrition, especially for pregnant or breastfeeding women, infants, or children, and reduced prescription adherence;

- Increased use of emergency rooms and emergent care as a method of primary health care due to delayed treatment;

- Increased prevalence of communicable diseases, including among members of the U.S. citizen population who are not vaccinated;

---

[124] Batalova et al., *Chilling Effects*, at 5.

- Increases in uncompensated care in which a treatment or service is not paid for by an insurer or patient;

- Increased rates of poverty and housing instability; and

- Reduced productivity and educational attainment.

83 Fed. Reg. at 51,270. By similarly sowing confusion and fear in the immigrant community, the FAM change has precisely the same effects. Baltimore and its residents will have to cope with all these problems in the years to come.

169.     These harms, in turn, "may make it harder to achieve self-sufficiency" for the immigrants and others affected by the FAM change.[125] Indeed, as noted above, the INS's Field Guidance specifically recognized that public benefits can help individuals become self-sufficient. *See* supra ¶ 64. Specifically, "public assistance can make someone *less likely* to rely on government in the future" because "temporary use of public benefits can stabilize immigrants and families, putting them on a track to long-term financial stability and health."[126] Thus, while the Trump Administration believes that expanding the definition of public charge will discourage immigrants from taking public benefits, the long-term effect could be the exact opposite—with consequences for Baltimore as a whole.

170.     The effects upon Baltimore's children will be especially dire. "For citizen children in mixed status and non-citizen households, the poverty rate could increase by more than a quarter and the deep poverty rate could increase by more than half in the absence of SNAP

---

[125]  *Id.* at 31.

[126]  Matthew La Corte, *The New 'Public Charge' Rule Will Harm the Rule of Law, Economic Growth, and Public Health*, Niskanen Ctr. (Aug. 28, 2018) [hereinafter La Corte, *The New 'Public Charge' Rule*], https://niskanencenter.org/blog/the-new-public-charge-rule-will-harm-the-rule-of-law-economic-growth-and-public-health/.

and WIC."[127] Research similarly indicates that children receiving EITC and SNAP "do better in

school, graduate high school and attend college at higher rates, and likely work more and earn

more as adults."[128] Even the unborn are affected: "the lack of prenatal care and nutrition

assistance for their mothers could affect their birth and early health outcomes, and extend

decades into the future, diminishing their opportunity to thrive in tangible and entirely

preventable ways."[129] In other words, "[t]he demographic hit hardest will be children and

pregnant women."[130] Baltimore as a whole will suffer.

## CLAIMS FOR RELIEF

### Count One
### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

171.    Plaintiff repeats and incorporates by reference each of the foregoing allegations as

if fully set forth herein.

172.    The public charge amendment to the FAM constitutes "final agency action for

which there is no other adequate remedy in court" and is "subject to judicial review." 5 U.S.C.

§ 704; *see id.* § 702.

173.    Under the Administrative Procedure Act, a "reviewing court shall … hold

unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

---

[127]  Laird et al., *Forgoing Food Assistance*, at 2-3.

[128]  Greenstein, *Trump Rule*.

[129]  Parrott et al., *Trump "Public Charge" Rule*, at 3; *see also* La Corte, *The New 'Public Charge' Rule* ("There exists an enormous peer-reviewed literature on the importance and benefit of ensuring that pregnant women and children receive adequate health care and nutritional food.").

[130]  *Id.*

174.    As detailed above, Defendant State Department failed to acknowledge that in amending the FAM, the Department was departing from how it had interpreted the public charge ground of inadmissibility for decades, and from practice and policy reaching back longer still. *See supra* ¶¶ 115-20. Specifically, the State Department failed to acknowledge, let alone provide adequate reason for, the following changes:

a.    Permitting consular officers to consider a visa applicant's use of non-cash benefits.

b.    Permitting consular officers to consider the use of public benefits of any kind by an applicant's family members.

c.    Ascribing decreased weight to an otherwise valid affidavit of support, including by requiring joint sponsors to be related to the applicant and by discounting affidavits executed by sponsors that have previously taken public benefits.

These unexplained changes violate the maxim that when an agency changes position, it must at a minimum "provide reasoned explanation for its action," "display awareness that it is changing position," and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009) (emphasis omitted).

175.    Although Defendant State Department provided no reason for these changes, they appear to be based on "factual findings that contradict those which underlay its prior policy" (*id.* at 515), *i.e.*, a different understanding of how immigrants will react to the imposition of immigration consequences for using public benefits and/or a different assessment of the odds that an immigrant who uses non-cash benefits is likely to use cash benefits as well. Defendant

State Department was therefore obligated to "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.*

176.    Similarly, Defendant State Department provided no reason for overriding the "serious reliance interests" engendered by its decades-long understanding of public charge (*id.*)—a rule which has allowed immigrants, their families, and their sponsors to use non-cash benefits without fear of adverse immigration consequences. Those interests are particularly important given that the FAM changes do not disclaim retroactive application. These interests, too, obligated Defendant State Department to provide a more fulsome explanation.

177.    Accordingly, the FAM change is arbitrary and capricious, and must be held unlawful and set aside.

178.    The interests Baltimore seeks to protect in this lawsuit are, at the very least, "arguably within the zone of interests" protected by the INA. *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017) (quoting *Assoc. of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970)). The INA contains a detailed set of provisions that permit the admission of non-citizens into the United States, recognizing the benefit that immigrants can provide if they are allowed to become fully functioning members of American society. 8 U.S.C. §§ 1153, 1184. Moreover, the public charge provisions of the INA recognize that an immigrant's acceptance of public benefits is only one factor in the balance, and that immigrants can therefore contribute to local communities, in the here and now and over the long term, even if they require assistance. *Id.* §§ 1182, 1183a. Thus, courts have frequently recognized that governments fall within the INA's zone of interests. *See, e.g.*, *Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015); *Hawaii v. Trump*, 878 F.3d 662, 682 (9th Cir. 2017), *rev'd and remanded*, 138 S. Ct. 2392 (2018).

**Count Two**
**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))**

179.     Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

180.     As written, the FAM change appears to apply retroactively, directing consular officers to consider the past use of non-cash benefits by visa applicants and their family members, and by U.S. citizens and lawful permanent residents, and their family members, who file Affidavits of Support.

181.     However, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (cleaned up). "Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant." *Id.* at 208-09. No such statutory grant exists for the FAM change.

182.     Accordingly, the FAM change, to the extent it applies retroactively, is arbitrary and capricious, and not in accordance with law, and must be held unlawful and set aside.

**Count Three**
**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D))**

183.     Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

184.     The Administrative Procedure Act requires that agencies provide the public notice of, and the opportunity to comment on, legislative rules before their promulgation. 5 U.S.C. § 553.

185.     As detailed above, the FAM provisions related to public charge were amended without notice and comment—in effect, as an end-run around the DHS rulemaking process.

186.     Accordingly, the FAM change was promulgated "without observance of procedure required by law" (5 U.S.C. § 706(2)(D)), and must be held unlawful and set aside.

## Count Four
### (Violation of the Fifth Amendment – Equal Protection, U.S. Const. amend. V)

187.     Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

188.     The Due Process Clause of the Fifth Amendment prohibits Defendants from denying any person the equal protection of the laws, including on the basis of race, national origin, nationality, income, or receipt of public benefits.

189.     The FAM change discriminates on the basis of race, national origin, nationality, income, or receipt of public benefits, and was motivated by animus and a desire to effect such discrimination. Moreover, the FAM change was motivated by discriminatory and baseless stereotypes concerning the receipt of public benefits by immigrants, particularly immigrants from Latin American, African, and Asian countries. Defendants' statements provide direct evidence of their discriminatory motives in enacting the FAM change.

190.     Additionally, the FAM change effectively differentiates between persons on the basis of national origin and nationality, and is accordingly subject to strict scrutiny.

191.     The FAM change also differentiates between persons on the basis of income or receipt of public benefits, imposing immigration consequences on immigrants, their families, and their sponsors for taking essential public benefits. *Cf. Plyler v. Doe*, 457 U.S. 202, 223 (1982).

192.     The FAM change fails strict scrutiny because its broad focus on the receipt of "public assistance" by immigrants, their families, and their sponsors, and the diminished role of the affidavit of support, are not narrowly tailored to the goal of preventing immigrants from becoming primarily dependent upon public benefits.

193.    Alternatively, and for the same reasons, the FAM change furthers no substantial state interest when weighed against the harm to immigrants, their families, and their sponsors. Nor is the FAM change rationally related to any legitimate state interest.

194.    Through the actions described in this Complaint, Defendants have violated the equal protection guarantee of the Fifth Amendment's Due Process Clause.

195.    Baltimore may assert the equal protection claims of its immigrant residents, their families, and their sponsors. Baltimore is injured by the FAM change, as described above. *See supra* ¶¶ 133-70.

196.    Baltimore also has a close relationship with those who take Baltimore's public benefits, including its medical, legal, educational, food, and housing services. Because Baltimore is better off when all of its residents can access the public benefits to which they are entitled, regardless of immigration status, Baltimore will serve as an especially effective advocate for their equal protection claims.

197.    Finally, Baltimore's immigrant residents, their families, and their sponsors face impediments to bringing their claims in their own names because they fear the potential immigration consequences of coming forward, suffer from language-related and other barriers, and cannot bear the significant economic and logistical burdens of participating in litigation. *Cf. Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 732 (S.D. Ind.), *aff'd*, 838 F.3d 902 (7th Cir. 2016) (concluding that social services organization could assert equal protection claims of its refugee clients).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.    declare the FAM change arbitrary and capricious, procedurally infirm, and unconstitutional;

2.      vacate the FAM change;

3.      enjoin Defendants, their officers, their employees, and their agents from

adjudicating visas on the basis of the heightened standards implemented through the FAM

change, and instead apply the FAM "public charge" provision as it stood in December 2017;

4.      award Plaintiff its costs, attorneys' fees, and other disbursements for this action;

and

5.      grant any other relief this Court deems appropriate.


Dated: November 28, 2018                          Respectfully submitted,

**Democracy Forward Foundation**                  **Mayor and City Council of Baltimore**
Javier M. Guzman (D.C. Bar No. 462679)            Andre M. Davis #00362
    (*pro hac vice* motion forthcoming)          City Solicitor
Legal Director

                                                 */s/ Suzanne Sangree*
Karianne Jones (D.C. Bar. No. 187783)             Suzanne Sangree #26130
    (*pro hac vice* motion forthcoming)          Senior Counsel for Public Safety & Director of
Counsel                                           Affirmative Litigation

John Lewis (D.C. Bar No. 1033826)                 Elizabeth R. Martinez #29394
    (*pro hac vice* motion forthcoming)          Assistant Solicitor, Litigation
Counsel

1333 H St. NW                                     City of Baltimore Department of Law
Washington, DC  20005                             City Hall, Room 109
(202) 448-9090                                    100 N. Holliday Street
jguzman@democracyforward.org                      Baltimore, MD 21202
kjones@democracyforward.org                       443-388-2190
jlewis@democracyforward.org                       Andre.Davis@baltimorecity.gov
                                                 suzanne.sangree2@baltimorecity.gov
                                                 Gabriel.Auteri@baltimorecity.gov
                                                 liz.martinez@baltimorecity.gov

                                                 ***Counsel for Plaintiff***