# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MAYOR AND CITY COUNCIL OF
BALTIMORE,

            Plaintiff,

   v.

DONALD J. TRUMP, President, *et al.*,

            Defendants.

Civil Action No.: 18-cv-3636 (ELH)

**BRIEF OF *AMICI CURIAE* CIVIL RIGHTS ORGANIZATIONS IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

               **Page**

TABLE OF AUTHORITIES ......................................................................................................... iii

STATEMENT OF INTEREST .......................................................................................................1

ARGUMENT ..................................................................................................................................1

I.      THE HISTORY OF THE PUBLIC CHARGE PROVISION IS ROOTED IN
        ANIMUS TOWARD IMMIGRANTS ............................................................................2

II.     THIS ADMINISTRATION'S CHANGE IN THE PUBLIC CHARGE
        PROVISION WAS MOTIVATED BY ANIMUS TOWARD RACIAL
        MINORITIES ..................................................................................................................6

        A.     Administration Officials' Statements Demonstrate That the Change in the
              Public Charge Provision Is Motivated by Animus Toward Racial, Ethnic,
              and Religious Minorities ........................................................................................6

        B.     The Marked Expansion of the Public Charge Provision Reflects President
              Trump's Intent to Exclude Racial Minorities From the United States ...................9

        C.     The Administration's Changes to the Public Charge Rules Will Have a
              Disproportionate Harmful Impact on Racial and Ethnic Minorities....................13

CONCLUSION .............................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Batalla Vidal v. Nielsen*,
   291 F. Supp. 3d 260 (E.D.N.Y. 2018) ................................................................ 7, 8

*Centro Presente v. DHS*,
   332 F. Supp. 3d 393 (D. Mass. 2018) ................................................................ 13

*Gegiow v. Uhl*,
   239 U.S. 3 (1915) ............................................................................................... 10

*Hawai'i v. Trump*,
   241 F. Supp. 3d 1119 (D. Haw. 2017) ................................................................. 8

*Howe v. United States*,
   247 F. 292 (2d Cir. 1917) .................................................................................. 10

*Matter of B*,
   3 I. & N. Dec. 323 (B.I.A. 1948) ......................................................................... 5

*Matter of Martinez-Lopez*,
   10 I&N Dec. 409 (Att'y Gen. 1962) ................................................................... 14

*Matter of Perez*,
   15 I. & N. Dec. 136 (B.I.A. 1974) ....................................................................... 5

*Ramos v. Nielsen*,
   321 F. Supp. 3d 1083 (N.D. Cal. 2018) ............................................................... 7

*Saget v. Trump*,
   345 F. Supp. 3d 287 (E.D.N.Y. 2018) ................................................................. 6

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................................................. 2

**Statutes and Regulations**

Affordable Care Act, 124 Stat. 119 *et seq.* (2010) .................................................. 10

Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. 104-
   193, § 403, 110 Stat. 2105, 2265–66 (Aug. 22, 1995) ........................................ 11

8 U.S.C. § 1182(a)(4)(A) ............................................................................................. 1

26 Stat. 1084 ............................................................................................................ 10

9 FAM § 40.41 ..............................................................................................................12

9 FAM § 302.8 ...............................................................................................................9

**Other Authorities**

Annie Karni, *Trump Rants Behind Closed Doors with CEOs*, Politico (Aug. 8, 2018), https://www.politico.com/story/2018/08/08/trump-executive-dinner-bedminster-china-766609 ...........................................................................................9

Barbara L. Bailin, *The Influence of Anti-Semitism on United States Immigration Policy with Respect to German Jews During 1933-1939* (May 10, 2011) (thesis, City University of New York), https://academicworks.cuny.edu/cgi/viewcontent.cgi?article=1261&context=cc_etds_theses...........................................................................................................4

Emma Green, *First, They Excluded the Irish*, The Atlantic (Feb. 2, 2017), https://www.theatlantic.com/politics/archive/2017/02/trump-poor-immigrants-public-charge/515397 ...............................................................................................3

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689 (May 26, 1999)..........................................................................6

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689 (May 26, 1999)........................................................................11

*Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28,676 (proposed May 26, 1999) ...........................................................................11

*Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114 (Oct. 10, 2018) .....................15

Jeanna Batalova et al., *Chilling Effects: The Expected Public Charge Rule and Its Impact on Legal Immigrant Families' Public Benefits Use*, Migration Policy Inst. (2018), https://www.migrationpolicy.org/research/chilling-effects-expected-public-charge-rule-impact-legal-immigrant-families ................................. 13, 14, 15

Jeff Simon, *Donald Trump Impersonates Asian Negotiators*, CNN Politics (Aug. 26, 2015), https://www.cnn.com/2015/08/26/politics/ donald-trump-asian-negotiator-impersonation/index.html ......................................................................9

Leah Zallman & Karen Finnegan, *Changing Public Charge Immigration Rules: The Potential Impact on Children Who Need Care*, California Health Care Foundation (Oct. 2018), https://www.chcf.org/publication/changing-public-charge-immigration-rules/ ...............................................................................14

Manatt, *Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard* (Oct. 11, 2018), https://www.manatt.com/Insights/Articles/2018/Public-Charge-Rule-Potentially-Chilled-Population; .......................................................................14

Maya Oppenheim, *Donald Trump Appears to Mock Asian Leaders' Gestures During Speech on Tax Reform*, Independent (Nov. 30, 2017), https://www.independent.co.uk/news/world/americas/donald-trump-appears-to-mock-asian-leaders-gestures-during-speech-donald-trump-asian-leaders-a8084281.html...........................................................................................................9

National Health Law Program, *CIS No. 2499–10; DHS Docket No. USCIS–2010–0012 Inadmissibility on Public Charge Grounds* (Dec. 10, 2018)...........................................................................................................................12

Office of the Historian, *The Immigration Act of 1924 (the Johnson-Reed Act)*, U.S. Dep't of State, https://history.state.gov/milestones/1921-1936/immigration-act ............................................................................................4

Paul Yin, *The Narratives of Chinese-American Litigation During the Chinese Exclusion Era*, 19 Asian Am. L.J. 145 (2012) ......................................................3

*Public Charge*, U.S. Citizenship and Immigration Services, https://www.uscis.gov/greencard/ ...................................................................1

Randy Capps et al., Migration Policy, Inst., *Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration* (Nov. 2018), https://www.migrationpolicy.org/sites/default/files/.............................................15

T.A. Frail, *The Injustice of Japanese-American Internment Camps Resonates Strongly to This Day*, Smithsonian Magazine (Jan. 2017), https://www.smithsonianmag.com/ history/injustice-japanese-americans-internment-camps-resonates-strongly-180961422/................................................5

The American Presidency Project, *The President's News Conference on Immigration Sept. 9, 1930* .................................................................5, 7

Torrie Hester et al., *Historians' Comment: DHS Notice of Proposed Rule "Inadmissibility on Public Charge Grounds" FR 2018-21106* (Oct. 5, 2018) .......................3

U.S. Dep't of Lab. Ann. Rep. (1914)........................................................................4

UC Santa Barbara, https://www.presidency.ucsb.edu/documents/the-presidents-news-conference-772.......................................................................................5

## STATEMENT OF INTEREST[1]

*Amici curiae* Asian Americans Advancing Justice – Los Angeles, LatinoJustice PRLDEF,
Muslim Advocates, Refugee and Immigrant Center for Education and Legal Services, Inc.,
Americans for Immigrant Justice, MacArthur Justice Center, Black Alliance for Just
Immigration, American Immigration Council, National Immigrant Justice Center, and Southern
Poverty Law Center are national and local non-profit organizations that promote equity, justice,
and civil rights for immigrants and racial minorities through community outreach, policy
advocacy, direct services, and litigation.  Amici are particularly interested in, and deeply
troubled by, Defendants' changes to the Foreign Affairs Manual's ("FAM's") instructions
regarding the administration of the "public charge" provision of the Immigration and Nationality
Act of 1952 ("INA").  Based on their experience, Amici offer valuable insights regarding both
the historical backdrop surrounding the FAM's public charge provisions and the harmful effects
the administration's recent changes to those provisions will have on racial, ethnic, and religious
minority communities.  Amici respectfully urge this Court to deny Defendants' motion to
dismiss, especially in light of the severe impact the changes to the public charge provision will
have on immigrants and communities of color.

## ARGUMENT

The INA denies admission to the United States or an adjustment of status to lawful
permanent resident for any person who "at the time of application . . . is likely at any time to
become a public charge."  INA § 212(a)(4), 8 U.S.C. § 1182(a)(4)(A).  "'Public charge' means
an individual who is likely to become primarily dependent on the government for subsistence."

---

[1]     Amici affirm that no counsel for a party authored this brief in whole or in part, and that no
person other than the amici curiae, its members, or its counsel made a monetary contribution
intended to fund the brief's preparation or submission.

*Public Charge*, U.S. Citizenship and Immigration Services, https://www.uscis.gov/greencard/public-charge. Historically, the government has never considered a person's receipt of non-cash benefits in evaluating whether the person is likely to become a public charge, but the Trump administration has implemented a change to the FAM that diverges from that history. This and other changes are motivated by Defendants' animus toward minority communities and therefore violate the Equal Protection Clause. *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977) (even facially neutral laws may violate the Equal Protection Clause if they are motivated by animus and have a discriminatory effect).

The history of the public charge provision is one of invidious discriminatory intent. And the provision has long served to prevent immigrants of color from coming to the United States in greater numbers. Even so, prior administrations have not treated the receipt of non-cash public benefits as a negative factor in a public charge determination. Breaking with this long tradition, the Trump administration has done exactly that. It has dramatically expanded the scope of the provision by adding the receipt of non-cash public benefits as a detractor. That change, along with other changes to the statutory factors, follows many other draconian changes to immigration policy driven by animus against racial and religious minorities. The discriminatory purpose of the change is evident from frequent, overt remarks by President Trump disparaging immigrants from certain countries and backgrounds, and is also evidenced by the clearly foreseeable disproportionate impact the new rule will have on immigrant communities of color. Amici urge this Court to deny Defendants' motion to dismiss.

## I.      THE HISTORY OF THE PUBLIC CHARGE PROVISION IS ROOTED IN ANIMUS TOWARD IMMIGRANTS

Today's federal public charge provision has been manipulated and used as a weapon against racial or ethnic minorities since its inception. The provision has often been fueled by

animus toward minority communities, and administrations have since used it as a tool of discrimination, particularly during nativist periods in this country's history.

From their earliest origins, public charge rules grew out of strong racial, cultural, and religious prejudice, initially against Irish Catholics.  Emma Green, *First, They Excluded the Irish*, The Atlantic (Feb. 2, 2017), https://www.theatlantic.com/politics/archive/2017/02/trump-poor-immigrants-public-charge/515397.  "Calling Irish paupers 'leeches,'" nativists advocated for America to close its borders to poor immigrants from Europe, especially Ireland, in the first half of the nineteenth century.  Hidetaka Hirota, Expelling the Poor: Atlantic Seaboard States & the Nineteenth-Century Origins of American Immigration Policy 2 (2017).  New York and Massachusetts answered the call by building upon the colonial "poor laws" to create state immigration laws under which state officials in Massachusetts and New York "enjoyed sweeping powers over foreigners," *id.* at 2, 3, and they often abused their discretion to exclude immigrants as "likely to become a public charge" even when those immigrants had a sufficient amount of money at the time of arrival, Green, *supra*.  The laws became "a convenient tool to inject religious, ethnic, and racial prejudice into" a facially neutral immigration system.  *Id.*  Congress first codified this scheme into federal law in the Immigration Act of 1882, *see* Torrie Hester et al., *Historians' Comment: DHS Notice of Proposed Rule "Inadmissibility on Public Charge Grounds" FR 2018-21106*, at 2 (Oct. 5, 2018), just months after adopting the first significant law to restrict immigration based on race, the Chinese Exclusion Act, another manifestation of overt animus against racial minorities in the country at that time, *see* Paul Yin, *The Narratives of Chinese-American Litigation During the Chinese Exclusion Era*, 19 Asian Am. L.J. 145, 145 (2012).

Armed with discretion to interpret the phrase "*likely* to become a public charge," federal officials in the first decades of the twentieth century used the new federal public charge law to

target a number of racial groups. By way of example, at one point, the head official at the Bureau of Immigration instructed his agents to exclude immigrants from India, based on the "strong prejudice among the people generally because of their uncleanliness, their obnoxious habits, their unfitness for labor, etc." 2 U.S. Dep't of Lab. Ann. Rep. 438–39 (1914); Hester et al., *supra*, at 3. In fact, prejudice was noted as an explicit consideration in public charge determinations. *See* U.S. Dep't of Lab. at 439 ("It was realized that this prejudice, sooner or later, in one way or another, would cause those already here to become public charges, and likewise those who were entering if they were allowed to remain.").

Near the end of World War I, "Americans, driven by strong isolationist and nativist sentiments, . . . clamored for a permanent law to severely restrict immigration." Barbara L. Bailin, *The Influence of Anti-Semitism on United States Immigration Policy with Respect to German Jews During 1933-1939*, 16 (May 10, 2011) (thesis, City University of New York), https://academicworks.cuny.edu/cgi/viewcontent.cgi?article=1261&context=cc_etds_theses. Congress thus enacted the Immigration Act of 1924, or the National Origins Act, which set nationwide quotas for immigrants based on their national origin and completely excluded immigrants from Asia. *Id.*; Office of the Historian, *The Immigration Act of 1924 (the Johnson-Reed Act)*, U.S. Dep't of State, https://history.state.gov/milestones/1921-1936/immigration-act. The desire for restrictive immigration policies only grew over the next few years as the country fell into the Great Depression and many Americans faced severe economic conditions. Bailin, *supra*, at 18. In response, then-President Herbert Hoover asked the State Department to identify a provision that would permit the administration to reduce immigration numbers without congressional involvement, and the State Department located such a provision—the public charge rule. *Id.* President Hoover announced that "[t]he only important provision of our law as to immigration is that one requiring the exclusion of those who are liable to become public

charges." The American Presidency Project, *The President's News Conference on Immigration Sept. 9, 1930*, UC Santa Barbara, https://www.presidency.ucsb.edu/documents/the-presidents-news-conference-772. While this pronouncement was neutral on its face, it "provided administrative justification for decisions denying visa applications that, in fact, were the result of anti-Semitism." Bailin, *supra*, at 21. From 1933 to 1939, "the four government officials who controlled American immigration policy" manipulated the public charge provision and injected their own anti-Semitism into immigration decisions. *Id.* at 1.

As the country recovered from the Great Depression, the effect of prejudice on public charge determinations diminished with the implementation of explicit standards for making the determination.[2] Hester et al., *supra*, at 3. These quantifiable standards mitigated federal officials' discretion in public charge determinations, and so the restriction of immigrants from a particular group or class based on personal prejudices became less pronounced.[3]

---

[2]     For example, in 1948, the Board of Immigration Appeals set an explicit three-part test for determining whether an immigrant could be deported on public charge grounds. *Matter of B*, 3 I. & N. Dec. 323, 326 (B.I.A. 1948). And, in 1974, the Board made clear that the determination of whether an immigrant is inadmissible as a public charge depends on the totality of the circumstances. *Matter of Perez*, 15 I. & N. Dec. 136, 137 (B.I.A. 1974). This totality of the circumstances test was adopted by the State Department in the FAM, which mandates that officers consider the totality of the immigrant's circumstances "at the time of visa application, including, at a minimum, age, health, family status, assets, resources, financial status, education, and skills." 9 FAM § 302.8-2(B)(1).

[3]     Nonetheless, racist sentiment continued throughout World War II, with the internment of over 120,000 Japanese and Japanese Americans simply because of their race, unlike with other adversaries. *See* T.A. Frail, *The Injustice of Japanese-American Internment Camps Resonates Strongly to This Day*, Smithsonian Magazine (Jan. 2017), https://www.smithsonianmag.com/history/injustice-japanese-americans-internment-camps-resonates-strongly-180961422/ ("During WWII, 120,000 Japanese-American were forced into camps, a government action that still haunts victims and their descendants[.] . . . There was no wholesale incarceration of U.S. residents who traced their ancestry to Germany or Italy, America's other enemies.").

Importantly, for the past several decades, no administration has expanded the scope of the public charge rule to include the use of non-cash benefits as a negative factor or changed so drastically the weight given to certain factors used in making a public charge determination. In fact, in the past, the INS has explicitly prohibited consular officials from considering non-cash benefits when making public charge determinations. *See Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689, 26,689 (May 26, 1999).

Going against years of well-settled practice, President Trump and his administration have changed those quantifiable standards. The administration's inclusion of non-cash benefits as a negative factor in the public charge determination is an unprecedented expansion of the public charge rule, and this manipulation reintroduces and amplifies the most invidiously discriminatory effects of the public charge rule against immigrants of color.

## II.  THIS ADMINISTRATION'S CHANGE IN THE PUBLIC CHARGE PROVISION WAS MOTIVATED BY ANIMUS TOWARD RACIAL MINORITIES

### A.  Administration Officials' Statements Demonstrate That the Change in the Public Charge Provision Is Motivated by Animus Toward Racial, Ethnic, and Religious Minorities

President Trump's animus toward non-white immigrants who are and will continue to be impacted by the change to the public charge provision is well-documented. Recent court cases, national news media, and Twitter provide ample evidence of President Trump's animosity towards members of certain racial, ethnic, and religious groups.

Several courts throughout the country have already recognized President Trump's animus toward non-white immigrants. In *Saget v. Trump*, Haitian nationals residing in the United States with Temporary Protected Status ("TPS") sued President Trump and the Department of Homeland Security when the administration terminated Haiti's TPS status. 345 F. Supp. 3d 287, 292–93 (E.D.N.Y. 2018). The Eastern District of New York found that the Haitian plaintiffs had

sufficiently alleged an equal protection claim.  *Id*. at 303.  The court noted that the plaintiffs

described "several instances of anti-Haitian and anti-immigrant comments made by President

Trump."  *Id*.  These instances included, but were not limited to, President Trump commenting

that "all [Haitians] have AIDS," publicly saying that Nigerians should not be allowed to

immigrate to the United States because they would never go back to their "huts" in Africa, and

telling U.S. senators that he did not want people from "shithole" countries like Haiti and other

Latin American and African countries in the United States.  *Id*.  After summarizing the countless

examples of President Trump's animus toward immigrants of color, the court in *Saget* found the

evidence "*more than sufficient* to support a plausible inference of [President Trump's] animus

based on race and/or national origin/ethnicity against non-white immigrants *in general*."  *Id*.

(emphases added); *see also Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1123 (N.D. Cal. 2018)

(noting that the administration "[did] not deny that President Trump's alleged statements[4]

evidence racial animus").

       In *Batalla Vidal v. Nielsen*, a group of states, individuals, and nonprofit organizations

sued President Trump and other members of his administration for the collective decision to

rescind the United States' Deferred Action for Childhood Arrivals ("DACA") program.  291 F.

Supp. 3d 260, 267 (E.D.N.Y. 2018).  The court found that the plaintiffs "alleged sufficient facts

to raise a plausible inference that the DACA rescission was substantially motivated by unlawful

discriminatory purpose."  *Id*. at 274.  In fact, the court went so far as to say that the plaintiffs

---

[4]    "[I]n a January 11, 2018 meeting with Congressional representatives concerning TPS
protections for nationals from Latin American and African countries, in which at least El
Salvador and Haiti were specifically discussed, President Trump wondered aloud, 'Why are we
having all these people from shithole countries come here?' . . .  He expressed a preference,
instead, for immigrants from countries like Norway, which is overwhelmingly white. . . .
President Trump asked 'Why do we need more Haitians?' and 'insisted that lawmakers "[t]ake
them out" of any potential immigration deal.'

"identif[ied] a ***disheartening*** number of statements made by President Donald Trump that allegedly suggest that he is prejudiced against [non-white immigrants]." *Id.* at 276 (emphasis added). Specifically, the court noted: President Trump's comments that Mexican immigrants are "criminals, drug dealers, [and] rapists" President Trump's assertion that an American federal judge of Mexican descent could not fairly preside over a lawsuit against him because the judge was "Mexican"; and President Trump's public statements in which he called Mexican immigrants "animals" and "bad hombres." *Id.* at 276–77. Given the overwhelming evidence demonstrating President Trump's racial animus,[5] the court refused to dismiss the plaintiffs' equal protection claims. *Id.* at 285.

President Trump's animus extends even further in reference to Muslim communities and Muslim-majority countries. In *Hawai'i v. Trump*, a case considering President Trump's "Muslim ban," the district court found "significant and unrebutted evidence" of President Trump's animus toward Muslim people. 241 F. Supp. 3d 1119, 1136 (D. Haw. 2017). In reaching this conclusion, the court took note of President Trump's promise to implement a "Muslim ban" during his campaign, a White House press release "calling for a total and complete shutdown of Muslims entering the United States" after President Trump was elected, and other comments by President Trump and members of his administration. *Id.* at 1136–37. The court went on to say that "[a]ny reasonable, objective observer" would conclude, from President Trump's behavior and public statements, that the President's actions indicate animus toward Muslim people. *Id.* at 1137.

---

[5]     News media also provides a database of evidence that President Trump and his administration's actions are motivated by racial animus. In addition to statements noted by courts, he has also characterized immigration from Latin American, African, and Asian countries as an infestation. *See* Compl. ¶ 69; *see also id.* at ¶ 71.

There is ample evidence, too, of President Trump's animus toward other minorities such as those in the Asian community.  For instance, while campaigning in 2015, he mockingly used broken English to impersonate Asian negotiators.  Jeff Simon, *Donald Trump Impersonates Asian Negotiators*, CNN Politics (Aug. 26, 2015), https://www.cnn.com/2015/08/26/politics/ donald-trump-asian-negotiator-impersonation/index.html.  More recently, President Trump demeaned Asian political leaders by sarcastically hunching his shoulders, nodding his head side to side, and humming to imply that Asian leaders do not speak English.  Maya Oppenheim, *Donald Trump Appears to Mock Asian Leaders' Gestures During Speech on Tax Reform*, Independent (Nov. 30, 2017), https://www.independent.co.uk/news/world/americas/donald-trump-appears-to-mock-asian-leaders-gestures-during-speech-donald-trump-asian-leaders-a8084281.html.  He additionally implied after a political dinner that almost all Chinese students who come to the United States are spies.  Annie Karni, *Trump Rants Behind Closed Doors with CEOs*, Politico (Aug. 8, 2018), https://www.politico.com/story/2018/08/08/trump-executive-dinner-bedminster-china-766609.

### B. The Marked Expansion of the Public Charge Provision Reflects President Trump's Intent to Exclude Racial Minorities From the United States

The administration's unannounced move to permit consular officers to consider the receipt of non-cash benefits in making public charge determinations is unprecedented.  For decades, the FAM explicitly prohibited consular officers from considering a visa applicant's past, current, or future use of non-cash benefits: "Neither the past nor possible future receipt of such non-cash or supplemental assistance may be considered in determining whether an alien is likely to become a public charge."  7 Immigration Law Service Primary Source, 9 FAM 302.8. Public Charge (2d ed. 2019) (citing 9 FAM § 302.8-2(B)(1)).  This prohibition comported with years of existing law, policy, and practice regarding the public charge rule.

As noted above, the public charge rule was first codified into federal immigration law with the Immigration Act of 1882, and shortly thereafter the Immigration Act of 1891 added to the class of inadmissible persons those "likely to become a public charge."  The Immigration Act of 1891 equated "likely to become a public charge" with the term "pauper."  26 Stat. 1084.  And in 1915, the Supreme Court held that the phrase "likely to become a public charge" should be "read as generically similar to the other [terms] mentioned before and after" it: paupers, professional beggars, idiots, and persons with a mental or physical defect that affect their ability to earn a living, to name a few.  *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915); *see also Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917) ("Congress meant the act to exclude persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future.").  Thus, it was widely understood that the public charge provision targeted those without the ability to care for their most basic needs without significant government assistance.

To be sure, this conception of public charge predates the development of many non-cash public benefit programs.  But when creating these programs, Congress did not make corresponding changes to the public charge provisions.  However, Congress chose to directly regulate non-citizens' eligibility for public benefits through the benefits programs themselves.  For instance, the legislation authorizing the major federal benefit programs in the 1960s and 70s, like Medicaid, Medicare, and food stamps, generally permitted lawful immigrants and refugees to receive those benefits.  Hester et al., *supra*, at 5–6.   More recently, the Patient Protection and Affordable Care Act permits "lawfully present immigrants" to access health insurance exchanges and subsidies.  *Id* at 6; Affordable Care Act, 124 Stat. 119 *et seq.* (2010).  A number of federal benefits have *no* eligibility restrictions based on immigration status, such as public health programs, school breakfast and lunch programs, and Women, and Infant and Children nutrition (WIC).  Hester et al.*, supra*, at 6.  On the other hand, when Congress passed the Personal

Responsibility and Work Opportunity Reconciliation Act in 1996 ("PRWORA"), it limited

eligibility for "federal means-tested public benefits"[6] to "qualified" immigrants and set time

requirements for the eligibility of lawful permanent residents. Pub. L. 104-193, § 403, 110 Stat.

2105, 2265–66 (Aug. 22, 1995).

Noting the mass public confusion as to whether immigration authorities considered non-

cash benefits when making public charge decisions, the Immigration and Naturalization Service

("INS") issued field guidance and a proposed rule shortly after the passage of PRWORA to

clarify the types of public benefits to be considered. *See Inadmissibility and Deportability on*

*Public Charge Grounds*, 64 Fed. Reg. 28,676 (proposed May 26, 1999); 64 Fed. Reg. 28,689;

*see also* Hester et al.*, supra*, at 7. In its proposed rule, INS explained that the "tension between

the immigration and welfare laws is exacerbated by the fact that 'public charge' has never been

defined in statute or regulation." 64 Fed. Reg. 28,676, 28,676. It also recognized that the

confusion was creating "significant, negative public health consequences across the country."

*Id.* Accordingly, INS defined "public charge" as an individual who is likely to become

"primarily dependent on the government for subsistence, as demonstrated by *either (i) the receipt*

*of public cash assistance for income maintenance, or (ii) institutionalization for long-term care*

*at government expense.*" *See* 64 Fed. Reg. 28,689, 28,689; 64 Fed. Reg. 28,676, 28,677

(emphasis added). INS indicated that this definition aligned with the policy codified in the FAM

and explained that non-cash benefits "are by their nature supplemental and do not, alone or in

combination, provide sufficient resources to support an individual or family." 64 Fed. Reg.

28,689, 28,692. Indeed, these programs "frequently support the general welfare," and "[i]t has

never been Service policy that the receipt of *any* public service or benefit must be considered for

---

[6]    Federal means-tested benefits include Medicaid, CHIP, TANF, SNAP, and SSI.

public charge purposes." 64 Fed. Reg. 28,676, 28,678 (emphasis added). Instead, "[t]he nature

of the program is important. For instance, . . . taking advantage of school lunch or other

supplemental nutrition programs, such as WIC, . . . typically do not make a person inadmissible

or deportable." *Id.* Therefore, "participation in . . . [non-cash] programs is not evidence of

poverty or dependence." *Id.*

The INS made clear in its proposed rule and field guidance that it was not departing from

previous policy or practice. The proposed definition was "consistent with the facts found in the

deportation and admissibility cases," and with the advice provided by federal benefit-granting

agencies. *Id.* at 28, 677–78. What is more, the instruction that consular officers should not

consider the receipt of non-cash benefits as a factor in public charge determinations comported

with previous internal directives, like that in the 1993 FAM, which stated that "the rule-of-thumb

is that a program that is [] supplementary in nature, in the sense of providing training, services,

food, etc. to augment the standard of living, rather than to undertake directly the support of the

recipients, does not fall within the scope of the INA 212(a)(4)." National Health Law Program,

*CIS No. 2499–10; DHS Docket No. USCIS–2010–0012 Inadmissibility on Public Charge*

*Grounds*, at 21 (Dec. 10, 2018) (citing 9 FAM § 40.41, n. 9.1).

In sum, each branch of government—the judiciary, the executive, and the legislature—

has recognized that the public charge provision is intended to render inadmissible only those who

will become primarily dependent on the government for subsistence. It has never been

understood to prevent lawfully present immigrants from accepting supplemental, non-cash public

benefits that are intended to uplift, rather than primarily support, immigrant and non-immigrant

families alike. However, the Trump administration does not desire to uplift immigrant families,

at least not those from what he considers to be "shithole countries." His animus toward racial

- 12 -

minorities fueled a remarkable deviation from the past, which will drastically and disparately impact racial, ethnic, and religious minorities for years to come.

### C. The Administration's Changes to the Public Charge Rules Will Have a Disproportionate Harmful Impact on Racial and Ethnic Minorities

President Trump's statements of animus and unjustified deviation combined with the disparate impact this rule will have on communities of color evidence a discriminatory intent sufficient to sustain an Equal Protection Clause claim. *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) ("[T]he combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy" are "sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision."). The change in the rule primarily affects the public benefits use and interests of immigrant-headed families and will have a significant impact on who is admitted and allowed to stay in the country. And most of those who will be affected by the change are members of communities of color.

The change will have a chilling effect not only on immigrants themselves, but also on their families, which often contain at least one citizen. About "18 million immigrant adults and children live in families in which at least one member received TANF/[General Assistance], SSI, SNAP, or Medicaid/CHIP," the latter two of which are non-cash benefits never before considered in public charge determinations. Jeanna Batalova et al., *Chilling Effects: The Expected Public Charge Rule and Its Impact on Legal Immigrant Families' Public Benefits Use*, Migration Policy Inst. 23 (2018), https://www.migrationpolicy.org/research/chilling-effects-expected-public-charge-rule-impact-legal-immigrant-families. About 9.2 million children born in the United States live in such families. *Id.*

Most of those who will be affected are members of communities of color. Nearly 26 million non-citizens and their family members could be impacted as a result of the proposed rules. Manatt, *Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard* (Oct. 11, 2018), https://www.manatt.com/Insights/Articles/2018/Public-Charge-Rule-Potentially-Chilled-Population; *see also* Batalova et al., *supra*, at 4. ("[I]f immigrants' use patterns were to follow those observed during the late 1990s there could be a [chilling effect] of between 20 percent and 60 percent."). People from communities of color make up nearly 90% of that population (23.2 million). Manatt, *supra*. This includes an estimated 70% from Latino communities, 12% from Asian American and Pacific Islander communities, and 7% from Black communities. *Id.*

The change to the rule has a particularly harmful impact on children, especially those belonging to racial minorities. About 4.8 million children in need of medical attention live in families with at least one noncitizen adult and are insured by Medicaid or Children's Health Insurance Program. Leah Zallman & Karen Finnegan, *Changing Public Charge Immigration Rules: The Potential Impact on Children Who Need Care*, California Health Care Foundation (Oct. 2018), https://www.chcf.org/publication/changing-public-charge-immigration-rules/. The change to the public charge provision will likely result in about 700,000 to 1.7 million children disenrolling from these benefits, causing them to become uninsured. *Id.*

Further, Defendants have also diminished the weight afforded to affidavits of support in the public charge determination. The affidavit of support alone used to be sufficient proof of satisfying the public charge test in most cases, but is now merely a "positive factor" in the totality of the circumstances. *See* 9 FAM § 302.8-2(B)(3); *Matter of Martinez-Lopez*, 10 I&N Dec. 409, 421-23 (Att'y Gen. 1962) ("A healthy person in the prime of life cannot ordinarily be considered likely to become a public charge, especially where he has friends or relatives in the

United States who have indicated their ability and willingness to come to his assistance in case of emergency."). Defendants' change marks an unsubstantiated departure from this long-standing interpretation of the statutory factors under the FAM. Similarly, Defendants have modified the evaluation of certain statutory factors in the public charge determination, including age, employment, family status (household size), and medical condition, all of which will have a disproportionate impact on racial communities. For example, individuals who are under the age of eighteen are subject to heightened scrutiny; individuals with health conditions are advised to provide proof of medical insurance now; and while evidence of job offers were rarely required in the past, they are more likely to be required under the modified standards. *See* 9 FAM § 302.8-2(B)(2)(b)-(e); Randy Capps et al., Migration Policy, Inst., *Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration* (Nov. 2018), https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration; *see also Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114 (Oct. 10, 2018); Batalova et al., *supra*, at 26. This will penalize members of minority communities at astounding rates. For example, many immigrant women stay at home as caregivers, as opposed to earning an income, because of the high cost of childcare. Although all of these factors were relevant to a public charge determination, in most cases, a valid affidavit of support was sufficient to overcome any concerns. Overall, the disproportionate impact on people of color that the change to the public charge provision will have is evidence of the Trump administration's continued targeted attacks on racial, ethnic, and religious minorities.

## CONCLUSION

For the foregoing reasons, Amici request that this Court deny Defendants' motion to dismiss.

Dated:  March 22, 2019

Respectfully submitted,

/s/ *R. Stanton Jones*

Sirine Shebaya (Bar No. 07191)
MUSLIM ADVOCATES
P.O. Box 34440
Washington, DC 20043
Tel: (202) 897-2622
sirine@muslimadvocates.org

*Counsel for Muslim Advocates*

Nicole Ochi
Yanin Senachai
ASIAN AMERICANS ADVANCING
JUSTICE-LOS ANGELES
1145 Wilshire Blvd.
Los Angeles, CA 90017
Tel: (213) 977-7500
nochi@advancingjustice-la.org

*Counsel for Asian Americans Advancing
Justice-Los Angeles*

Jose L. Perez
LatinoJustice PRLDEF
115 Broadway, 5th Floor
New York, NY 10006
(212) 219-3360
jperez@latinojustice.org

*Counsel for LatinoJustice PRLDEF*

R. Stanton Jones (Bar No. 20690)
  *Counsel of Record*
Upnit K. Bhatti
Jayce L. Born
Hillary A. Anderson
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC  20001-3743
(202) 942-5000
stanton.jones@arnoldporter.com

*Counsel for Amici Curiae*