IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAYOR AND CITY COUNCIL OF
BALTIMORE,
    *Plaintiff*,

v.

DONALD J. TRUMP, *et al.*,
    *Defendants*.

Civil Action No. ELH-18-3636

## MEMORANDUM OPINION

This Memorandum Opinion concerns a challenge to recent amendments to the State Department's Foreign Affairs Manual (the "FAM" or "Manual"). The amendments pertain to the determination of "public charge" for purposes of an immigrant visa application.

Among other things, the FAM sets forth the criteria that consular officers must consider to determine whether a visa applicant is likely to be a "public charge"—a person dependent on the government for subsistence—if admitted to the United States. *See* ECF 1, ¶ 92. Under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, enacted in 1952, an applicant deemed "likely . . . to become a public charge" is "inadmissible" for entry into the United States. *Id.* § 1182(a)(4)(A).

The Mayor and City Council of Baltimore (the "City") filed a 70-page lawsuit against Donald J. Trump, in his official capacity as President of the United States; the United States Department of State ("State Department"); and Michael R. Pompeo, in his official capacity as United States Secretary of State, seeking to enjoin defendants from using the revised Manual to process immigrant visas applications. ECF 1 ("Complaint"). Appended to the City's Complaint is a redlined copy of the FAM. *See* ECF 1-1.

The Complaint contains three counts under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), and one count asserting an equal protection violation under the Due Process Clause of the Fifth Amendment to the United States Constitution.   According to the City, the amendments to the FAM's public charge provisions impose financial costs on the City and disrupt its social services.   The City also contends that the amendments harm the health and well-being of Baltimore's immigrant communities, which include family members who may be citizens.   In turn, it asserts that "Baltimore as a whole will suffer."   ECF 1, ¶ 170.

Defendants (sometimes collectively referred to as the "government") have moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction, and under Fed. R. Civ. P. 12(b)(6), for failure to state a claim.   ECF 17.   The motion is supported by a memorandum of law (ECF 17-1) (collectively, the "Motion") and a copy of the Manual.   ECF 17-2.   According to the government, the claims are not ripe and the City lacks standing to pursue them.   Further, defendants maintain that even if the City can overcome these jurisdictional obstacles, the City has failed to plausibly allege that the FAM violates either the APA or the Due Process Clause.   The City opposes the Motion.   ECF 25.   Defendants have replied.   ECF 56.

Numerous amici curiae have filed memoranda in support of the City.   ECF 49; ECF 51; ECF 53.[1]

---

[1] The Public Justice Center; Capital Area Immigrant Rights Coalition; CASA of Maryland, Inc.; Catholic Charities of Baltimore's Immigration Legal Services; and Episcopal Refugee and Immigrant Center Alliance, jointly filed a memorandum in support of plaintiff, docketed at ECF 49.

American Immigration Council; Americans for Immigrant Justice; Asian Americans Advancing Justice Los Angeles; Black Alliance for Just Immigration; LatinoJustice PRLDEF; MacArthur Justice Center; Muslim Advocates; National Immigrant Justice Center; Refugee and Immigrant Center for Education and Legal Services, Inc.; and Southern Poverty Law Center jointly filed a memorandum in support of plaintiff, docketed at ECF 51.

No hearing is necessary to resolve the Motion.  Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.     Background[2]

### A.  The Public Charge Statute

The INA contains ten grounds that render a visa applicant inadmissible.  8 U.S.C. § 1182(a).  This case concerns one of them:  the public charge ground.  The statute provides: "Any alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible."  *Id.* § 1182(a)(4)(A).  Thus, under the statute,[3] individuals deemed a public charge are "ineligible to receive visas and ineligible to be admitted to the United States."  *Id.* § 1182(a).

---

And, Alameda County, California; Austin, Texas; Boise, Idaho; Los Angeles, California; Marin County, California; Montgomery County, Maryland; Mountain View, California; Oakland, California; Palm Springs, California; Philadelphia, Pennsylvania; Sacramento, California; Santa Cruz County, California; Seattle, Washington; St. Paul, Minnesota; Stockton, California; Tucson, Arizona; and West Hollywood, California jointly filed a memorandum in support of plaintiff.  It is docketed at ECF 53.

[2] As discussed, *infra*, at this juncture the facts alleged in the suit are taken as true.  *See*, *e.g.*, *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013); *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).  Further, the Court "may take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

[3] The term "public charge" has a sordid heritage.  *See* ECF 51 at 2-6 (recounting the history of the public charge rule).  It first appeared in 1847, when New York, facing a surge of impoverished Irish immigrants, created a commission to prevent the entrance of "any lunatic, idiot, deaf and dumb, blind or infirm persons, not members of emigrating families, and who . . . are likely to become permanently a public charge," unless the shipmaster would post a bond for the passenger.  Torrie Hester et al., Historians' Comment: DHS Notice of Proposed Rule "Inadmissibility on Public Charge Grounds" FR 2018-21106, at 2 (Oct. 5, 2018) (citation omitted).  Other states took similar action.  *See* HIDETAKE HIROTA, EXPELLING THE POOR: ATLANTIC SEABOARD STATES & THE ORIGINS OF AMERICAN IMMIGRATION POLICY 41-70 (2017).

The INA does not define the term "public charge."  Rather, the INA directs that the government "shall at a minimum consider the alien's—(I) age; (II) health; (III) family status; (IV) assets, resources, and financial status; and (V) education and skills."  *Id.* § 1182(a)(4)(B)(i).  In making public charge determinations, the government "may also consider any Affidavit of Support[.]"  *Id.* § 1182(a)(4)(B)(ii).

Visa applicants in the United States are processed by U.S. Citizenship and Immigration Services ("USCIS"), which is part of the Department of Homeland Security ("DHS").  ECF 1, ¶ 84. Visa applicants abroad are processed by the State Department through consular offices.  *Id.* ¶ 21.  Both DHS and the State Department consider whether a visa applicant is likely to become a "public charge."  *Id.* ¶ 39.

### B.  Visa Application Process

The Consular Visa Process is the process by which non-citizens apply for a visa to enter the United States.  *Id.* ¶ 18.  There are two primary types of visas: (1) immigrant visas, for

---

When the Supreme Court invalidated New York's law on Commerce Clause grounds in 1875, *see Henderson v. Mayor of City of New York*, 92 U.S. 259, 274-75 (1875), Congress took up the mantle. HIROTA, EXPELLING THE POOR, *supra*, at 184-85.  In 1882, Congress passed two laws restricting immigration. In May 1882, Congress prohibited the entry of "Chinese laborers." Chinese Exclusion Act, ch. 126, 22 Stat. 58. (1882). Three months later, it enacted the first general immigration law "with immigrant exclusion and deportation at its core."  HIROTA, EXPELLING THE POOR, *supra*, at 191.  Among other things, the Act prohibited the entry into the United States of "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge."  An Act to Regulate Immigration, ch. 376, § 2, 22 Stat. 214 (1882). Throughout the early Twentieth Century, the federal government employed the public charge rule to exclude immigrant groups deemed undesirable, such as South Asians, Jews, and Hispanics. *See* Hester et al., Historians' Comment, *supra*, at 3-4; *see also* ECF 51 at 5.

When Congress enacted the INA in 1952 to modernize the nation's immigration system, it included the public charge rule as a basis for inadmissibility. *See* Pub. L. No. 414, ch. 2, § 212(a)(15), 66 Stat. 163, 183 (1952) (codified at 8 U.S.C. § 1182(a)(4)).  The public charge provision was last amended in 1996. *See* Pub. L. 104-208, Div. C, 110 Stat. 3009-674, § 531(a)(4)(B) (1996).

individuals who seek to become permanent residents of the United States; and (2) nonimmigrant visas, for individuals seeking a temporary stay in the United States. *Id.* ¶ 19; *see also* 8 U.S.C. §§ 1181(a); 1182(a)(7).

The "vast majority" of foreign nationals must travel to a U.S. consulate to apply for a visa. ECF 1, ¶ 20. "Consular processing" requires the visa applicant to submit various documents, undergo a medical screening, and be interviewed in person by a consular officer. *Id.* ¶ 21; *see also* 8 U.S.C. §§ 1202(a), (e); 22 C.F.R. § 42.62. During the interview, the consular officer reviews the applicant's criminal, financial, and medical records to decide if the applicant is admissible to the United States. ECF 1, ¶ 28.

The applicant bears the burden to demonstrate "to the satisfaction of the consular officer" that he or she is eligible for the type of visa for which the applicant has applied. 8 U.S.C. § 1361. No visa "shall be issued to an alien" if "it appears to the consular officer" from the application papers "that such alien is ineligible to receive a visa" or if "the consular officer knows or has reason to believe" that the alien is ineligible. *Id.* § 1201(g); *see* 22 C.F.R. § 40.6 (explaining that the term "'reason to believe' . . . shall be considered to require a determination based upon facts or circumstances which would lead a reasonable person to conclude that the applicant is ineligible to receive a visa").[4]

An individual illegally residing in the United States must satisfy additional requirements to obtain a visa. ECF 1, ¶ 22. Those individuals must leave the country and undergo consular

---

[4] Although a visa normally is necessary for admission, it does not guarantee admission; a visa holder still must be found admissible upon inspection at a port of entry. *See* 8 U.S.C. §§ 1201(h), 1185(d), 1225(a); *see also id.* § 1101(a)(4) (specifying that an application for a visa is distinct from an application for admission).

processing abroad in order to obtain a visa. *Id.* ¶ 29.[5]   The individual must remain abroad while the consulate processes his or her application.   This can take weeks or months or may last indefinitely if the individual's visa is denied or put into administrative processing. *Id.*

Individuals may obtain an immigrant visa through three channels.  First, a United States employer may file for an employment-based visa for the immigrant. *Id.* ¶ 23.  Second, an individual may submit a diversity visa application to the diversity visa lottery. *Id.*  Third, a lawful permanent resident or United States citizen may file on behalf of a relative for a family-based visa. *Id.* ¶¶ 23, 25.  Where an applicant files for a family-based visa, the family member sponsor must submit an Affidavit of Support (Form I-864) on the applicant's behalf. *Id.* ¶ 25.  Consular officials use the Affidavit to determine whether a visa applicant will have sufficient financial support should he or she receive a visa. *Id.* ¶ 26.  The Affidavit also serves as a contract between the visa applicant, the sponsor, and the federal government, in which the sponsor pledges to support the applicant if he or she is not self-sufficient.[6] *Id.*  According to the City, "an immigrant who can depend on a reliable source of support from a sponsor is dramatically less likely to need any public benefits." *Id.*

### C.  The Foreign Affairs Manual

The State Department's website describes the FAM as "a single, comprehensive, and authoritative source for the Department's organization structure, policies, and procedures that govern the operation of the State Department, the Foreign Service, and, when applicable, other

---

[5] In contrast, individuals already in the United States on a valid visa who wish to extend their visa, change their visa status, or apply for permanent residency must petition USCIS. *See* ECF 1, ¶¶ 20 n.12, 84.

[6] If a sponsor has a household income of less than 125% of the federal poverty limit, the sponsor must co-sponsor the applicant with another individual such that their joint income exceeds that threshold. ECF 1, ¶ 27. However, the joint sponsor need not be related to the applicant. *Id.*

federal agencies." *Id.* ¶ 42 (quoting Foreign Affairs Manual and Handbook, U.S. Dep't of State, http://fam.state.gov/).   Along with the State Department's handbooks, the Manual "convey[s] codified information to Department staff and contractors so they can carry out their responsibilities in accordance with statutory, executive, and Department mandates."  *Id.*; *see also Sheikh v. U.S. Dep't of Homeland Sec.*, 685 F. Supp. 2d 1076, 1090 (C.D. Cal. 2009) ("FAM contains the functional statements, organizational responsibilities, and authorities of each of the major components of the U.S. Department of State, including Consular Officers.").

### 1.   The Prior FAM Public Charge Rule

Volume Nine of the Manual contains instructions that consular officers are to follow when assessing whether a visa applicant is a public charge.  Prior to January 3, 2018, the FAM defined "public charge" as a non-citizen "likely to become primarily dependent on the U.S. Government for subsistence." ECF 1, ¶ 44; ECF 17-2 (9 FAM § 302.8 (2017)) at 3.  This occurred either from "[r]eceipt of public cash assistance for income maintenance" or "[i]nstitutionalization for long-term care at U.S. Government expense."    ECF 1, ¶ 44; ECF 17-2 at 3.

"When considering the likelihood of an applicant becoming such a 'public charge,' [the consular officer] must take into account, the totality of the alien's circumstances at the time of visa application." ECF 17-2 at 3.  However, the FAM clarified that the officer "must assess only the 'totality of the circumstances' existing at the time of visa application." *Id.* at 11.  In other words, the officer "may not refuse a visa on the basis of 'what if' type considerations." *Id.*

Notably, the Manual excluded the visa applicant's past, current, or future receipt of non-cash benefits from this holistic review.  ECF 1, ¶ 44.  It stated, ECF 17-2 at 4 (emphasis added):

> There are many forms of U.S. Government assistance that an alien may have accepted in the past, or that you may reasonably believe an alien might receive after admission to the United States, that are of a noncash and/or supplemental nature and would not create an inadmissibility under INA 212(a)(4). Certain programs are

funded with public funds for the general good, such as public education and child vaccination programs, etc., and are not considered to be benefits for the purposes of INA 212(a)(4). Although the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 prohibit aliens from receiving many kinds of public benefits, it specifically exempts from this prohibition several of the public benefits indicated below. *Neither the past nor possible future receipt of such non-cash or supplemental assistance may be considered in determining whether an alien is likely to become a public charge.*

The FAM provided a non-exhaustive list of non-cash benefits "that are not to be considered as public cash assistance or income . . . ." *Id.* The list included:

1. The Food Stamp Program;

2. The Medicaid Program (other than payments under Medicaid for long-term institutional care);

3. The Child Health Insurance Program (CHIP);

4. Emergency medical services;

5. The Women, Infants and Children (WIC) Program;

6. Other nutrition and food assistance programs;

7. Other health and medical benefits;

8. Child-care benefits;

9. Foster care

10. Transportation vouchers;

11. Job training programs;

12. Energy assistance, such as the low-income home energy assistance program (LIHEAP);

13. Educational assistance, such as Head Start or aid for elementary, secondary, or higher education;

14. Job training;

15. In-kind emergency community services, such as soup kitchens and crisis counseling;

16. State and local programs that serve the same purposes as the Federal in-kind programs listed above; and

17. Any other Federal, State, or local programs in which benefits are paid in-kind, by voucher or by any means other than payment of cash benefits to the eligible person for income maintenance.

ECF 1, ¶ 45; ECF 17-2 at 4-5.

Further, the Manual limited the relevance of benefits used by the visa applicant's family members.  It stated: "Past or current receipt of cash benefits for income maintenance by a family member of the visa applicant may be factored into the applicant's case only when such benefits also constitute(d) the primary means of subsistence of the applicant."  ECF 1, ¶ 102; ECF 17-2 at 10 (alteration in original).  The Manual also provided: "Past or current receipt of other types of benefits, . . . must not be considered."  ECF 1, ¶ 102; ECF 17-2 at 101.

In regard to an Affidavit of Support, the FAM instructed that "[a] properly filed, non-fraudulent Form I-864 should normally be considered sufficient to overcome the INA 212(a)(4) requirements."  ECF 1, ¶ 47; ECF 17-2 at 7.  "If the sponsor or any member of his or her household has received public means-tested benefits within the past three years," the FAM required the consular officer to "review fully the sponsor's current ability to provide the requisite level of support, taking into consideration the kind of assistance provided and the dates received."  ECF 1, ¶ 48; ECF 17-2 at 11-12.  Nonetheless, the Manual stated: "There is no provision in the law to indicate that the receipt of means-tested benefits by the sponsor would, in itself, result in a finding of inadmissibility for the applicant . . . ."  ECF 1, ¶ 107; ECF 17-2 at 11.

## 2.  The Amended FAM Public Charge Rule

Without prior notice, the State Department issued amendments to Volume Nine of the Manual on January 3, 2018.  ECF 1, ¶ 92.  The State Department posted a memorandum on its website on January 4, 2018, announcing the changes.  *Id.* ¶ 115.  In three significant ways, the revisions alter how consular officers conduct public charge determinations.

First, the FAM previously prohibited consular officers from considering the applicant's past or potential future use of non-cash public assistance.  ECF 1, ¶ 97.  But, the Manual now requires consular officers to consider a visa applicant's receipt of non-cash benefits as part of the public charge determination.  *Id.* ¶ 96.  Specifically, the FAM states: "There are many forms of public assistance that an applicant may have accepted in the past, or that you may reasonably believe, an alien might receive after admission to the United States that are of a non-cash and/or supplementary nature and should not be considered to be benefits when examining the applicant under INA 212(a)(4), and *may only be considered as part of the totality of the applicant's circumstances in determining whether an applicant is likely to become a public charg*e."  *Id.* ¶ 98; ECF 1-1 at 5 (emphasis added).  Furthermore, the State Department dropped the FAM's directive that "[n]either the past nor possible future receipt of such non-cash or supplemental assistance may be considered in determining whether an alien is likely to become a public charge."  ECF 1, ¶¶ 99-100; ECF 1-1 at 5.

Second, under the earlier version of the FAM, consular officers were not permitted to consider the use of non-cash benefits by the applicant's family members; the receipt of cash assistance was relevant only if the benefits were the applicant's primary source of income.  ECF 1, ¶ 102.  However, the FAM now includes the receipt of non-cash benefits by the visa applicant's family members as a part of the totality-of-the-circumstances test.  *Id.* ¶ 101.  The relevant provision now states: "Past or current receipt of public assistance of *any type* by the visa applicant or a family member in the visa applicant's household is relevant to determining whether the applicant is likely to become a public charge in the future[.]"  ECF 1, ¶ 103; ECF 1-1 at 9 (emphasis added).  Further, the FAM instructs consular officers to treat "[a] dependent family member's receipt of public benefits" as "a *heavily negative* factor in the totality of the circumstances unless

the applicant can demonstrate that his or her prospective income and assets with the income and assets of the others in the family will be sufficient for the family to overcome the poverty income guideline for the family."  ECF 1, ¶ 104; ECF 1-1 at 10 (emphasis added).

Third, whereas the FAM once taught that an Affidavit of Support from the applicant's sponsor was "normally . . . sufficient" to satisfy the public charge inquiry, the revised Manual diminishes the Affidavit's weight, instructing that it is merely one factor among many that the consular officer should consider.  ECF 1, ¶¶ 105-08.  Currently, the consular officer may treat the Affidavit as a "positive" factor, whereas it was previously "sufficient" in most cases.  *Id.* ¶ 105; ECF 1-1 at 7.

According to the City, the State Department "now considers the past or current receipt of non-cash, means-tested benefits by sponsors or their family members to be disqualifying."  ECF 1, ¶ 106.  For support, plaintiff notes that the new Manual no longer contains the qualifier that "[t]here is no provision in the law to indicate that the receipt of means-tested benefits by the sponsor would, in itself, result in a finding of inadmissibility . . . ."  *Id.* ¶ 108; ECF 1-1 at 24.

The City contends that the memorandum posted by the State Department on January 4, 2018, concerning the revisions to the FAM, did not mention many of the changes made to the FAM.  ECF 1, ¶ 119(a).  In particular, it "failed to acknowledge that the changes to the FAM's public charge provisions amounted to a reversal of the decades-old understanding of the public charge ground of inadmissibility, codified in prior versions of the FAM and by INS in the 1999 NPRM and Field Guidance."  *Id.* ¶ 119(c).  Moreover, it did not "disclose that DHS would be proposing for public comment similar changes to the public charge determination . . . ."  *Id.* ¶ 119(e).  And it "failed to provide *any* explanation as to why the State Department was changing

its policy and approach to the public charge ground of inadmissibility, nor reasons for the new approach." *Id.* ¶119(f) (emphasis in original).

The State Department removed the memorandum from its website several weeks after it was posted. *Id.* ¶ 116. Since then, the State Department has neither reposted the memorandum nor issued any other public statement about the revisions to the FAM's public charge provisions. But, the amendments to the FAM remain in effect.

### 3. The Effect of the FAM's New Public Charge Rule

The City alleges that "the FAM change deters immigrants, their family members, and their sponsors from accepting public benefits—benefits for which they are legally eligible and which are designed to promote public health and economic self-sufficiency." *Id.* ¶ 121. It points to media stories detailing a steep drop in the receipt of non-cash benefits by immigrants. *Id.* ¶ 126; *see infra* Part III.A(2). And, the City notes that healthcare providers throughout Maryland have observed that immigrants are foregoing health benefits like WIC or Medicare for fear of immigration consequences. *Id.* ¶ 127.

According to the City, the changes to the FAM's public charge provisions will be felt most acutely by non-white immigrants. *Id.* ¶ 128. For support, plaintiffs turn to an analysis of DHS's proposed rule pertaining to the definition of public charge, which found that the rule, if implemented, would "have disproportionate effects based on national origin and ethnicity, blocking 71% of applicants from Mexico and Central America, 69% from Africa, and 52% from Asia—but only 36% from Europe, Canada, and Oceania." *Id.* (quoting *The Public Charge Rule, Explained*, Boundless (Sept. 23, 2018), https://www.boundless.com/_blog/public-charge-rule-explained). Thus, the City posits that the FAM change will disproportionately affect immigrants from developing countries. *Id.*

The City and Amici also note in their briefs that visa denials due to public charge inadmissibility have surged since the State Department issued the amended FAM.  *See* ECF 25 at 19-20; ECF 49 at 5; ECF 53 at 3-4.  In 2015, the State Department denied 897 visa applications on public charge grounds.  U.S. Dep't of State, Ann. Rep. Table XX (2015), https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2015AnnualReport/FY15 AnnualReport-TableXX.pdf.  There were 3,237 such denials in 2017. U.S. Dep't of State, Ann. Rep. Table XX (2017), https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/ FY2017AnnualReport/FY17AnnualReport-TableXX.pdf.  In contrast, during the 2018 fiscal year, the number of visa applications denied on public charge grounds exceeded 13,000 visa applications. U.S. Dep't of State, Ann. Rep. Table XX (2018), https://travel.state.gov/content/ dam/visas/Statistics/AnnualReports/FY2018AnnualReport/FY18AnnualReport%20%20- %20TableXIX.pdf.

### D.  Allegations of Defendants' Animus

The City alleges that President Trump and senior Executive Branch officials harbor "animus towards immigrants, particularly those from Latin American, Asian, and African countries, and those who accept public benefits."  ECF 1, ¶ 74.  In support of this allegation, plaintiff points to multiple statements by President Trump that allegedly reflect disdain for immigrants from Africa and Latin America.

For example, President Trump reportedly told advisors in June 2017 that immigrants from Haiti "all have AIDS" and that Nigerians, once admitted to the United States, would never "go back to their huts."  *Id.* ¶ 70; *see* Eugene Scott, *Trump's History of Making Offensive Comments About Nonwhite Immigrants*, Wash. Post (Jan. 11, 2018), https://www.washingtonpost.com/news/ the-fix/wp/2018/01/11/trumps-history-of-controversial-remarks-about-nonwhite-immigrants/.

And, during a cabinet meeting on January 11, 2018, in reference to immigrants from Haiti and Africa, President Trump allegedly remarked, "Why do we want all these people from 'shithole countries' coming here?"  ECF 1, ¶ 69; *see also* Scott *supra*.

Moreover, the Complaint contains four pages of other public statements made by President Trump, complaining that immigrants are a drain on the public fisk.  ECF 1, ¶ 71.  Those statements include:

1. "According to the National Academy of Sciences, our current immigration system costs America's taxpayers many billions of dollars a year."  *Id.* ¶ 71(m).

2. "We also believe that those seeking to immigrate into our country should be able to support themselves financially and should not be able to use welfare for themselves or the household for a period of at least five years."  *Id.* ¶ 71(n).

3. "Current immigration policy imposes as much as $300 billion annually in net fiscal costs on U.S. taxpayers."  *Id.* ¶ 71(p).

4. "According to the Center for Immigration Studies, the $18 billion wall will pay for itself by curbing the importation of crime, drugs, and illegal immigrants who tend to go on the federal dole."  *Id.* ¶ 71(q).

5. "[T]hey're not sending their finest. We're sending them the hell back."  *Id.* ¶ 71(r).

6. "So-called Birthright Citizenship, which costs our Country billions of dollars and is very unfair to our citizens, will be ended one way or the other."  *Id.* ¶ 71(t).

7. "We're the only country in the world where a person comes in and has a baby, and the baby is essentially a citizen of the United States . . . with all of those benefits."  *Id.* ¶ 71(u).

In support of the City's claims that the Trump Administration harbors animus towards immigrants, the City also cites to statements made by Stephen Miller, a senior advisor to President Trump on immigration policy, and comments made by former Attorney General Jeff Sessions when he was a U.S. Senator.  *Id.* ¶¶ 72-73.

Significantly, the City alleges that the President's conduct led to the State Department's decision to amend the FAM's public charge instructions.  *Id.* ¶ 76.  The City asserts that, shortly

after President Trump's inauguration in January 2017, the media obtained a draft order titled "Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote Accountability and Responsibility." *Id.* ¶ 77; *see* Andrew Bremberg, Memorandum for the President, Subject: Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote Accountability and Responsibility (Jan. 23, 2017). According to the City, the draft order directed DHS to "rescind any field guidance" and "propose for notice and comment a rule that provides standards for determining which aliens are inadmissible or deportable on public charge grounds." ECF 1, ¶ 77. In addition, the City alleges that the draft order instructed the State Department "to amend the Foreign Affairs Manual to ensure that its public-charge provisions are consistent with the goals of this Order." *Id.*

Notably, the draft order was never finalized. *Id.* Nevertheless, plaintiff contends that both the State Department and DHS took measures in accordance with the draft order. On October 10, 2018, DHS published a notice of proposed rulemaking in the Federal Register titled "Inadmissibility on Public Charge Grounds." *Id.* ¶ 83; *see* 83 Fed. Reg. 51, 114 (Oct. 10, 2018) ("DHS Proposed Rule"). The proposed rule purported to expand the definition of public charge to include the receipt of non-cash public benefits. ECF 1, ¶ 86. DHS published a final version of the regulation on August 14, 2019. *See Inadmissibility of Public Charge Grounds*, 84 Fed. Reg. 41,292, 41,501 (Aug. 14, 2019) (to be codified as 8 C.F.R. § 212.21(a)).[7] And, as noted, the State Department amended the FAM's public charge provisions on January 3, 2018. ECF 1, ¶ 92.

---

[7] There are seven pending lawsuits lodged against DHS's public charge rule. *See CASA de Maryland Inc. v. Trump*, PWG-19-02715 (D. Md.); *Make the Road N.Y. v. Cuccinelli*, No. 1:19-cv-07993 (S.D.N.Y.); *New York v. U.S. Dep't of Homeland Sec.*, No. 1:19-cv-07777 (S.D.N.Y.); *California v. U.S. Dep't of Homeland Sec.*, No. 3:19-cv-04975 (N.D. Cal. 8/16/19); *La Clinica De La Raza v. Trump*, No. 3:19-cv-04980 (N.D. Cal.); *Washington v. U.S. Dep't of Homeland Sec.*, No. 4:19-cv-05210 (E.D. Wash.); *City and Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.*, No. 3:19-cv-4717 (N.D. Cal.).

This litigation followed. Additional facts are included below, as necessary for the analysis.

## II.    Standard of Review

Defendants have moved to dismiss the City's Complaint under Rule 12(b)(1) for lack of subject matter jurisdiction, and pursuant to Rule 12(b)(6) for failure to state a claim.

### A.  Rule 12(b)(1)

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "'that the jurisdictional allegations of the complaint [are] not true.'" *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013). The plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192. On the other hand, in a factual challenge, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Id.* In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009); *Evans*, 166 F.3d at 647.

### B.  Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 849 F.3d 93, 112 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10, 135 S. Ct. 346, 346 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim

for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards,* 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.'"* *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Therefore, the court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 08 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds* by *Reed v. Town of Gilbert, Ariz.*, 576 U.S. ____, 135 S. Ct. 2218 (2015), *as recognized in Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015); *see Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). However, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

19

In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). But, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)).

Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights

asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).  *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  And, "these facts [must be] construed in the light most favorable" to the nonmovant. *Clatterbuck,* 708 F.3d at 557.

As noted, the City has attached as an exhibit to its Complaint the redline version of the FAM's public charge provisions, subsequent to January 3, 2018.  ECF 1-1; *see* ECF 1, ¶ 95.  With their Motion, the government submitted a version of the Manual, dated August 4, 2017.  ECF 17-2.  As the City's APA and constitutional claims are predicated on the Manual, it is integral to the Complaint and may be considered.  In addition, the government references the Attorney General's Manual on the APA in its Motion (ECF 17-1 at 42), and plaintiff relies on data concerning visa application denials in its opposition.  ECF 25 at 19-20.  Because these materials are publicly available, and neither party disputes their authenticity, I may take judicial notice of them.

Accordingly, I may consider the exhibits and referenced public materials, without converting defendants' Motion to one for summary judgment.

### III.    Justiciability

The government argues that this Court is without subject matter jurisdiction to consider this case.  According to defendants, plaintiff lacks Article III standing to pursue this suit and the case is not ripe.  ECF 17-1 at 21-32.

Defendants advance several arguments in regard to standing.  First, they assert that plaintiff's harm does not qualify as an injury-in-fact, as "it relies on speculation about what might happen to the City depending on how Baltimore residents react to the guidance." *Id.* at 25.  Second, they maintain that the City's alleged harms are not "fairly traceable" to the FAM or redressable by judicial order, because they are caused by the "'unfettered choices'" of "'independent actors not before the courts.'"  *Id.* at 26 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1993) (plurality opinion)).  In addition, the government contends that the City lacks standing to assert the constitutional rights of its residents.  *Id.* at 29-30.  And, defendants argue that even if the City has Article III standing to sue the State Department and Pompeo, the City lacks standing to sue the President, because it does not plausibly allege that its injuries are fairly traceable to him.  *Id.* at 30-31.  Not surprisingly, the City disagrees.  ECF 25 at 22-37.

As noted, under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction.  *See Lujan*, 504 U.S. at 561; *Demetres*, 776 F.3d at, 272; *Durden*, 736 F.3d at 300.  Notably, the analysis of standing will vary with the stage of litigation.  *Overbey v. Mayor and City Council of Balt.*, 930 F.3d 215, 227 (4th Cir. 2019).  In the context of a facial challenge under Rule 12(b)(1), the question is whether

plaintiff's allegations, taken as true, "are enough to give the [plaintiff] constitutional standing." *Id.*

When, as here, "'standing is challenged on the pleadings, [the court will] accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party.'" *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands*, *LLC*, 713 F.3d 175, 181-82 (4th Cir. 2013)); *see Kerns*, 585 F.3d at 192. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, [because] on a motion to dismiss [the court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citation and quotation marks omitted); *accord Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018); *Moore v. Blibaum & Assocs., P.A.*, 693 F. App'x 205 (4th Cir. 2017); *NAACP v. Bureau of the Census*, PWG-18-891, 2019 WL 355743, at *17 (D. Md. Jan 19, 2019).

Therefore, in analyzing the standing issue, I shall accept as true the allegations in the Complaint, so long as "there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678), *cert. denied sub nom. Beck v. Shulkin*, __ U.S. __, 137 S. Ct. 2307 (2017); *see also Twombly*, 550 U.S. at 555-56.

## A. Standing

### 1. Background

It is a bedrock principle that Article III of the Federal Constitution confines the federal courts to adjudicating "actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408

(2013). "Indeed, 'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Dreher v. Experian Info. Solutions, Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. __, __, 136 S. Ct. 1540, 1547 (2016)).

Therefore, during the pendency of a case, an actual controversy must exist. *See Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974); *Int'l Bhd. of Teamsters, Local Union No. 639 v. Airgas, Inc.*, 885 F.3d 230, 234 (4th Cir. 2019); *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013). Conversely, in the absence of a case or controversy, "the court's subject matter jurisdiction ceases to exist . . . ." *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same).

"One element of the case-or-controversy requirement" is that a plaintiff must establish standing to sue. *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *see Spokeo, Inc.*, 136 S. Ct. at 1547 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."); *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019) ("The standing doctrine derives from the Constitution's limitation on Article III courts' power to adjudicate 'cases and controversies.') (internal quotation marks and citations omitted). The *Clapper* Court explained, 568 U.S. at 408: "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."[8]

---

[8] Under the political question doctrine, which is not asserted here, courts may not "review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). It is a "narrow exception" to judicial review. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012); *see Kravitz v. U.S. Dep't of Commerce*, 336 F. Supp. 3d 545, 561 (D. Md. 2018).

The "constraint of Article III" includes principles of standing as well as ripeness, which "presents a 'threshold question [] of justiciability.'" *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013) (citation omitted); *South Carolina*, 912 F.3d at 730. Like standing, ripeness is an issue of subject matter jurisdiction. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013); *see NAACP*, WL 355743, at *8 (describing standing and ripeness as "overlapping facets" of subject matter jurisdiction).

The doctrine of standing consists of two distinct "strands": constitutional standing, pursuant to Article III, and prudential standing. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). As discussed, *infra*, "the standing inquiry asks whether a plaintiff ha[s] the requisite stake in the outcome of a case . . . ." *Deal*, 911 F.3d at 187 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)). Under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a particularized injury," which is a requirement that "serves vital interests going to the role of the judiciary in our system of separated powers." *Hollingsworth v. Perry*, 570 U.S. 693, 696 (2013).

In addition to satisfying constitutional standing requirements, a plaintiff must also demonstrate that his claims are not barred by prudential limitations on a federal court's exercise of jurisdiction. *United States v. Windsor*, 570 U.S. 744, 756-57 (2013); *see also*, *e.g.*, *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11; *Doe v. Sebelius*, 676 F. Supp. 2d 423, 428 (D. Md. 2009). Prudential standing "'embodies judicially self-imposed limits on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11 (citation omitted).

One such limitation is that "a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This limitation serves to "preclude a court from deciding

'questions of broad social import in cases in which no individual rights will be vindicated'" and to ensure that "'access to the federal courts [is] limited to those litigants best suited to assert the claims.'"  *Buchanan v. Consolidated Stores Corp.*, 125 F. Supp. 2d 730, 738 (D. Md. 2001) (quoting *Mackey v. Nationwide Ins. Co.*, 724 F.2d 419, 422 (4th Cir. 1984)).

To establish Article III standing, a plaintiff must satisfy three elements.  *Lujan,* 504 U.S. at 560. They are, *id.* (internal quotation marks and citations omitted):

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*See also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014); *Clapper*, 568 U.S. at 409; *Friends of the Earth, Inc.*, 528 U.S. at 180-81; *Overbey*, 930 F.3d at 226-27; *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018); *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 207 (4th Cir. 2017); *Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015); *Lane v. Holder*, 703 F.3d 668, 671 (4th Cir. 2011); *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011).

To meet the injury-in-fact requirement, a plaintiff must allege that it "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural and hypothetical.'"  *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560); *see South Carolina*, 912 F.3d at 726.  A threatened injury can also satisfy Article III standing, although "not all threatened injuries constitute an injury-in-fact."  *Beck*, 848 F.3d at 271; S*outh Carolina*, 912 F.3d at 726.

The Fourth Circuit recently explained in *Deal*, 911 F.3d at 189, that the two concepts— actual, ongoing injury or imminent injury—are "disjunctive."  An "allegation of future injury may

suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'"  *Susan B. Anthony*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5); *see Lujan*, 504 U.S. at 564; *South Carolina*, 912 F. 3d at 726.  In contrast, "'[a]llegations of *possible* future injury' are not sufficient."  *Clapper*, 568 U.S. at 409 (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  This requirement serves "to ensure that the alleged injury is not too speculative for Article III purposes."  *Wikimedia Found.*, 857 F.3d at 208.

In some cases, it is enough that there is a "substantial risk" of a harm occurring that "prompt[s] plaintiffs to reasonably incur costs to mitigate or avoid that harm."  *Clapper*, 568 U.S. at 414 n.5.  But, in such a case, the plaintiff cannot rely on an "attenuated chain of inferences" nor "on speculation about 'the unfettered choices made by independent actors not before the court.'"  *Id.* (quoting *Lujan*, 504 U.S. at 562).  Nor can plaintiffs "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Clapper*, 568 U.S. at 416.  "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear."  *Id.*; *see, e.g.*, *Wikimedia*, 857 F.3d at 216 ("Nor can Plaintiffs establish standing on the ground that . . . surveillance compels them to take burdensome and costly measures.").

"For an injury to be traceable, 'there must be a causal connection between the injury and the conduct complained of' by the plaintiff."  *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quoting *Lujan*, 504 U.S. at 560).  However, "the defendant's conduct need not be the last link in the causal chain[.]'"  *Id.*; *see also Lexmark Int'l, Inc.*, 572 U.S. at 134 n.6 ("Proximate causation is not a requirement of Article III standing[.]").  "[W]here the plaintiff suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendant's

conduct 'upon the action of someone else,'" the traceability requirement is satisfied. *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

### 2.  Alleged Harms

The City asserts that it has alleged "quintessential injuries-in-fact."  ECF 25 at 28.  In sum, it asserts that allegations of diversion of its resources, increased financial costs to the City, and withdrawal of immigrants and their families from City programs, all due to the revised FAM, "satisfy its pleading burden.[l]"  *Id.*

The City alleges that the change to the FAM sows confusion among immigrants and their families as to the consequences of accepting public benefits from the City and other levels of government, and chills them from pursuing such benefits.  As a result, plaintiff avers that immigrants are taking advantage of fewer public benefits to avoid adverse effects on immigration determinations.  The City rests this allegation on a mountain of news stories,[9] think tank reports,[10]

---

[9] *See, e.g.*, Helena Bottemiller Evich, *Immigrant Families Appear to Be Dropping Out of Food Stamps*, Politico (Nov. 14, 2018), https://www.politico.com/story/2018/11/14/immigrant-families-dropping-out-food-stamps-966256; Christina Jewett et al., *Under a Trump Proposal, Lawful Immigrants Might Shun Medical Care*, Nat'l Pub. Radio (May 10, 2018) https://www.npr.org/sections/health-shots/2018/05/10/609758169/under-a-trump-proposal-lawful-immigrants-might-shun-medical-care; Kathleen Page, *Cutting Off Immigrants from Public Benefits Means American Children Will Pay the Price*, Baltimore Sun (Sept. 25, 2018), http://www.baltimoresun.com/news/opinion/oped/bs-ed-op-0926-public-charge-20180924-story.html.

[10] *See, e.g.*, Samantha Artiga et al., Potential Effects of Public Charge Changes on Health Coverage for Citizen Children, Kaiser Family Found. 5 (May 2018), http://files.kff.org/attachment/Issue-Brief-Potential-Effects-of-Public-Charge-Changes-on-Health-Coverage-for-Citizen-Children; Jeanne Batalova et al., Chilling Effects: The Expected Public Charge Rule and Its Impact on Legal Immigrant Families' Public Benefits Use, Migration Pol'y Inst. 14 (June 2018), https://www.migrationpolicy.org/research/chilling-effects-expected-public-charge-rule-impact-legal-immigrant-families; Sharon Parrott et al., Trump "Public Charge" Rule Would Prove Particularly Harsh for Pregnant Women and Children, Ctr. on Budget & Pol'y Priorities 2 (May 1, 2018), https://www.cbpp.org/sites/ default/files/atoms/files/5-1-18pov2.pdf.

and academic articles.[11]  *See* ECF 1.  In addition, the City describes the recent effects of the policy change on the City's programs.  *See, e.g.*, ECF 1, ¶¶ 143, 144.  And, the City alleges that the government has acknowledged that these changes are likely.  It avers: "Research shows that when eligibility rules change for public benefits programs there is evidence of a 'chilling effect' that discourages immigrants from using public benefits programs for which they are still eligible."  *Id.* ¶ 122 (quoting Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114, 51,266 (Oct. 10, 2018)); *see also* ECF 1, ¶ 122 ("There may also be additional reductions in transfer payments from states to individuals who may choose to disenroll from or forego enrollment in a public benefits program." (quoting 83 Fed. Reg. at 51,268)).

The City claims that by inducing immigrants to use fewer public benefits, the changes to the FAM harm the City in three distinct ways.  These contentions are discussed below.

### a.   Impeding the City's Delivery of Social Services to Immigrants

First, the amendments to the FAM allegedly impede the City's attempts to provide benefits and social services to immigrants residing in the City.  ECF 1, ¶¶ 137-55.  Baltimore provides significant health services, operating specialty clinics in two facilities, and funding of a visiting-nurse program, as well as programs targeted at asthma, tuberculosis, childhood lead poisoning, and substance abuse.  *Id.* ¶¶ 141-42.

The City also provides housing benefits and services through three separate entities.  *Id.* ¶ 144.  For example, the Baltimore City Department of Housing and Community Development

---

[11] *See, e.g.*, Mitchell H. Katz & Dave A. Chokshi, *The "Public Charge" Proposal and Public Health: Implications for Patients and Clinicians,* J. Am. Med. Ass'n Viewpoint 3 (Oct. 1, 2018)*, https://jamanetwork.com/journals/jama/fullarticle/2705813*; Krista M. Perreira et al., *A New Threat to Immigrants' Health – The Public-Charge Rule,* 901 New Eng. J. Med. 903, 903 (Sept. 12, 2018).

operates the Leading Innovation for a Green and Healthy Tomorrow ("LIGHT") Program, which assesses residents and their homes to determine eligibility for over 200 federal, state, and local programs. According to the City, "LIGHT employees have seen clients come in to start the application process and voice concern over the potential immigration consequences of doing so." *Id.* The City also administers and funds housing programs used by immigrants. *Id.* These programs provide weatherization assistance, energy conservation services, and lead hazard reduction, as well as financial assistance with down payments and closure costs. *Id.* ¶ 145. Further, the City provides services targeted at the homeless and those at risk for homelessness, including immigrants. *Id.* ¶ 146. And, the City manages over 9,000 public housing units in fifteen developments and administers rental assistance programs. *Id.* ¶ 147.

The City also provides low-income assistance programs targeted at poverty reduction. *Id.* ¶ 148. This includes a Summer Food Service Program, which it makes available to all minors regardless of their immigration status. *Id.* ¶ 150. The City maintains that many of these services resemble other services that immigrants are avoiding because of the change to the FAM. *Id.*; *see id.* ¶¶ 126-27. As a result, the City concludes that immigrants are likely avoiding the City's programs as well. *Id.* ¶ 150.

Using federal funds, Baltimore operates Head Start programs. These programs are available to immigrants, but enrollment "has decreased, even sharply decreased among immigrants." *Id.* ¶ 151. The Complaint asserts that Baltimore's African immigrant population has "virtually ceased" enrollment in the months leading up of to the filing of the Complaint in November 2018. *Id.*

Baltimore also subsidizes a litany of other programs that provide services to immigrants. And, the City's SAFE Cities Network subsidizes legal assistance for immigrants facing

deportations. *Id.* ¶ 152. Although the City presumes that these services are not within the scope of the FAM change, it maintains that some immigrants may fear that using these services could jeopardize their immigration status and therefore decline to use them. *Id.* ¶ 154.

But, the City asserts that, "'[e]ven before the publication of th[e] [DHS] rule, there have been reports of immigrants avoiding health care for concern of being considered a public charge.'" ECF 1, ¶ 143 (quoting Katz & Chokshi, *supra* n.9). Accordingly, plaintiff posits that the change to the FAM has driven some immigrants not to use health clinics and public services. ECF 1, ¶ 143.

### b. Forcing the City to Divert Resources

The City contends that it must incur significant financial expense to adapt its programs to the policy changes. *Id.* ¶¶ 156-61. The City alleges that it will need to divert resources to analyze the policy change and its effects on the City's programs. *Id.* ¶ 157; *see also id.* ("Indirect costs . . . include familiarization with the rule for those entities that are not directly regulated but still want to understand the changes in federal and state transfer payments due to this rule familiarization costs, those familiarization costs are a direct cost of the rule." (quoting 83 Fed. Reg. at 51,260)). It will then devote additional costs training City employees, as well as the City's contractors and partners. ECF 1, ¶ 158. According to the City, the government has acknowledged these costs. *Id.* ("[local governments] may need to update and rewrite guidance" and "prepare training materials and retrain staff," which "will require staff time and have associated costs" (quoting 83 Fed. Reg. at 51,270)).

The City will also allocate additional time and resources to encouraging immigrants to accept public benefits that are not within the scope of the FAM change. ECF 1, ¶ 159. And, it will

spend still more funds advising immigrants about the potential adverse effects of accepting public resources and the uncertainties that remain due to changes to the FAM.  *Id.* ¶ 161.

### c.   Imposing Financial Costs on the City

The amendments to the FAM shift costs from the federal budget to the City's budget.  *Id.* ¶¶ 162-70.  The City alleges that immigrants may believe that local programs are exempt from immigration consequences, driving increased demand to City programs and draining the City's coffers.  *Id.* ¶ 163.  For example, the withdrawal of immigrants from state and federal publicly subsidized health insurance programs, such as Medicaid, could result in a shift to Baltimore's public clinics for the provision of care to immigrants.  *Id.* ¶¶ 134-35, 164-65.  Likewise, an immigrant may refuse to take federal nutrition programs, like the Supplemental Nutrition Assistance Program and the Special Supplemental Nutrition Program for Women, Infants, and Children, instead turning to Baltimore's Summer Food Service Program or its public school-administered pantries.  *Id.* ¶ 166. Similarly, an immigrant unwilling to use Section 8 housing vouchers may instead rely on the City's homeless services programs.  *Id.*

Indeed, the City alleges that the government acknowledged the following possible consequences: falling productivity, vaccination rates, and educational achievement, rising poverty, malnutrition, and communicable diseases.  ECF 1, ¶ 168 (citing 83 Fed. Reg. at 51,270).  Thus, the City asserts that the amendments to FAM will make the City's immigrants "poorer and less healthy[.]"  ECF 1, ¶ 167.

### 3.   Analysis

As noted, defendants contend that plaintiff has not suffered an injury-in-fact as a result of the amendments to the FAM.  Further, they argue that the City's alleged injuries are not fairly traceable to the FAM.

32

The government places significant weight on the case of *Frank Krasner Enterprises, Ltd. v. Montgomery Cty.*, 401 F.3d 230, 235 (4th Cir. 2005). However, the *Frank Krasner* Court did not establish that courts could never find standing when the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else," only that doing so will be "'substantially more difficult.'" *Id.* at 235 (quoting *Lujan*, 504 U.S. at 562). (internal citation omitted). The Fourth Circuit explained: "This is so because, '[t]he existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Frank Krasner Enters.*, 401 F.3d at 235(emphasis omitted) (quoting *Lujan*, 504 U.S. at 562).

In the recent case of *Department of Commerce v. New York*, __ U.S. __, 139 S. Ct. 2551 (2019), the Supreme Court confronted the standing arguments the government raises here. That case involved the Department of Commerce's plan to ask about citizenship on the 2020 United States Census. Several states, counties, cities, and other entities challenged the change as arbitrary and capricious under the Administrative Procedure Act. *Id.* at 2564. The respondent challengers maintained that the question would result in residents declining to complete the Census, and that this underreporting would, in turn, lead to a host of injuries, including a loss of federal funds for states with a disproportionate share of noncitizen households. *Id.* at 2565.

The Department of Commerce contested respondents' Article III standing on the ground that the alleged harms were not traceable to the Department's actions but to the independent actions of third parties. *Id.* at 2565-66. Indeed, the Department contended that the chain of causation was further attenuated by the fact that the intervening, third party-actions were unlawful and driven by "unfounded fears." *Id.* The Supreme Court rejected the Department's argument, concluding that

33

respondents "met their burden of showing that third parties will likely react in *predictable* ways to the citizenship question, even if they do so unlawfully and despite the requirement that the Government keep individual answers confidential." *Id.* at 2566 (emphasis added). As a result, the respondents' theory of standing "d[id] not rest on mere speculation about the decisions of third parties" but "instead on the predictable effect of Government action on the decisions of third parties." *Id.*

The Court's decision applies here on all fours. The City alleges that immigrants and their families will react in "predictable ways" to the changes in the FAM. They support this allegation with significant evidence that is consistent with the government's own statements. Furthermore, the causal connection is even tighter here. According to the City, the amendments to FAM were intentionally designed to discourage immigrants from using public benefit programs. This expected behavior is neither speculative nor unlawful. Rather, it is the desired result. The City's "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce*, 139 S. Ct. at 2566.

The government's other challenges to standing are also without merit. It maintains that costs incurred by the City for education and outreach are not a cognizable injury because the harm is "the result of the City's own decisions[.]" ECF 17-1 at 28. But, the City claims that it is compelled to reallocate its finite resources in response to the FAM for the purpose of combatting the injurious effects that the FAM will have on its residents, and the public programs it administers. ECF 1, ¶¶ 156-59, 161, 165-66. This qualifies as an Article III injury because it "threaten[s] [the City's] ability to bear the costs of local government and to provide services." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110-11 (1979); *see also Air Evac EMS*, 910 F.3d 760

("'[F]inancial harm is a classic and paradigmatic form of injury in fact[.]'") (citation omitted); *Texas v. United States*, 809 F.3d 134, 150-62 (5th Cir. 2015) (standing to challenge based on cost of issuing driver's licenses to immigrants made eligible by executive action).

In a footnote, defendants assert that the City lacks standing to assert the constitutional rights of its residents.  ECF 17-1 at 29.  To be sure, the general prohibition against asserting the rights of another is a prudential limitation on standing.  *See Warth*, 422 U.S. at 498.  "To overcome the prudential limitation on third-party standing, a plaintiff must demonstrate: (1) an injury-in-fact; (2) a close relationship between herself and the person whose right she seeks to assert; and (3) a hindrance to the third party's ability to protect his or her own interests."  *Freilich v. Upper Chesapeake, Health, Inc.*, 313 F.3d 205, 215 (4th Cir. 2002) (citing *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991)); *see also Singleton v. Wulff*, 428 U.S. 106, 114-15 (1976).  Regarding the third prong, the obstacles need not be "insurmountable."  *Singleton*, 428 U.S. at 117.  Rather, it is enough if they engender "some hindrance to the third party's ability to protect his or her own interests."  *Powers*, 499 U.S. at 411.

At this juncture, the City alleges sufficient facts to clear this prudential hurdle.  *See* ECF 1, ¶¶195-97.  First, as discussed, *supra*, plaintiff satisfies the injury-in-fact requirement of Article III standing.  Second, the City provides a range of social services to immigrants and others residing within the City, from health clinics to housing to supplemental food programs to educational opportunities.  The City seeks to assert the constitutional rights of immigrants living within the jurisdiction in order to seek relief from the FAM changes, which it alleges will disrupt the delivery of its services, force it to divert precious resources to understanding and explaining the FAM to its residents, and overwhelm its stop-gap services.

And, the City's immigrants face significant obstacles in bringing this suit on their own, as they may hold a credible fear that suing the federal government would torpedo the visa application of a family member whom they are sponsoring or seek to sponsor. *See Singleton*, 428 U.S. at 117 (holding that physicians have third-party standing to assert the rights of abortion patients because those women "may be chilled from . . . assert[ing] [their rights] by a desire to protect the very privacy of [their] decision from the publicity of a court suit"); *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 732-33 (S.D. Ind. 2016) (finding organization had third-party standing to assert constitutional rights of Syrian refugees due to an understandable desire to "lay-low and not draw the attention to themselves that this suit would necessarily bring"), *aff'd*, 838 F.3d 902 (7th Cir. 2016).

In short, the City satisfies the requirements of Article III standing to challenge the amendments to the FAM.

## B. Standing to Sue the President

Defendants aver that the City does not have standing to sue President Trump in his official capacity. ECF 17-1 at 30-31. They assert that because the FAM "was issued by and is used by the Department of State, not by the President," any injury that the City suffers "'is not fairly traceable' to the President." *Id.* at 31. The City responds that it has standing to sue the President under the Due Process Clause, because the Complaint plausibly alleges that the President's animus was a motivating factor that led to the amendments to the FAM. ECF 25 at 36-37. .

The City must establish Article III standing for each claim against each defendant. *See, e.g.*, *Bostic v. Schaefer*, 760 F.3d 352, 371 (4th Cir. 2014). As defendants correctly point out (ECF 17-1 at 49), the President is not amenable to suit under the APA as he is not an "agency." *See*

*Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (plurality opinion). Thus, the inquiry focuses on whether the City has standing to bring its equal protection claim against the President.

The City alleges that the President harbors animus towards immigrants of color. *See* ECF 1 at 25-31, 72. In this regard, the Complaint alleges that President Trump made repeated statements that, accepted as true, exhibit hostility towards immigrants from Africa, Asia, and Latin America. Those statements include his remark that immigrants from Haiti "all have AIDS"; his suggestion that Nigerian immigrants, if admitted to the United States, would never "go back to their huts"; and his comment that immigrants from Africa and Latin America are "people from shithole countries[.]" *Id.* ¶¶ 69-70.

In addition, the Complaint plausibly alleges, at least by inference, that President Trump deliberately manipulated the State Department to revise the FAM. According to the Complaint, in the weeks following the President's inauguration, high-ranking executive branch officials drafted an executive order directing the State Department "to amend the Foreign Affairs Manual to ensure that its public-charge provisions are consistent with the goals of this Order." *Id.* ¶ 77 (quoting Andrew Bremberg, Memorandum for the President, Subject: Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote Accountability and Responsibility (Jan. 23, 2017)). Although the draft order was never finalized, plaintiff contends that the State Department got the message because, approximately a year after the draft order, it broadened the FAM's definition of public charge. ECF 1, ¶ 92. Thus, the City has plausibly alleged that President Trump's racial animus inspired the FAM revision. Consequently, the injuries that the City alleges are fairly traceable to the President.

I am not persuaded by defendants' argument that plaintiff lacks standing to sue the President because the State Department, not the President, revised the FAM. "Our Constitution

37

vests 'executive Power' in the President, not in the Secretary of [State], who reports to the President and is removable by him at will." *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018) (quoting U.S. Const., art. II, § 1, cl. 1).  In other words, the buck stops with the President.  Consequently, if President Trump harbors animus towards immigrants of color, and if he encouraged the State Department to revise the FAM, then the amendments violate equal protection, even if officials within the State Department did not personally harbor racial animus.

Indeed, other courts have found that plaintiffs had plausibly stated an equal protection claim against an executive agency's immigration action based on the same statements by President Trump that are alleged here.  *See NAACP v. U.S. Dep't of Homeland Sec*., 364 F. Supp. 3d 568, 578 (D. Md. 2019) (concluding that President Trump's statements were sufficient to plausibly alleged that DHS's decision to rescind immigrants' temporary protected status violated equal protection); *Saget v. Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018) (same); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1123-24 (N.D. Cal. 2018) (same); *Batalla*, 291 F. Supp. 3d at 279 (holding that plaintiff had plausibly alleged that DHS's decision to rescind the Deferred Action for Childhood Arrivals policy violated equal protection based on the President's statements).

The issue is presented in the context of a motion to dismiss.  The City's Complaint alleges facts sufficient to nudge from conceivable to plausible the allegation that the President harbors racial animus and that he played a role in the creation of the FAM amendments.  I conclude that the City has standing to advance its equal protection claim against the President.

### C.  Ripeness

As with standing, the ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . ." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted);

*see Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 632 (D.C. Cir. 2017) (ripeness "has both constitutional and prudential facets"), *cert. denied*, __, U.S. __, 138 S. Ct. 978 (2018).  Whereas standing focuses on who can sue, ripeness "addresses 'the appropriate timing of judicial intervention.'"  *Deal*, 911 F.3d at 190 (quoting *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013)); *see NAACP*, 2019 WL 355743, at *8 (noting that standing addresses who may sue, and ripeness addresses when a party may sue).

"Like standing, the ripeness doctrine 'originates in the case or controversy constraint of Article III.'"  *South Carolina*, 912 F.3d at 730 (citation omitted) (cleaned up).  And, "[a]s with standing, ripeness is a question of subject matter jurisdiction."  *Id.*; *see San Sotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013).  Moreover, the doctrine of ripeness requires presentation of "a controversy in a 'clean-cut and concrete form.'"  *Id.* (quoting *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006)).  In so doing, the doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (citations omitted).

Ripeness depends on "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808; *accord South Carolina*, 912 F.3d at 730; *Deal,* 911 F.3d at 191.  "A case is 'fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties.'"  *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013) (quoting *Miller*, 462 F.3d at 318-19).  "'The hardship prong is measured by the immediacy of the threat and the burden imposed on the

plaintiff.'" *Id.* (brackets omitted) (quoting *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992)); *see also Pashby v. Delia*, 709 F.3d 307, 317 (4th Cir. 2013); *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 665 (4th Cir. 1997).

Thus, a claim is not ripe for judicial review "'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Scoggins*, 718 F.3d at 270 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)); *see also South Carolina*, 912 F.3d at 730 (an action is ripe if "final and not dependent on future uncertainties or intervening agency rulings") (quoting *Franks v. Ross*, 313 F.3d 184, 195 (4th Cir. 2002)).

The government contends that the City's claims are not ripe because the City "has not identified any particular instance in which the guidance has been applied in a way that threatens harm to the City." ECF 17-1 at 30. Further, they maintain that the City is not harmed by the FAM because it "has never been applied to the City of Baltimore and it will never be—a city is obviously never in the position of applying for a U.S. visa." *Id.* In response, the City argues that the bulk of the issues are "purely legal," and the City is already suffering from the FAM change. ECF 25 at 36. According to the City, it has presented "ample evidence that the application of the FAM change produces a chilling effect that harms the city." *Id.*

Defendants' ripeness argument is without merit. The City's claims satisfy the fitness criterion. Its APA claims—whether the FAM change is "arbitrary and capricious," impermissibly retroactive, or procedurally invalid—present purely legal questions. And, postponing review is unnecessary for the City's equal protection claim to crystallize into a more definite form, given that the City rests its claim primarily on the President's statements.

As for the hardship prong, delayed review would cause the City significant hardship. The FAM change is "final and not dependent on future uncertainties." *South Carolina*, 912 F.3d at

730; *see also infra* Part IV.C.  And, as discussed, *supra*, the City has plausibly alleged that it is suffering substantial harm due to the FAM change.  *See* Part III.A(2), *supra*.

The government's contention that the City will "never [be] in the position of applying for a U.S. visa" and therefore experiences no hardship is not persuasive.  ECF 25 at 35.  The primary injury alleged by the City is not that it fears being deemed a public charge.  Rather, it is that the City must bear the financial costs of the defendants' unlawful action.  To repeat, the City alleges that the revised Manual frustrates the City's efforts to provide social services to immigrants; forces the City to divert valuable resources to understanding the changes and conducting education and outreach; and strains the City's budget by increasing the demand for certain City benefits like emergency health care.  *See* ECF 1 at 53-68.  Postponing review will only exacerbate these harms.

Accordingly, I find that the City's claims are ripe for judicial review.

## IV.    APA Claims

Defendants put forth a smorgasbord of arguments for why the City's claims are not cognizable under the APA.  ECF 17-1 at 32-44.  They argue that the City has failed to state a claim under the APA because the FAM change is committed to agency discretion, the City does not fall within the INA's zone of interests, and the FAM change is not a final agency action.  *Id.* at 33-41.  In addition, defendants posit that Count Two should be dismissed, as the Manual's changes are not retroactive.  *Id.* at 42-44.  Defendants also move to dismiss Count Three, asserting that the FAM is not subject to notice and comment.  *Id.* at 41-42.

## A.  Background

The APA provides for judicial review of a final agency action.  5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").  *See Abbott*

*Labs. v. Gardner*, 387 U.S. 136, 140-41, (1967) (quoting 5 U.S.C. § 704); *see also Ergon-W. Va., Inc. v. EPA*, 896 F.3d 600, 609 (4th Cir. 2018); *Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 629 n.3 (4th Cir. 2017); *Friends of Back Bay v. U.S. Army Corps of Eng'rs,* 681 F.3d 581, 586 (4th Cir. 2012).

"The APA provides that a reviewing court is bound to 'hold unlawful and set aside agency action' for certain specified reasons, including whenever the challenged act is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Back Bay*, 681 F.3d at 586-87 (quoting 5 U.S.C. § 706(2)(A)); *see United States v. Bean*, 537 U.S. 71, 77 (2002). Review under the APA is highly deferential, however, and the agency action enjoys a presumption of validity. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citing *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993)).

In assessing an agency decision, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). But, the court "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And, while the arbitrary and capricious standard "is not meant to reduce judicial review to a rubber-stamp of agency action," *Ohio Valley Entl. Coal.*, 556 F.3d at 192 (internal quotation marks and citations omitted), so long as the agency "'provide[s] an explanation of its decision that includes a rational connection between the facts found and the choice made,' its decision should be sustained." *Perez v. Cissna*, 914 F.3d 846, 855 (4th Cir. 2019) (quoting *Ohio Valley Envtl. Coal.*, 556 F.3d at 192); *see also Motor Vehicle Mfrs. Ass'n of U.S.*,

463 U.S. at 43, (noting that a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

In addition, the APA mandates that, subject to limited exceptions, agencies comply with certain procedures before issuing a rule. 5 U.S.C. § 553; *N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012); *Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1103 (4th Cir.1985). Under the APA, a rule is "the whole or party of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy[.]" 5 U.S.C. § 551(4).

Generally stated, the APA's rulemaking provisions require that the agency publish a notice of proposed rule-making in the Federal Register; permit interested parties the opportunity to comment on the proposed rule; and, after considering the submitted comments, issue a concise general statement of the rule's purpose along with the final rule. *See* 5 U.S.C. § 553(b), (c); *N.C. Growers' Ass'n, Inc.*, 702 F.3d at 763. The notice and comment procedures serve both to "ensure informed agency decisionmaking" and to "encourage public participation in the administrative process." *N.C. Growers' Ass'n, Inc.*, 702 F.3d at 763 (internal quotation marks and citations omitted). Although review of an agency's decision under the arbitrary and capricious standard is deferential, the Fourth Circuit has instructed that courts "'must be strict in reviewing an agency's compliance with procedural rules.'" *Id.* at 764 (quoting *Chocolate Mfrs. Ass'n*, 755 F.2d at 1103).

## B. Reviewability

The government maintains that executive immigration policies cannot be challenged under the APA, absent express statutory authorization. ECF 17-1 at 33-34. According to defendants, the City's APA claims must fail "because the Supreme Court 'ha[s] long recognized the power . . . to exclude aliens as a fundamental sovereign attribute exercised by the Government's political

departments largely immune from judicial control.'"  *Id.* at 33 (quoting *Fiallo ex rel. Rodriguez v. Bell*, 430 U.S. 787, 792 (1977)).[12]

"[T]here is a 'strong presumption' in favor of judicial review of agency action."  *Casa de Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 697 (4th Cir. 2019) (quoting *Speed Mining, Inc. v. Fed Mine Safety & Health Review Comm'n*, 528 F.3d 310, 316 (4th Cir. 2008), *petition for cert. filed* (U.S. May 24, 2019) (No. 18-1469); *see Ergon-W. Virginia, Inc.*, 896 F.3d at 609; *Roland*, 850 F.3d at 629 n.3.  As the Supreme Court has repeatedly emphasized, the APA "creates a 'basic presumption of judicial review for one 'suffering legal wrong because of agency action.'"  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, __ U.S. __, __, 139 S. Ct. 361, 370 (2018) (quoting A*bbott Labs.*, 387 U.S. at 140); *see also Mach Mining, LLC v. EEOC*, 575 U.S. __, __, 135 S. Ct. 1645, 1651 (2015); *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993).

However, judicial review is not available "to the extent that . . . statutes preclude judicial review," 5 U.S.C. § 701(a)(1), or "agency action is committed to agency discretion by law."  *Id.* § 701(a)(2).  The latter exception is read "quite narrowly."  *Weyerhaeuser Co.*, 139 S. Ct. at 370; *accord Citizens to Preserve Overton Park,* 401 U.S. at 410.  This applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'"  *Id.* (quoting *Lincoln*, 508 U.S. at 191); *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (judicial review is unavailable if the statute provides "no judicially manageable standards . . . for judging how and when an agency should exercise its discretion"); *see also Speed Mining, Inc.*, 528 F.3d at 317.  "In determining whether a 'meaningful standard' for reviewing agency discretion exists,

---

[12] Defendants do not contend that § 702 precludes judicial review of plaintiff's constitutional claim.  Nor could they, as "it is well settled that even if agency action is committed to its discretion by law, a court may still determine whether the action is constitutional."  *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 347 (4th Cir. 2001).

courts consider the particular language and overall structure of the statute in question, as well as 'the nature of the administrative action at issue.'" *Speed Mining, Inc.*, 528 F.3d at 317 (internal citations omitted) (quoting *Heckler*, 470 U.S. at 830 and *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002)).

Defendants do not specify which provision of § 701 they believe precludes plaintiff's APA claims. *See* ECF 17-1 at 33-34. But this is of no moment, because neither applies to this case.

First, the APA specifies procedures that agencies must follow when engaging in "substantive" or "legislative" rulemaking. *See* 5 U.S.C. §§ 553, 604. Therefore, the Court can review the process by which defendants promulgated the amended Manual in light of the APA's procedural requirements. *See Lincoln*, 508 U.S. at 195-98. Second, the INA provides a meaningful standard against which to assess whether the FAM change is arbitrary and capricious. In sum, § 701(a)(1) does not bar the City's APA claims.

Moreover, defendants have not identified any statutory authority for their argument. *See* 5 U.S.C. § 701(a)(1). Rather, they seem to argue that the Manual is immune from judicial scrutiny simply because it bears on immigration policy. *See* ECF 17-1 at 33.

To be sure, significant deference is due to foreign affairs and immigration policy determinations made by the Executive Branch. *See, e.g., Trump v. Hawaii,* __ U.S. __, __, 138 S. Ct. 2392, 2419 (2018) ("For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'") (quoting *Fiallo v. Bell*, 430 U.S. 787 (1977)); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952). However, "the Supreme Court has repeatedly and explicitly rejected the notion that the political branches have unreviewable authority over

immigration . . . ." *Washington v. Trump*, 847 F.3d 1151, 1162 (9th Cir. 2017), *superseded by* 858

F.3d 1168 (9th Cir. 2017); *see also Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 278

(4th Cir. 2018) (Gregory, C.J., concurring) ("No case from either this Court or the Supreme Court

supports [the] sweeping proposition" that courts may not review "statutory challenge[s] to the

President's authority to exclude classes of noncitizens"), *vacated on other grounds*, __ U.S. __,

138 S. Ct. 2710 (2018); *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 151-52 (E.D.N.Y. 2017)

(rejecting government's contention that § 702(a)(2) barred review of Deferred Action for

Childhood Arrivals policy); *see also Casa de Maryland*, 924 F.3d at 699 (citing cases).  Indeed, a

brief survey of the Supreme Court's immigration cases reveals that the Court regularly reaches the

merits of a plaintiff's statutory claims.  *See*, *e.g.*, *Hawaii*, 138 S. Ct. at 2407 (reviewing plaintiffs'

statutory claims lodged against President Trump's so-called Travel Ban); *Sale v. Haitian Centers*

*Council, Inc.*, 509 U.S. 155, 170-88 (1993); *Fiallo*, 430 U.S. at 800.

Defendants lean heavily on *Fiallo v. Bell*, 430 U.S. 787 (1977), for the proposition that

changes to the Manual are unreviewable under the APA due to the Executive's broad discretion to

enforce the immigration laws.  ECF 17-1 at 33.  But, in my view, *Fiallo* cuts in favor of the City.

In *Fiallo*, three sets of fathers and children attacked the constitutionality of an INA

provision that extended "special preference" to natural fathers of legitimate U.S. citizen children

but not the fathers of "illegitimate" children.  *Id.* at 788-89.  After recounting the facts, the Court

stated, *id.* at 792 (internal quotation marks and citations omitted):

> At the outset, it is important to underscore the limited scope of judicial
> inquiry into immigration legislation. This Court has repeatedly emphasized that
> over no conceivable subject is the legislative power of Congress more complete
> than it is over the admission of aliens.  Our cases have long recognized the power
> to expel or exclude aliens as a fundamental sovereign attribute exercised by the
> Government's political departments largely immune from judicial control.

This statement is consistent with the longstanding principle that courts may not review individual immigration determinations. *See, e.g., Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (courts lack jurisdiction to review a consular officer's decision to grant or deny a visa). However, it does not mean, as defendants would have it, that any agency policy touching immigration escapes judicial review. That much is confirmed by the fact that the *Fiallo* Court proceeded to resolve the merits of the plaintiff's claims. *See* 430 U.S. at 800. Thus, *Fiallo* reinforces that the federal judiciary retains the authority to review challenges to executive action in the immigration sphere.

Accordingly, § 701(a) does not compel the dismissal of plaintiff's APA claims.

### C.  Zone of Interests

Defendants argue that the City's APA claims fail because they fall outside the "zone of interests" protected by the INA. ECF 17-1 at 34-35. According to the government, the City's interest in this litigation is its "desire to ensure that its residents take advantage of available social services when needed." *Id.* at 35. In their view, the INA does not "protect or even consider interests of this type." *Id.*

The zone-of-interests test asks "whether the statute grants the plaintiff the cause of action that he asserts." *Bank of Am. Corp.*, 137 S. Ct. at 1303; *see Lexmark Int'l, Inc.*, 134 S. Ct. at 1387 ("Whether a plaintiff comes within the zone of interests" turns on "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim" (internal quotation marks omitted)). Where the plaintiff asserts a cause of action under the APA, the inquiry focuses on the relevant zone of interest defined by the substantive statute, not the APA. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345-48 (1984); *Mendoza v. Perez*, 754 F.3d 1002, 1017 (D.C. Cir.

2014); *Am. Inst. of Certified Pub. Accountants v. IRS*, 746 F. App'x. 1, 7 (D.C. Cir. 2018) (collecting cases).

The "zone-of-interests limitation" applies to "all statutorily created causes of action." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014); *see also Bank of Am. Corp. v. City of Miami*, __ U.S. __, __, 137 S. Ct. 1296, 1303 (2017). However, unlike standing and ripeness, the test is not jurisdictional because "'the absence of a valid . . . cause of action does not implicate . . . the court's statutory or constitutional *power* to adjudicate the case.'" *Lexmark Int'l, Inc.*, 527 U.S. at 128 (emphasis in original) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642-43 (2002)).

Moreover, the zone-of-interests test "is not meant to be especially demanding." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Sec. Industry Ass'n*, 479 U.S. 388, 399 (1987)). This is especially so where the plaintiff files suit under the APA, given "Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" *Id.* (quoting *id.*). To that end, the plaintiff need only demonstrate that its interests "arguably" fall within the statute's purpose, with "the benefit of any doubt go[ing] to the plaintiff." *Id.* Further, courts "do not require any indication of congressional purpose to benefit the would-be plaintiff." *Id.* Thus, the rule "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399).

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, __ U.S. __, 136 S. Ct. 2271 (2016) (mem.), is instructive on this point. Texas filed suit against the federal government under the APA to enjoin the implementation of the Deferred Action for Parents

of Americans and Lawful Permanent Residents program ("DAPA"), an executive action to delay the deportation of immigrants who lacked lawful residency status. *Id.* at 148. Texas asserted that it satisfied prudential standing to challenge DAPA because, under Texas law, DAPA recipients would be entitled to obtain a state-subsidized driver's license. *Id.* at 149-50. The Fifth Circuit agreed. *Id.* at 163. It observed that the INA "[r]eflect[s] a concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates . . . .'" *Id.* at 163 (quoting *United States v. Alabama*, 691 F.3d 1269, 1298 (11th Cir. 2012)).

The Fifth Circuit pointed out that 8 U.S.C. § 1621(a) prohibits unlawfully present immigrants from receiving state or local benefits, including driver's licenses. *Id.* Texas's claim thus fell within the INA's zone of interest, because it was asserting its right to "participate in notice and comment before the Secretary changes the immigration classification of millions of illegal aliens in a way that forces the state to the Hobson's choice of spending millions of dollars to subsidize driver's licenses or changing its statutes." *Id.*

Here, the City's interest in avoiding the costs of the FAM revision falls within the INA's zone of interest. As the Fifth Circuit observed, the INA expressly regulates the use of public assistance by immigrants. Section 1621 provides that immigrants who lack lawful status are "not eligible for any State or local public benefit." 8 U.S.C. § 1621(a). And, § 1621(c) clarifies that "State or local public benefit" encompasses "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit *by an agency of a State or local government or by appropriated funds of a State or local government.*" *Id.* § 1621(c)(B) (emphasis added). Moreover, the INA's public charge provision accounts for the impact public charge determinations may have on municipal

governments.   Specifically, § 1183 entitles "the proper law officers" of "any State, territory, district, county, town, or municipality in which [an] alien becomes a public charge" to bring a lawsuit against the individual who sponsored the alien's visa to enforce the Affidavit of Support. 8 U.S.C. § 1183.

And, like Texas, the City seeks to vindicate its interest in having the opportunity to "participate in notice and comment before [defendants] change[d] the immigration classification of millions of [immigrants] in a way that forces the [City] to the Hobson's choice of spending millions of dollars . . . or changing its [services]." 809 F.3d at 163. Thus, the City's claims "are, at the least, 'arguably within the zone of interests'" protected by the INA. *Bank of Am.*, 137 S. Ct. at 1303 (citation omitted).

### D.  Finality

Defendants maintain that the City has failed to state a claim because the revision to the Manual is not a "final agency action" and "therefore is not reviewable under the APA." ECF 17-1 at 36.

The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see also City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 430-31 (4th Cir. 2019); *Clear Sky Car Wash LLC v. City of Chesapeake*, 743 F.3d 438, 445 (4th Cir. 2014); *Golden & Zimmerman LLC v. Domenech*, 599 F.3d 426, 432-33 (4th Cir. 2010). Under *Bennett v. Spear*, 520 U.S. 154 (1997), an agency action is final if it (1) "'mark[s] the consummation of the agency's decisionmaking process'" and (2) is an action "'by which rights or obligations have been determined, or from which legal consequences will flow.'" *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. ___, ___, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v*, 520 U.S. at 177-78).

"The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Massachusetts v. Franklin*, 505 U.S. 788, 797 (1992) (plurality opinion); s*ee Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 858 (4th Cir. 2002) ("[T]he critical issue is whether the [agency's action gives rise to legal consequences, rights, or obligations."). Courts take a "'pragmatic' approach . . . to finality." *Hawkes*, 136 S. Ct. at 1815 (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967)).

The government does not contest that the revision to FAM satisfies the first *Bennett* prong, and for good reason. The FAM is not "informal, or only the ruling of a subordinate official, or tentative." *Abbott Labs*, 387 U.S. at 151. Rather, it is the State Department's "*authoritative* source" on "policies[] and procedures," including consular processing. Foreign Affairs Manual and Handbook, U.S. Dep't of State, http://fam.state.gov/. The Manual is the State Department's last word on the criteria consular officers should consider when making public charge determinations. Accordingly, the FAM "mark[s] the consummation of the [State Department's] decisionmaking process." *Hawkes*, 136 S. Ct. at 1813.

The parties dispute, however, whether the amendments to the FAM have "'direct and appreciable legal consequences.'" *Id.* at 1814 (quoting *Bennett*, 520 U.S. at 178). The government maintains that the change to the Manual "does not have any legal effect of its own" because "it only instructs Department of State personnel on how to apply the governing statute and regulations." ECF 17-1 at 36. Yet, the government concedes that the "new guidance, compared to the old guidance, could potentially lead to individuals being denied visas on 'public charge' grounds more frequently." *Id.* at 41. Nevertheless, it contends that this fact alone does not render the revision to the Manual a final agency action. *Id.*

51

The City counters that the amendments to the FAM have legal force because they eliminated a safe harbor for visa applicants and their families by directing consular officers to consider non-cash benefits in making public charge determinations.  ECF 25 at 40.

Agency action has legal consequences if it "alters the legal regime[.]"  *Bennett*, 520 U.S. at 178; *see also Hawkes*, 136 S. Ct. 1814; *Nat'l Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011).  So too does action that grants or withdraws a regulatory "safe harbor."  *Hawkes*, 136 S. Ct. 1814; *Frozen Food Express v. United States*, 351 U.S. 40, 44-45 (1956); *Scenic Am., Inc. v. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016), *cert. denied*, __ U.S. __, 138 S. Ct. 2 (2017); *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1032 (D.C. Cir. 2016); *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 637 F.3d 259, 266 (4th Cir. 2011); *Gen. Elec. Co. v. EPA*, 290 F.3d 384, 383 (D.C. Cir. 2002).

The Supreme Court's analysis in *U.S. Army Corps of Engineers v. Hawkes Co.*, ___ U.S. ___, 136 S. Ct. 1807 (2016), is instructive.  There, the Court considered whether "jurisdictional determinations" made by the U.S. Army Corps of Engineers regarding whether a particular tract of land contains "waters of the United States," and thus subject to the Clean Water Act ("CWA"), were final agency actions.  *See id.* at 1812-13.  The Court found that the determinations satisfied the second *Bennett* prong because legal consequences flow from both negative and affirmative determinations.  *Id.* at 1814.  If the Army Corps concludes that a parcel does not contain such waters, that finding creates a "safe harbor," precluding the Army Corps and EPA from bringing an enforcement action under the CWA against the property owner for five years.  *Id.*  Moreover, while a negative determination does not foreclose the possibility of citizen suits under the CWA, the property owner cannot be held liable for past violations.  *Id.*  Thus, a negative finding "both narrows the field of potential plaintiffs and limits the potential liability a landowner faces for

discharging pollutants without a permit. Each of those effects is a 'legal consequence' satisfying the second *Bennett* prong." *Id.* (brackets omitted). Affirmative determinations "have legal consequences as well: They represent the denial of the safe harbor that negative [determinations] afford." *Id.*

The revisions to the FAM alter the visa application regime by eliminating, in effect, a safe harbor once extended to the receipt of non-cash benefits. Previously, the Manual directed that "[n]either the past nor possible future receipt of such non-cash or supplemental assistance may be considered in determining whether an alien is likely to become a public charge." ECF 17-2 at 4. And, it barred consular officers from denying a visa application on public charge grounds due to the current or past use of non-cash public assistance by the applicant's family. *Id.* at 11. In no uncertain terms, the new version of the Manual reverses this position.

According to the new version of the FAM, consular officers should consider the past and future use of non-cash benefits by the applicant as "part of the totality of the applicant's circumstances in determining whether an applicant is likely to become a public charge." ECF 1-1 at 5. Moreover, the FAM now requires consular officers to examine the use of non-cash public benefits by the applicant's family members and dictates that this is a "heavily negative factor" in the analysis. *Id.* at 8-9. Thus, it is no longer the case that visa applicants and their families can use non-cash public assistance without the possibility of being deemed a public charge.

The government argues that this safe harbor was illusory. ECF 56 at 20. According to the government, applicants "who accepted noncash public benefits never had any assurances that they would not be denied visas on public-charge grounds." *Id.* In their view, because an applicant receiving non-cash public benefits could have been deemed a public charge based on some other consideration, such as health or financial condition, the change is of no legal significance. *Id.*

This contention misses the mark.  The fact that consular officers can deny visa applications for reasons other than the receipt of non-cash benefits does not rob the FAM change of legal consequences.  Rather, as *Hawkes* demonstrates, agency action has legal consequences even if it only "narrows" the field of regulatory targets or "limits the[ir] potential liability[.]"  *Hawkes*, 136 S. Ct. at 1814; *see also Texas v. EEOC*, No. 18-10638, slip op. at 12-13 (5th Cir. Aug. 6, 2019) (finding EEOC guidance letter to be final agency action because it creates a safe harbor by detailing how employers can avoid liability).

The amendments to the FAM bear the hallmarks of finality.  In particular, they present the "authoritative" position of the State Department on the public charge rule; they alter a legal regime; and they eliminate a safe harbor relied on by visa applicants and their families.  It follows that defendants' Motion, seeking dismissal of the City's APA claims under § 704, is unavailing on this basis.

Defendants further assert that the FAM is not a "final agency action" because it is an interpretive rule.  *See* ECF 17-1 at 37-41.  This argument elides § 704's finality requirement with § 553's command that agencies provide notice and comment before promulgating legislative rules.

I discuss interpretive and legislative rules, *infra*.  But, I note here that the D.C. Circuit recently explained: "[A]lthough all legislative rules are final, not all final rules are legislative, and the finality analysis is therefore distinct from the test for whether an agency action is a legislative rule." *Cal. Comtys. Against Toxics v. EPA*, 934 F.3d 627, 631 (D.C. Cir. Aug. 20, 2019); *see also id.* (observing that the *Hawkes* Court "neither asked whether the action at issue had the force and effect of law nor made a single mention of legislative rules").  The Manual's legislative character (or lack thereof) is therefore inapposite to the finality inquiry.

### E.  Retroactivity

The revised FAM directs consular officers to consider an immigrant's use of non-cash benefits at any time as a factor in visa determinations.  This directive is not limited to an immigrant's current or future use of non-cash public benefits; the officer also must consider the use of non-cash benefits, even if that use occurred before the changes to the FAM were implemented.

Defendants have moved (ECF 17-1 at 42-44) to dismiss Count Two of the Complaint, which alleges that the amendments to the FAM have an impermissible retroactive effect, in violation of the APA.  ECF 1 at 71.  The government argues that the City has not plausibly raised this claim, insisting that the amended FAM does not attach new legal consequences to past events.  ECF 17-1 at 42-44.  Instead, it allows past events to be considered as a factor in future visa determinations.

The City disagrees.  It maintains that it sufficiently alleged that the changes to the FAM are impermissibly retroactive.  ECF 25 at 49-51.  Further, it contends that such a retroactive change must be authorized by statute.  Moreover, even if it were authorized, it would be unjustified, according to the City.

"Retroactivity is not favored in the law."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  The "core principle disfavoring retroactive application of laws" is that "'settled expectations should not be lightly disrupted[.]'"  *GTE S., Inc. v. Morrison*, 199 F.3d 733, 741 (4th Cir. 1999) (quoting *Landgraf*, 511 U.S. at 265).  The APA provides that a rule must be of "future effect." 5 U.S.C. § 551(4).  Therefore, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."  *Bowen*, 488 U.S. at 208.  This

prohibition applies to "interpretative rules, no less than legislative rules." *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994).

A rule is impermissibly retroactive if it "'alter[s] the past legal consequences of past actions.'" *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 588 (D.C. Cir. 2001) (quoting *Bowen*, 488 U.S. at 219 (Scalia, J., concurring)); *see also Landgraf*, 511 U.S. at 269-70. Specifically, a rule may not "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280.

If a rule has an "exclusively 'future effect'" that "affect[s] the desirability of past transactions," it is considered "secondarily retroactive" and is "invalid only if arbitrary and capricious." *Celtronix Telemetry*, 272 F.3d at 589; *see Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 159 (D.C. Cir. 2010); *see also Nat'l Petrochemical & Refiners* Ass'n, 630 F.3d at 159 (describing rules that "merely 'upset[] expectations'" as "secondarily retroactive"). A secondarily retroactive rule is arbitrary and capricious if a court determines that it is not "reasonable both in substance and in being made retroactive." *Celtronix Telemetry, Inc.*, 272 F.3d at 589.

The government rests its argument primarily on *Boniface v. U.S. Dep't of Homeland Sec.*, 613 F.3d 282 (D.C. Cir. 2010), and *Matherly v. Andrews*, 817 F.3d 115 (4th Cir. 2016). In *Boniface*, the court considered a regulation directing DHS to consider past criminal acts to determine eligibility for a license to transport hazardous materials. A state can grant a "'license to operate a motor vehicle transporting in commerce hazardous materials'" only if the TSA has determined that the applicant is not a security threat. *Id.* at 284 (quoting 49 C.F.R. §§ 5103a(a)(1)). The challenged rule provided a list of "disqualifying criminal offense[s]." If an applicant has been

convicted of a disqualifying offense, then the TSA issues an initial determination that the applicant is a "'security threat warranting denial'" of his application.  However, this initial determination could be rebutted through a waiver process.

After Bonifice was denied a license in 2009 because of a 1975 conviction for a "disqualifying criminal offense," he challenged the rule.  The court found that a "disqualifying criminal offense" creates only a rebuttable presumption that the applicant poses a threat.  As a result, it concluded that the regulation did have not an unauthorized retroactive effect under any of the tests set out in *Landgraf*.

In *Matherly*, 817 F.3d 115, the Fourth Circuit considered a challenge to a federal statute providing for the civil commitment to the Bureau of Prisons of a "sexually dangerous person." Matherly challenged the law as impermissibly retroactive because it took effect after he was convicted and in the Bureau's custody.  *Id.*  The Court determined that the statute was not retroactive because "it simply 'uses' prior acts 'solely for evidentiary purposes' to support a finding" that a person is sexually dangerous.  *Id.* at 120 (quoting *United States v. Comstock*, 627 F.3d 513, 523 (4th Cir. 2010) (internal citation omitted)).

These cases are distinguishable.  In both cases, the contested law or regulation changed the effect of past criminal convictions on future governmental decisions.  In essence, the government considered the plaintiffs' prohibited acts as evidence adverse to the plaintiff in future government decisions.  Here, the revised FAM does not pertain to prior unlawful acts, but to "transactions already completed," *i.e.*, the receipt of non-cash public benefits. *Landgraf*, 511 U.S. at 280.  Before the changes to the Manual, the receipt of these benefits was not only lawful, but also sanctioned by the FAM. After the changes to the Manual, however, benefits received prior to the policy change are considered as a factor (or in some cases a "heavily negative factor") in visa

determinations.  Based on the allegations, this change represents a "complete[] reversal of the status quo." *See Nat'l Petrochemical & Refiners Ass'n,* 630 F.3d at 160 (characterizing *Bowen*, 488 U.S. 204, as an instance in which an "agency 'completely reversed the status quo ante'").

Even if the change does not "alter the past legal consequences of past actions," the City has adequately alleged that the revised FAM is secondarily retroactive. *Celtronix Telemetry, Inc.*, 272 F.3d at 588. Immigrants (and their families) had "settled expectations" that receipt of non-cash benefits would have no effect on visa determinations. *See Olatunji v. Ashcroft*, 387 F.3d 383, 396 (4th Cir. 2004).  Accordingly, plaintiff plausibly alleges that the changes to the FAM are retroactive.[13]

### F.  Notice and Comment

Count Three of the Complaint asserts that the amended public charge instructions must be set aside as unlawful because the Manual was "amended without notice and comment," in violation of 5 U.S.C. § 706(2)(D).  ECF 1, ¶¶ 186-87.  Defendants move to dismiss Count Three for failure to state a claim.  ECF 17-1 at 41.

As noted, the APA generally requires that before a federal agency adopts a rule it must publish a proposed rule in the Federal Register and provide interested parties with an opportunity to comment.  *See* 5 U.S.C. § § 551(4)-(5), 553(a)-(c).  Failure to comply with the APA's rulemaking process renders the rule invalid.  *See, e.g., N.C. Grower's Ass'n., Inc.*, 702 F.3d at 770 (invalidating regulation that was issued without notice and comment); *Mendoza*, 654 F.3d at 1025; *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95-96 (D.C. Cir. 2012).

---

[13] Although not essential to my determination, I note that the DHS Proposed Rule expressly declined to apply the rule retroactively.  93 Fed. Reg. at 51,206.  ("DHS would not consider public benefits under the proposed 8 C.F.R. § 212.21(b) that were previously excluded under the 1999 Interim Field Guidance if received before effective date of the final rule.").

The APA, however, contains several exemptions to these procedural requirements.  *See* 5 U.S.C. §§ 553(a), 553(b)(3).  Here, defendants offer two distinct reasons for why the FAM is not subject to the APA's rulemaking procedures.  First, they contend the Manual is exempt from notice and comment as an "interpretive rule" under § 553(d)(2).  ECF 17-1 at 36-41.  Second, they argue the FAM falls within the sweep of § 553(a)(1), which exempts from notice and comment rules affecting "foreign affairs."  ECF 17-1 at 42.

## 1.  Interpretative and Legislative Rules

Under the APA, a "Rule" is a "statement of general or particular applicability and future effect" that is "designed to implement, interpret, or prescribe law or policy or describ[e] the organization, procedure, or practice requirements of an agency[.]"  5 U.S.C. § 551(4).  "The APA divides agency action, as relevant here, into three boxes: legislative rules, interpretive rules, and general statements of policy.  A lot can turn on which box an agency action falls into."  *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 246 (D.C. Cir. 2014) (Kavanaugh, J.).

"The APA generally requires that agencies provide notice of proposals to create, amend, or repeal a rule and an opportunity for interested parties to comment on the proposal."  *Casa de Md.*, 924 F.3d at 701 (citing 5 U.S.C. §§ 551(4)-(5), 553(a)-(c)).  Thus, an agency's failure to comply with notice and comment renders a rule procedurally invalid.  *See, e.g.*, *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018) ("*CHKD*"); *N.C. Growers' Ass'n Inc.*, 702 F.3d at 771; *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 208 (4th Cir. 1989).  However, the APA's rulemaking procedure "does not apply" to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."  5 U.S.C. § 553(b)(A).

"Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'" *Perez v. Mortg. Bankers Ass'n*, 572 U.S. 92, __, 135 S. Ct. 1199, 1203-04 (2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-303 (1979)).  In contrast, "interpretive rules" are those "'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Id.* (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)).  Although "the process of issuing interpretive rules [is] comparatively easier for agencies than issuing legislative rules," they "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Id.* (citation omitted).

The line between legislative rules and interpretative rules is less than perfectly pellucid.  The DC Circuit has, at various times, characterized the doctrine as "tenuous,"[14] fuzzy,"[15] blurred,"[16] "byzantine,"[17] "enshrouded in considerable smog,"[18] and "quotidian but abstruse."[19] Indeed, even "[t]he Supreme Court recently acknowledged that the 'precise meaning' of the term 'interpretive rule' in the APA 'is the source of much scholarly and judicial debate,' and expressly declined to 'wade into that debate.'" *CKHD*, 896 F.3d at 620 (quoting *Perez*, 135 S. Ct. at 1204).

---

[14] *Chisholm v. FCC*, 538 F.2d 349, 393 (D.C. Cir. 1976).

[15] *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C. Cir. 1987).

[16] *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987).

[17] *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 246 (D.C. Cir. 2014).

[18] *Ass'n. of Flight Attendants v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015) (quoting *Cmty. Nutrition Inst.*, 818 F.2d at 946).

[19] *Cal. Comtys. Against Toxics v. EPA*, 934 F.3d at 630.

The Fourth Circuit has instructed that "'interpretative rules simply state what the administrative agency thinks the statute means, and only remind affected parties of existing duties.'" *CHKD*, 896 F.3d at 620 (quoting *Jerri's Ceramic Arts*, 874 F.2d at 207). "Put differently, '[a]n interpretive rule is merely a clarification or explanation of an *existing statute or rule*.'" *Id.* (brackets and emphasis in original) (quoting *Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995)). As for legislative rules, the Fourth Court has explained:

> "By contrast, 'a substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties.' To that end, '[a] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy.' Likewise, a rule is legislative if it 'expand[s] the footprint of a regulation by imposing new requirements, rather than simply interpreting the legal norms Congress or the agency itself has previously created.'"

*Id.* (first quoting *Jerri's Ceramic Arts*, 874 F.2d at 207, then quoting *Mendoza*, 754 F.3d at 1021, and then quoting *Iowa League of Cities v. EPA*, 711 F.3d 844, 873 (8th Cir. 2013)). Further, "[w]hen an agency relies on expressly delegated authority to establish policy . . . courts generally treat the agency action as legislative, rather than interpretive, rulemaking." *Id.* at 622.

Defendants argue that the City has failed to state a claim that the FAM violates the APA's notice and comment requirements because the FAM is an interpretive rule. In their view, the amendment to the FAM "does not carry legal force" because it merely "clarif[ies]" the agency's interpretation of the applicable statutes and regulations" and serves only to "advis[e]" consular officers. ECF 17-1 at 37. That is, the FAM's public charge provisions "merely draw on those statutes and regulations and do not establish legal rules in their own right." *Id.* at 39. In addition, defendants point out that the Ninth and D.C. circuits have described the FAM as not carrying "force of law," and they analogize to Fourth Circuit cases in which agency manuals were held to be interpretive rules. *Id.* at 38-40.

61

The government concedes that the revision to FAM "could potentially lead to individuals being denied visas on 'public charge' grounds more frequently." *Id.* at 41. But, it insists that this "does not mean the guidance should be considered substantive rather than interpretive." *Id.*

The City counters that it has plausibly alleged that the FAM is a legislative rule subject to notice and comment. They contend that defendants' characterization of the FAM as interpretive is belied by the fact that DHS "is simultaneously proceeding through notice-and-comment rulemaking to implement similar changes to public charge for immigrants seeking to adjust status." ECF 25 at 42 (citing 83 Fed. Reg. 51,114). Further, the City argues that the FAM change is a legislative rule because it "'change[d] the rules of the game' by including within public charge a host of programs that had previously been excluded—a quintessentially legislative action." *Id.* at 43 (bracket in original) (quoting *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003)).

The focus of this litigation, the FAM's public charge provisions, contain all the hallmarks of a legislative rule. For starters, it "supplements a statute," specifically 8 U.S.C. § 1182(a)(4). *CKHD*, 896 F.3d at 620. In making the public charge determination, the INA provides that consular officers "shall at a minimum consider" the applicant's "age"; "health"; "family status"; "assets resources, and financial status"; and "education and skills." 8 U.S.C. § 1182(a)(4)(B). Public assistance—cash or otherwise—is not, therefore, a factor that the statute explicitly requires consular officers to consider. And, to the extent that cash benefits are encompassed within "financial status," the same cannot necessarily be said for the receipt of non-cash benefits. Similarly, the INA makes no mention of the receipt of public benefits by a visa applicant's family members, nor does it prescribe the proper weight that should be given to an Affidavit of Support. *See id.* "Accordingly, [9 FAM] does not derive 'from an existing [statute or regulation] whose meaning compels or logically justifies the proposition,'" thereby weighing in favor of treating the

[challenged FAM provisions] as a legislative rule." *CKHD*, 896 F.3d at 622 (quoting *Mendoza*, 754 F.3d at 1021).

The FAM changes also "'expand[] the footprint of a regulation by imposing new requirements, rather than simply interpreting the legal norms Congress or the agency itself has previously created.'" *Id.* at 620 (brackets omitted). To be sure, the fact that the revision to FAM alters the longstanding concept of the public charge rule does not, alone, transform the FAM into a legislative rule. *See Perez*, 135 S. Ct. at 1206 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule."). But, the revisions to the FAM did not simply repeal an existing regulation or clarify the INA. Instead, the FAM effects substantive changes to the definition of public charge in the INA as interpreted and applied by the State Department.

In particular, non-cash benefits, which were once excluded from public charge determinations, are now part of the totality-of-the-circumstances analysis. ECF 1, ¶ 97. Likewise, while the FAM previously stated that past or current receipt of cash benefits by the applicant's family members "*must* not be considered," it now provides that the "[p]ast or current receipt of public assistance of *any type*" by the applicant's family members "is relevant" to the analysis. ECF 1, ¶ 103 (emphasis added). And, the FAM deemphasized the importance of an Affidavit of Support from "normally . . . sufficient" to only a "positive" factor. ECF 1, ¶ 105. Thus, the FAM revisions impose new requirements on visa applicants and their families with respect to what benefits they can utilize without the risk of being deemed a public charge. *See, e.g.*, *Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 45-47 (D.D.C. 2018) (denying motion to dismiss plaintiff's APA claims after finding plaintiff had alleged sufficient facts that USCIS memorandum was a legislative

rule because it "broadens statutory criteria" for deportability); *Mendoza,* 754 F.3d at 1022 (DOL guidance letters were legislative rules because the letters "do more than clarify or remind parties of preexisting duties"; "they supplement the statute by imposing specific duties on employers").

Finally, the State Department "relie[d] on expressly delegated authority to establish [the] policy" embodied in the FAM's public charge provisions. *CHKD*, 896 F.3d at 621. Section 1104 of the INA provides that "[t]he Secretary of State shall be charged with the administration and the enforcement of the provisions of this chapter and all other immigration and nationality laws relating to (1) the powers, duties, and functions of diplomatic and consular officers of the United States . . . ." 8 U.S.C. § 1104. Based on this authority, the State Department promulgated Volume Nine to instruct consular officers how to make public charge determinations. The "Introduction to 9 FAM Visa" explains that the Manual is "based on statutes, regulations, Executive Orders, Presidential directives, OMB circulars and other sources." 9 FAM 101.1-1 (2019).

Specifically, the FAM derives its authority from the INA and 22 C.F.R. §§ 40-42 (2019), which govern the State Department's visa operations. *See* 9 FAM 101.1-2. As the Fourth Circuit observed in *CKHD*, the Secretary's reliance on his delegated authority to implement the FAM's public charge provisions militates in favor of finding the provisions legislative, rather than interpretive. *See CKHD*, 896 F.3d at 623; *see also Mendoza*, 754 F.3d at 1022 ("Where Congress has specifically declined to create a standard, the Department cannot claim its implementing rule is an interpretation of the statute.").

The government makes three arguments in support of the contrary contention. First, it points out that the State Department "published the [Manual] in a form that does not carry legal force[.]" ECF 17-1 at 37. The government is correct that the form of the agency action bears on the analysis. *See McCarthy*, 758 F.3d at 252 (an "agency's characterization of the guidance" is a

relevant factor when identifying legislative rules). But, it is not dispositive. *See Jerri's Ceramic Arts*, 874 F.2d at 207 ("An agency's 'characterization of its statement as an expansion of its policy or interpretation . . . does not preclude our finding that it is something more.'" (citation omitted)); *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C.Cir.2000) (finding guidance document was a legislative rule).

Second, the government argues that this Court should follow in the footsteps of the Ninth Circuit and D.C. Circuit, both of which have held that the FAM does not carry the force of law. But, the government misreads both cases.

*Scales v. I.N.S.*, 232 F.3d 1159 (9th Cir. 2000), involved the appeal of an order of removal. Facing deportation, Scales argued that he was a U.S. citizen because his Filipina mother was married to a U.S. service member at the time Scales was born in the Philippines. *Id.* at 1162. The government responded by citing the FAM, which provided that, "[a]bsent a blood relationship between the child and the parent on whose citizenship the child's own claim is based, U.S. citizenship is not acquired." *Id.* at 1165 (quoting 7 FAM § 1131.4–1(a) (ed. 2000)). The government urged the Ninth Circuit to accord *Chevron* "defer[ence] to the FAM as an agency interpretation" of the INA. *Id.*

The Ninth Circuit declined to do so. The court observed that "the statement in the FAM is not specifically an interpretation of [the pertinent INA section] and, importantly, it is not an interpretation "arrived at after, for example, a formal adjudication or notice-and-comment rulemaking." *Id.* at 1166. For additional support, the court then quoted *Christensen v. Harris County*, 529 U.S. 576 (2000), a case principally concerned with *Chevron* and *Auer* deference, for the proposition that "'[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, *agency manuals,* and enforcement guidelines, all of which lack the

force of law—do not warrant *Chevron*-style deference.'" *Id.* (quoting *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000)).

In *Miller v. Clinton*, 687 F.3d 1332 (D.C. Cir. 2012), a safety inspector at the U.S. embassy in Paris sued the State Department, alleging that his forced retirement violated the Age Discrimination in Employment Act ("ADEA"). *Id.* at 1335. In assessing whether the State Department was bound by the ADEA, the court noted in passing: "Whether or not more informal documents like the Department's Foreign Affairs Handbook and Foreign Affairs Manual would qualify for *Chevron* treatment, there is no mention of mandatory retirement (or an exemption from the ADEA) in the provisions of those documents that the Department cites." *Id.* at 1349 (footnote omitted).

Neither *Scales* nor *Miller* preclude this Court from concluding that 9 FAM is legislative. Both cases discussed the FAM in passing, and in the context of *Chevron* deference—a question distinct from whether the FAM is a legislative rule. More important, neither concerned the FAM's public charge provisions—the focus of this litigation. And, the focus of the inquiry here is on those changes, not the FAM as a whole or Volume Nine. *Cf.* 5 U.S.C. § 551(4) (defining a "rule" as "the whole or part of an agency statement of general or particular applicability and future effect").

Third, the government asserts that agency manuals are interpretive rules under Fourth Circuit precedent, arguing that this case is "most similar" to *United States v. Ellen*, 961 F.2d 462 (4th Cir. 1992). *Ellen* involved an appeal of a criminal conviction for discharging pollutants in wetland areas, in violation of the Clean Water Act. *Id.* at 464. The defendant argued that his conviction violated the Due Process and Ex Post Facto Clauses because the court admitted testimony defining "wetlands" according to an inter-agency manual, which was promulgated after

he was charged. *Id.* at 465. The Court rejected this contention, stating: "Ellen has presented no reasons why the *1989 Manual* is legislative rather than interpretive in nature and we find no indication that promulgation of the 1989 Manual was an exercise of the agencies' delegated legislative function." *Id.* at 466 (emphasis in original).

*Ellen* is distinguishable. The manual at issue in *Ellen* "merged" the then-existing policies of four federal agencies into one "technical guidance document" to establish "a uniform national procedure for wetland determinations." *Id.* The manual "d[id] not purport to create new law or impose new rights or duties . . . ." *Id.* The same cannot be said for the FAM's public charge provisions.

For one thing, while the FAM provides guidance to consular officers, the FAM also affects the legal rights of visa applicants and their families, *i.e.*, what benefits they can utilize without the possibility of being deemed a public charge. Moreover, the FAM revisions are not merely codifying longstanding practices to improve inter-agency coordination; rather, they alter the standards that govern whether a visa applicant is inadmissible as a public charge.

*Jerri's Ceramic Arts, Inc. v. Consumer Product Safety Commission*, 874 F.2d 205 (4th Cir. 1989), is instructive. There, the Fourth Circuit determined that a "Statement of Interpretation" issued by the Consumer Product Safety Commission was a legislative rule. *See id.* at 206. The statement at issue designated the "paper, fabric, yarn, fuzz, elastic, and string" components of toys to be "small parts." *Id.* at 207. This reversed the agency's longstanding policy treating only hard components as "small parts," and it threatened to result in toys previously exempt from regulation being banned as choking hazards. *Id.*

Examining "'the provision's language, its context, and any available extrinsic evidence'" revealed its legislative character. *Id.* at 208 (quoting *Doe v. Hampton*, 556 F.2d 265, 280-81 (D.C.

Cir. 1977)).  The Court reasoned, 874 F.2d at 208: "[T]he language of the statement and related comments establishes that more is involved than mere 'interpretation,' because the proposed statement has the clear intent of eliminating a former exemption and of providing the Commission with power to enforce violations of a new rule."  Thus, given the Commission's authority to impose civil and criminal penalties on noncompliant actors, the Court found "the agency's argument that "the statement 'only expects' and 'urges' compliance, and merely provides guidance to the public and its staff" to be "simply incredible."  *Id.*  Further, the Court observed that "[t]he fact that the statement altered a long-standing position cannot readily be discounted," and here "the statement would, for the first time, have the effect of bringing within the sweep of the regulation entirely new classes of business."  *Id.*

Here too, at least according to the allegations, the changes to the FAM "alter a long-standing position," as it "imposes new duties" and has "the effect of bringing within the sweep of the regulation entirely new classes of [benefits]."  *Id.* at 208.  And, the FAM is not all bark and no bite—a visa applicant (or family member) who utilizes non-cash benefits faces the prospect of being deemed inadmissible to enter the United States on public charge grounds.  Thus, as in *Jerri's Ceramic Arts*, the facts surrounding the FAM change, in the light most favorable to the City, "establish that the [State Department] has made a legislative rule and called it an interpretation."  *Id.*

Therefore, I conclude that the City has adequately pleaded that the FAM is subject to notice and comment under the APA.  Accordingly, dismissal is not warranted in regard to the City's notice-and-comment claim.

### 2. Foreign Affairs Exception

The government maintains that the changes to the FAM are exempt from notice and comment under the APA's foreign affairs exception. ECF 17-1 at 41-42. Therefore, it claims that Count Three fails to state a claim.

The APA's foreign affairs exception provides that a rule need not undergo notice and comment "to the extent that there is involved . . . a military or foreign affairs function of the United States[.]" 5 U.S.C. § 553(a)(1). However, to invoke the exception, the government must do more than "merely recite that the Rule 'implicates' foreign affairs." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775 (9th Cir. 2018). The government must demonstrate a "need for immediate implementation of the final rule" due to "obvious international consequences." *Id.*; *see also Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995) ("For the exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences."), *superseded on other grounds by statute*, 8 U.S.C. § 1101(a)(42); *Jean v. Nelson*, 711 F.2d 1455, 1477-78 (11th Cir. 1983) (rejecting the foreign affairs exception where government "offered no evidence of undesirable international consequences that would result if rulemaking were employed"), *vacated and rev'd on other grounds*, 727 F.2d 957 (11th Cir. 1984) (en banc), *aff'd*, 472 U.S. 846 (1985).

To my knowledge, the federal appellate courts have recognized the applicability of the APA's foreign affairs exception on just two occasions: responding to the attacks of September 11, 2001, *see Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008), and the Iranian hostage crisis. *See Nademi v. INS*, 679 F.2d 811, 814 (10th Cir. 1982); *Yassini v. Crosland*, 618 F.2d 1356, 1360 (9th Cir. 1980) (per curiam); *Malek-Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981).

In the immigration context, "the dangers of an expansive reading of the foreign affairs exception . . . are manifest." *City of N.Y. v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010). Indeed, a capacious interpretation of § 553 (would risk "eliminat[ing] public participation in [an] entire area of administrative law." *Id.* (internal quotation marks and citation omitted); *see also Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) ("The foreign affairs exception would become distended if applied to [immigration] actions generally, even though immigration matters typically implicate foreign affairs."). Consequently, where the government seeks to apply the exception to immigration rules, it must establish that the "ordinary application of the public rulemaking provisions [will] provoke definitely undesirable international consequences." *East Bay Sanctuary Covenant*, 932 F.3d at 776 (brackets in original) (quoting *Yassini*, 618 F.2d at 1360); *accord City of New York*, 618 F.3d at 202; *Zhang*, 55 F.3d at 744; *Jean*, 711 F.2d at 1477-78.

At this stage, I cannot conclude that subjecting the FAM to APA rulemaking would produce "definitely undesirable international consequences." Nor are there "obvious" exigent circumstances like the September 11 attacks or the Iranian hostage crisis that would explain defendants' need to suddenly expand the FAM's definition of public charge.

Indeed, the government relies almost exclusively on the Attorney General's Manual on the APA to support its contention that the foreign affairs exception applies here. ECF 17-1 at 42. Such reliance is misplaced.

The Attorney General's Manual states that the foreign affairs exception is "broad" and "applicable to most functions of the State Department." U.S. Dep't of Justice, Attorney General's Manual on the Administrative Procedure Act 26-27 (1947). According to defendants, the Manual is "entitled to deference" because the Department of Justice was "heavily involved in the

legislative process that resulted in the Act's enactment in 1946." *Id.* at 42 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979), and *citing Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 546 (1978)).

The government overstates the import of the Attorney General's Manuel.  In *Chrysler Corp.*, 441 U.S. at 302 n.31, the Court only considered the Attorney General's Manual after noting that the House and Senate Reports did not address the issue under consideration.  Likewise, in *Vermont Yankee*, 435 U.S. at 546, the Court analyzed the House and Senate Reports before citing the Attorney General Manual as further confirmation of the legislative history.  Thus, while relevant, the Court need not blindly adhere to the Attorney General Manual's views on the foreign affairs exception.

And, in any event, the Attorney General Manual does not mandate the application of the foreign affairs exception to this case.  Tellingly, the government omits the quote of a House and Senate Report, contained in the Attorney General's Manual, *id.* at 26:

> As to the meaning of "foreign affairs function", both the Senate and House reports state: "The phrase 'foreign affairs functions,' used here and in some other provisions of the bill, is not to be loosely interpreted to mean any function extending beyond the borders of the United States *but only those 'affairs' which so affect relations with other governments* that, for example, public rule making provisions would clearly provoke definitely undesirable international consequences."

(quoting H. Rep. No. 79-1980 at 257 S. Rep. No. 79-572 at 199 (1946)) (emphasis added).

In sum, defendants' effort to invoke § 553(a)(1) is doomed by their failure to explain how subjecting the FAM to APA rulemaking would harm foreign policy interests.  At this stage, I agree with plaintiff that the foreign affairs exception does not require dismissal of the suit.

## V.    Equal Protection

The City contends that the amendments to the FAM violate the equal protection component of the Due Process Clause because they discriminate based on "race, national origin, nationality,

income, or receipt of public benefits." ECF 1, ¶ 189. The government moves to dismiss the City's equal protection claim, asserting that "the City has not alleged facts that could establish that the challenged FAM guidance was motivated by racial animus on the part of the Department of State or the President." ECF 17-1 at 44. And, the government points out that federal actions which discriminate on the basis of income and national origin are subject only to rational basis review. *Id.* at 45-46.[20]

The Equal Protection Clause of the Fourteenth Amendment "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). Equal Protection principles apply to the federal government through the Due Process Clause of the Fifth Amendment to the Constitution. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

"To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race." *Williams v. Hansen*, 326 F.3d 569, 583 (4th Cir. 2003); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). Discriminatory intent "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v.*

---

[20] The government does not explain why the City has failed to state a claim even if the FAM discriminated on the basis of income or national origin, as opposed to race. *See* ECF 17-1 at 44-46. Regardless, as discussed, *infra*, *Trump v. Hawaii*, __ U.S. __, __, 138 S. Ct. 2392 (2018), may compel the application of rational basis review to the City's equal protection claim, regardless of whether the alleged classification is income, national origin, or race.

*Feeney*, 442 U.S. 256, 279 (1979).  That said, "the Equal Protection Clause 'does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purposes.'" *Williams*, 326 F.3d at 584 (emphasis in original) (quoting *Arlington Heights*, 429 U.S. at 265).  It is enough to show "that racial animus was one of several factors that, taken together, moved the decision-maker to act as he did."  *Id.*

"There are several ways for a plaintiff to make out a valid claim of unconstitutional discrimination[:]" The plaintiff can (1) "point to a law or policy that expressly classifies persons on the basis of race," (2) "identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner," or (3) "allege that a facially neutral statute or policy that is neutrally applied nonetheless has an adverse effect on a protected group, and that the adoption of the statute or policy was motivated by discriminatory animus."  *Williams*, 326 F.3d at 584 (internal citations omitted).

In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the Supreme Court set forth a non-exhaustive list of factors for courts to consider in performing the "sensitive inquiry" into discriminatory intent.  These include: (1) "The historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (2) "The specific sequence of events leading up the challenged decision"; (3) "Departures from the normal procedural sequence"; (4) "Substantive departures . . ., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and (5) "The legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  *Id.* at 267-68 (internal citations and references omitted).

When undertaking this analysis, courts must be cautious not to "miss[] the forest in carefully surveying the many trees." *N.C. State Conference of NAACP v. McCrory*, 831 F.3d, 204, 214 (4th Cir. 2016). "Any individual piece of evidence can seem innocuous when viewed alone, but gains an entirely different meaning when considered in context." *Id.* at 233.

Applying the *Arlington Heights* factors, the City's allegations are sufficient to survive defendants' Motion. First, the Complaint alleges that the FAM change was a substantive departure from previous policy. "For decades," asserts the City, the FAM's definition of public charge did not encompass the receipt of non-cash benefit. Then, on January 3, 2018, the State Department changed course, making the receipt of non-cash benefits by both the visa applicant and his or her family a relevant factor. ECF 1, ¶ 44. Likewise, the State Department retracted its instruction that Affidavits of Support are "normally . . . sufficient," and replaced it with the advisement that an Affidavit is simply a "positive factor." *Id.*, ¶¶ 47, 105.

Second, the City points to "specific sequences of events" that raise red flags. Shortly after President Trump's inauguration, a draft Executive Order was leaked to the media, which directed DHS and the State Department to adjust how they conduct public charge determinations. *Id.* ¶ 77. Although the order was never finalized, both agencies have implemented nearly identical regulatory changes. *Id.* ¶ 78. Similarly, plaintiff alleges that the State Department published the amended Manual without forewarning; that when it did announce the changes on its website, it left out many of the details, including any explanation for the revisions; and it removed the press release from its website shortly after posting it. *Id.* ¶¶ 115-20.

Finally, the City identifies statements by the President and senior Executive Branch officials to support its claim that defendants' decision was motivated, at least in part, by intentional discrimination against immigrants of color. *See id.* ¶¶ 69-73.

The government throws the proverbial kitchen sink at the City's equal protection claim. However, none of its arguments are persuasive.

As an initial matter, defendants contend that the City cannot raise a plausible equal protection claim because "aliens seeking entry into the United States cannot assert constructional rights." ECF 17-1 at 44. That is undoubtedly true. *Kerry v. Din*, 576 ___ U.S. ___, ___, 35 S. Ct. 2128, 2131 (2015) (opinion of Scalia, J.); *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). But, the City is not asserting the rights of unadmitted nonresident aliens. Rather, it seeks to assert the constitutional rights of its residents, particularly those who are affected by the FAM, either because they are immigrant residents, sponsors, or family members of a visa applicant. ECF 1, ¶¶ 195-97. Thus, *Din* and *Kleindienst* are inapposite.

Further, the government insists that the remarks by President Trump, on which the Cities relies, are merely "statements about policy" and that, regardless, none of these statements pertain to the FAM change. ECF 17-1 at 47-48. The government is wrong on both fronts.

It is true that many of the President's remarks on which the City relies are policy or policy-related statements, like his contention that "[c]urrent immigration policy imposes as much as $300 billion annually in net fiscal costs on U.S. taxpayers." ECF 1, ¶ 71(p). And, others are nothing more than political bluster. *See, e.g.*, *id.* ¶ 71(e) ("ObamaCare gives free insurance to illegal immigrants."). Indeed, it cannot be the case that an equal protection claim is born every time a president expresses his views on contentious subjects, such as immigration. *See Hawaii*, 138 S. Ct. at 2417 ("The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf."). But, the Complaint contains statements of the President that plausibly constitute prejudice. Those statements include (1) the President's alleged complaint on January 11, 2019, about "people from shithole countries" coming to the United States (*id.* ¶ 69);

(2) his comment that immigrants from Haiti "all have AIDS" (*id.* ¶ 70); and (3) his assertion that Nigerians, if admitted to the United States, would never "go back to their huts" (*id.*).

And, the government invokes *Trump v. Hawaii*, __ U.S. __, 138 S. Ct. 2392 (2018), for the proposition that courts should ignore the President's statements when searching for evidence of racial animus.   ECF 17-1 at 48-49.   In *Trump v. Hawaii*, the plaintiffs lodged, *inter alia*, an Establishment Clause challenge to Presidential Proclamation No. 9645, which restricted the entry of foreign nationals from six predominantly Muslim countries.   *Id.* at 2403; *see* 82 Fed. Reg. 45161 (Sept. 27, 2017).   The President's statements in that case were at "the heart" of the plaintiffs' constitutional claim.   *Id.* at 2417.   The plaintiffs obtained a preliminary injunction barring enforcement of the restrictions, and the government appealed.   *Id.* at 2406-07.

As relevant here, the Court vacated the preliminary injunction based, in part, on finding that the plaintiffs had not "demonstrated a likelihood of success on the merits of their constitutional claim."   *Id.* at 2423.   The Court applied the standard set forth in *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972), which provides that, pursuant to Congress's plenary power over immigration, a court reviewing a constitutional attack on a visa denial should examine only whether there was a "facially legitimate and bona fide reason" for the decision.   *Id.* at 2420.

Applying the *Mandel* standard, the Court found that the Proclamation was facially neutral as to religion, "reflect[ed] the results of a worldwide review process undertaken by multiple Cabinet officials and their agencies," and was "expressly premised on legitimate purposes: preventing the entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices."   *Id.* at 2421.   But, the Court went further, finding it appropriate to "look behind the face of the Proclamation to the extent of applying rational basis review."   *Id.* at 2420. Thus, the Court stated: "As a result, we may consider plaintiffs' extrinsic evidence, but will uphold

the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.* Although the Court acknowledged the extrinsic record presented by the plaintiffs, it concluded that, "because there is persuasive evidence that the entry suspension has a legitimate grounding in national security concerns, quite apart from any religious hostility, we must accept that independent justification." *Id.*

There is little daylight between *Hawaii* and the case *sub judice*. Here, as there, plaintiff mounts a constitutional challenge to an Executive Branch policy concerning the entry of foreign nationals into the country. Accordingly, the Court is limited to the "circumscribed judicial inquiry," asking only if the FAM changes "can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.* at 2420.

However, *Hawaii* does not foreclose plaintiff's equal protection claim. First, rational basis review is not toothless. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 635 (1996); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 448-50 (1985); *U.S. Dep't of Agric. v. Moreno*, 413, U.S. 528, 534-36 (1973). Perhaps plaintiff will unearth evidence during discovery demonstrating that defendants were driven by nothing more than "a bare . . . desire to harm a politically unpopular group." *Moreno*, 413 at 534. Or, perhaps defendants will produce evidence that the revisions to the FAM have a legitimate basis. But, at this juncture, there is no evidence as to why defendants amended the Manual.

Second, *Hawaii* in no ways holds that the President's statements are irrelevant. *See Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d 650, 671 (D. Md. 2019) ("[*Hawaii*] does not instruct courts to disregard [presidential] statements . . ., nor does it hold that the subjective intent of the President and his advisors . . . is irrelevant."); *see also Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 519-520 (9th Cir. 2018), *cert. granted*, __ U.S. __,

139 S. Ct. 2779 (2019) (No. 18-587); *id.* at 524 n.4 (Owens, J., concurring in the judgment). Indeed, despite limiting its review, the *Hawaii* Court nonetheless considered "extrinsic evidence"—namely, President Trump's statements. *Hawaii*, 138 S. Ct. at 2420.

Finally, defendants ignore that the standard of review in *Hawaii* was materially different than the one this Court must apply to defendants' Motion. The question in *Hawaii* was whether the plaintiffs had established a "likelihood of success on the merits," so as to entitle them to a preliminary injunction. *See id.* at 2423; *see also Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Here, in contrast, this Court is tasked with deciding whether the Complaint states a plausible claim for relief. *See Arab Am. Civil Rights League v. Trump*, No. 17-10310, 2019 WL 3003455, at *9 (E.D. Mich. July 10, 2019) (declining to apply *Hawaii v. Trump* at motion to dismiss stage due to the differing standards of review).

The government is correct that none of the President's statements relate specifically to the decision to change the FAM's public charge provisions. But, at this juncture, the City does not need to demonstrate a tight nexus between words and actions. *See, e.*g., *Saget v. Trump*, 345 F. Supp. 3d 287 (E.D.N.Y. 2018) (plaintiffs plausibly alleged an equal protection violation based on the President's statements); *Casa de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 325-26 (D. Md. 2018) (same); *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 810 (S.D.N.Y. 2018) (same), *aff'd in part and rev'd in part*, __ U.S. __, 139 S. Ct. 953 (2019); *Centro Presente v. U.S. Dep't of Homeland Sec.,* 332 F. Supp. 3d 393, 414-15 (D. Mass. 2018) (same); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018) (rejecting the argument that the President's statements were irrelevant to equal protection challenge to agency action). Indeed, "there can be no doubt that if, as alleged, the President influenced the decision to [amend the FAM], the discriminatory motivation cannot be laundered through the Secretary." *Casa de Maryland*, 355 F.

Supp. 3d at 326.  And, in any event, plaintiff plausibly claims that President Trump was personally involved in the decision based on the draft Executive Order commanding the State Department to revise the FAM's public charge provisions.  ECF 1, ¶ 77.

Whether this evidence will ultimately suffice to establish an equal protection violation is a question for another day.  At this juncture, accepting plaintiff's allegations as true, and drawing all reasonable inferences in plaintiff's favor, as I must at this stage, I conclude that the City has alleged sufficient facts to allege a claim of an equal protection violation.

## VI.    Injunctive relief and the President

Relying primarily on *Franklin v. Massachusetts*, 505 U.S. 788 (1992) (plurality opinion), defendants assert that the Court should, at a minimum, dismiss the City's claims against the President because "separation of powers generally prevents a federal court from issuing an injunction purporting to supervise the President's performance of his duties."  ECF 17-1 at 50.

The prospect of enjoining the President raises serious separation of powers concerns. Indeed, the Supreme Court has consistently cautioned courts against granting equitable relief against the chief executive.  *See Clinton v. Jones*, 520 U.S. 681, 718-19 (1997) (Breyer, J. concurring); *Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923) (The "general rule is that neither department may invade the province of the other and neither may control, direct, or restrain the action of the other"); *Johnson*, 71 U.S. (4 Wall.) 475, 500 (1866) ("Neither [the Congress or President] can be restrained in its actions by the judicial department; though the acts of both, when performed, are, in proper cases, subject to its cognizance.").

In *Franklin*, 505 U.S. 788, Massachusetts sued to enjoin the President from submitting the census statement to Congress under the APA and the Enumeration Clause.  *Id.* at 802.  A plurality of the Supreme Court observed that a "grant of injunctive relief against the President himself is

extraordinary, and should . . . raise[ ] judicial eyebrows." *Id.*  The plurality went on to state: "in

general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his

official duties.'" *Id.* at 802-03 (quoting *Johnson*, 71 U.S. (4 Wall.) 475, 500).  But the plurality

did "not decide whether injunctive relief against the President was appropriate, because . . . the

injury alleged is likely to be redressed by declaratory relief against the Secretary alone." *Id.* at

803.

> In a concurring opinion, Justice Scalia opined in *Franklin*:

> > The apparently unbroken historical tradition supports the view, which I
> > think implicit in the separation of powers established by the Constitution, that the
> > principals in whom the executive and legislative powers are ultimately vested—
> > viz., the President and the Congress (as opposed to their agents)—may not be
> > ordered to perform particular executive or legislative acts at the behest of the
> > Judiciary. . . . . Permitting declaratory or injunctive relief against the President
> > personally would not only distract him from his constitutional responsibility to
> > "take Care that the Laws be faithfully executed," U.S. Const., Art. II, § 3, but, as
> > more and more disgruntled plaintiffs add his name to their complaints, would
> > produce needless head-on confrontations between district judges and the Chief
> > Executive.

*Id.* at 827-28 (Scalia, J., concurring in part and concurring in the judgment) (internal quotation

marks and citations omitted).

> But, this does not place the President above the law.  Justice Scalia explained that "[r]eview

of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the

officers who attempt to enforce the President's directive . . . ." *Id.* at 828; *accord Int'l Refugee*

*Assistance Project v. Trump,* 857 F.3d 554, 605 (4th Cir.), *as amended* (May 31, 2017), *as*

*amended (*June 15, 2017) (reversing injunction issued against the President because injury could

be remedied by injunctive relief against subordinate officials), *vacated and remanded on other*

*grounds sub nom. Trump v. Int'l Refugee Assistance,* __ U.S. __, __, 138 S. Ct. 353, 199 (2017);

*Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).

Despite casting grave doubt on enjoining Presidential action, the Supreme Court has not foreclosed the possibility that it may be warranted in extreme cases. *See Clinton v. New York*, 524 U.S. 417, 433 n.22 (1998) (holding plaintiffs satisfied Article III standing because "each injury is traceable to the President's cancellation of [certain act provisions], and [it] would be redressed by a declaratory judgment that the cancellations are invalid"); *see also* Patricia M. Wald & Jonathan R. Siegel, *The D.C. Circuit and the Struggle for Control of Presidential Information*, 90 Geo. L.J. 737, 758 (2002) (noting that the Court "has not expressly held that a court may never enjoin the President," only "that there is something unique about litigation against the President *eo nomine* that should cause a special judicial hesitation in the enforcement of legal constraints on executive action.").

Other district courts, when faced with this delicate question at the motion to dismiss stage, have declined the government's invitation to dismiss the President as a party. *See Stone v. Trump*, __ F. Supp. 3d __, __, 2019 WL 3935363 at[*]29 (D. Md. Aug. 2019) (declining to dismiss President from suit on a motion to dismiss); *District of Columbia v. Trump*, 291 F. Supp. 3d 725, 751-52 (D. Md. 2018), *rev'd and remanded on other grounds, In re Trump*, 928 F.3d 360 (4th Cir. 2019) (same); *Centro Presente*, 332 F. Supp. 3d at 418-19 (finding it "premature to determine whether this case has the potential to be the rare case in which such an extraordinary remedy might be justified"); *CASA de Md.*, 355 F. Supp. 3d at 328-29 ("Though ultimately, relief against the President himself is extraordinarily unlikely in this case, none of the authority cited by Defendants requires that the President be dismissed at this early stage. The Court thus denies Defendants' motion to dismiss President Trump from the case."); *Saget*, at 345 F. Supp. 3d at 297-98 (E.D.N.Y. 2018) ("Because this could be one of the rare cases in which the extraordinary remedy of injunctive

relief against the President could be appropriate, it is premature to dismiss the President as a party at this time.").

Defendants contend that the City's suit against the President is "especially weak" because the State Department, not the President, publishes the FAM.  ECF 71 at 50.  That may ultimately prove to be true.  But this argument is misplaced at this stage in the litigation.  Therefore, I shall deny the government's motion to dismiss defendant President Trump as a party.

## VII.    Conclusion

For the reasons stated above, I shall deny defendants' Motion to Dismiss (ECF 17).  An Order follows, consistent with this Memorandum Opinion.


Date: September 20, 2019                                   _____/s/_____
                                                          Ellen Lipton Hollander
                                                          United States District Judge