FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2019 DEC 19 PM 12: 07

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAYOR AND CITY COUNCIL OF
BALTIMORE,
*Plaintiff,*

v.

DONALD J. TRUMP, *et al.,*
*Defendants.*

Civil Action No. ELH-18-3636

## MEMORANDUM OPINION

This Memorandum Opinion resolves a motion (ECF 75) to modify the Court's Scheduling

Order (ECF 69), issued in connection with a suit challenging amendments to the Department of

State's Foreign Affairs Manual (the "FAM" or "Manual"). The amendments at issue concern the

criteria that consular officers use to determine whether a visa applicant is likely to be a "public

charge" and thus inadmissible for admission to the United States.

The suit was filed by the Mayor and City Council of Baltimore (the "City") against Donald

J. Trump, in his official capacity as President of the United States; the United States Department

of State ("State Department"); and Michael R. Pompeo, in his official capacity as United States

Secretary of State. Plaintiff seeks to enjoin defendants from using the revised Manual to process

immigrant visa applications. ECF 1 ("Complaint"). The Complaint contains four counts, three of

which are under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* ("APA"). Count One

alleges that the FAM revisions are "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law," in violation of 5 U.S.C. § 706(2)(A). ECF 1, ¶¶ 171-78. In Count Two,

the City asserts that the changes to the Manual have an impermissible retroactive effect, in

violation of 5 U.S.C. § 706(2)(A). ECF 1, ¶¶ 179-86. Count Three alleges that the FAM was

amended without notice and comment, as required by 5 U.S.C. § 706(2)(D). ECF 1, ¶¶ 183-86.

In Count Four, the City lodges claims under the equal protection component of the Due Process *Clause of the* Fifth Amendment to the Constitution, asserting that the changes to the FAM discriminate on the basis of race, national origin, nationality, income, and receipt of public benefits. *Id.* ¶¶ 187-97.

Defendants (sometimes referred to collectively as the "government") moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction, and Fed. R. Civ. P. 12(b)(6), for failure to state a claim. ECF 17. In a Memorandum Opinion (ECF 59) and Order (ECF 60) of September 20, 2019, I denied the government's motion.

Defendants subsequently answered the suit. ECF 68. Thereafter, the Court issued a Scheduling Order to facilitate discovery. ECF 69.[1] Pursuant to the Scheduling Order, the City has served defendants with requests for production of documents. In addition, it issued two sets of interrogatories. One was directed to President Trump and the other was directed to the State Department and Secretary Pompeo.

In response, defendants filed a "Motion To Modify Scheduling Order" (ECF 75), supported by a memorandum. ECF 75-1 (collectively, the "Motion"). They argue that no discovery is needed beyond production of the administrative record. And, defendants ask the Court to stay discovery pending the resolution of the Motion. The City opposes the Motion. ECF 81 ("Opposition). Ten exhibits were appended to the Opposition. ECF 81-2 to ECF 81-11. Defendants have replied. ECF 82. A flurry of submissions followed. *See* ECF 83; ECF 85; ECF 86.

---

[1] This case was initially assigned to me. However, it was reassigned to Judge Stephanie Gallagher on September 24, 2019, after she became a United States District Judge. She issued the Scheduling Order on November 5, 2019. ECF 69. On November 18, 2019, Defendants moved to modify the Scheduling Order. ECF 75. The next day, the case was reassigned from Judge Gallagher back to me. *See* Docket.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall vacate the Scheduling Order (ECF 69), and I shall grant the Motion (ECF 75) in part and deny it in part. In particular, I shall grant the Motion as to plaintiff's equal protection claims and deny the Motion as to plaintiff's APA claims. Following review of the administrative record, plaintiff may seek leave of court to conduct discovery beyond the administrative record if such a request is warranted.

## I.  Factual and Procedural Summary[2]

### A.  Factual Background

For well over a century, federal law has barred "any person unable to take care of himself or herself without becoming a public charge" from entering the United States. Act of Aug. 3, 1882, ch. 376, § 2, 22 Stat. 214 (1882). Today, this prohibition is codified in the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.* ("INA"). Under the INA, "[a]ny alien who . . . is likely at any time to become a public charge is inadmissible." *Id.* § 1182(a)(4)(A). The term "public charge" is not defined, however. Instead, the INA directs that, "at a minimum," the government must "consider the alien's—(I) age; (II) health; (III) family status; (IV) assets, resources, and financial status; and (V) education and skills." *Id.* § 1182(a)(4)(B)(i). The INA also permits the government to consider an "Affidavit of Support" when making a public charge determination. *Id.* § 1182(a)(4)(B)(ii).

The Department of Homeland Security ("DHS") and the State Department both make public charge determinations, depending on the location of the foreign national. *See* ECF 1, ¶¶ 20, 20 n.12. Visa applications submitted by aliens located outside the United States are processed at

---

[2] I incorporate here the factual summary set forth in my Memorandum Opinion of September 20, 2019. *See* ECF 59. Therefore, I need not recount the facts in detail.

a State Department consulate in the alien's home country. *Id.* ¶ 20. During "consular processing," the applicant must submit various documents, undergo a medical screening, and be interviewed by a consular officer. *Id.* ¶ 21. The applicant bears the burden of proving "to the satisfaction of the consular officer" that he or she is eligible for a visa. 8 U.S.C. § 1361. No visa "shall be issued to an alien" if "it appears to the consular officer" from the alien's application "that such alien is ineligible to receive a visa" or if "the consular officer knows or has reason to believe" that the alien is ineligible. *Id.* § 1201(g).

The State Department's Manual contains detailed instructions that consular officers are to follow when assessing whether a visa applicant is inadmissible as a public charge. Prior to January 3, 2018, the FAM defined "public charge" as a non-citizen "likely to become primarily dependent on the U.S. Government for subsistence." ECF 17-2 (9 FAM § 302.8 (2017)) at 3. This occurred either from "[r]eceipt of public cash assistance for income maintenance" or "[i]nstitutionalization for long-term care at U.S. Government expense." *Id.* at 3. Notably, the Manual expressly excluded from the public charge assessment the visa applicant's past, current, or future receipt of non-cash benefits. *See id.* at 4. Further, the Manual limited the relevance of benefits used by the visa applicant's family members. *See id.* at 10. The FAM also instructed that an Affidavit of Support "should normally be considered sufficient" to satisfy the public charge requirement, and it cautioned against finding a visa applicant inadmissible simply because his or her sponsor received public benefits. *Id.* at 7, 11.

On January 3, 2018, the State Department, allegedly without prior notice, issued amendments to the portions of the FAM dealing with public charge determinations. ECF 1, ¶¶ 92, 94. The revisions work three significant changes to the way in which consular officers conduct public charge determinations. First, the Manual now directs consular officers to consider a visa

4

applicant's receipt of non-cash benefits as part of the public charge determination. ECF 1-1 ("Redlined Version of 2018 FAM") at 5. Second, the FAM now instructs that the receipt of non-cash benefits by the visa applicant's family members is "a heavily negative factor" in the analysis. *Id.* at 10. Third, whereas the FAM once taught that an Affidavit of Support from the applicant's sponsor was "normally . . . sufficient" to satisfy the public charge inquiry, the revised Manual diminishes the Affidavit's weight, instructing that it is merely one factor among many that the consular officer should consider. *Id.* at 7.

As noted, the City alleges that the State Department acted in an arbitrary and capricious manner and that the FAM revisions are impermissibly retroactive. ECF 1, ¶¶ 171-82. The City also asserts that the FAM changes contravene the APA's notice-and-comment requirement. *Id.* ¶¶ 183-86. Further, the City alleges that the State Department revised the FAM at the direction of President Trump and senior Executive Branch officials, who harbor "animus towards immigrants, particularly those from Latin American, Asian, and African countries, and those who accept public benefits." *Id.* ¶ 74. To make its case, the City relies on multiple statements by President Trump; Stephen Miller, a senior advisor to the President; and then-Senator Jefferson B. Sessions III. *See id.* ¶¶ 71-73. The City connects the President to the FAM amendments by pointing to a draft executive order directing the State Department to amend the FAM, which was leaked to the public in January 2017, but which was never issued. *See id.* ¶¶ 76-77.

According to the City, the amendments to the FAM's public charge provisions impose financial costs on the City and disrupt its social services. Further, the City contends that the amendments harm the health and well-being of Baltimore's immigrant communities. Thus, it asserts that "Baltimore as a whole will suffer" if defendants are not enjoined from using the revised Manual. *Id.* ¶ 170.

## B. Procedural Background

Plaintiff filed suit on November 28, 2018. ECF 1. The government, on February 25, 2019, moved to dismiss the Complaint for lack of jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6), advancing a "smorgasbord of arguments." ECF 59 at 41. Specifically, defendants asserted that the City lacked standing to pursue the suit and, in particular, to sue the President (ECF 17 at 25-32); the FAM amendments were not reviewable under the APA (*see id.* at 33-34); the FAM revisions were not a reviewable "final agency action" (*id.* at 36-41); the FAM revisions were exempt from the APA's notice-and-comment requirement (*id.* at 41-42); and, the FAM changes did not have retroactive effect. *Id.* at 42-44. The government also moved to dismiss plaintiff's constitutional claim, arguing that the City had not alleged sufficient facts to state a plausible equal protection violation. *See id.* at 44-49. The City opposed that motion (ECF 25), and defendants replied. ECF 56. In addition, the Court received three amicus briefs from a total of thirty-two amici, all in support of the City. ECF 49; ECF 51; ECF 53.

As noted, I denied defendants' motion to dismiss in a Memorandum Opinion and Order of September 20, 2019. ECF 59; ECF 60. I determined that the City satisfied the requirements of Article III standing to challenge the Manual's amendments and to sue President Trump in his official capacity. ECF 59 at 36, 38. As for the City's APA claims, I concluded that the FAM change was reviewable, and that the City had plausibly alleged that the revisions were impermissibly retroactive (*id.* at 59) and procedurally invalid. *Id.* at 68. In addition, I concluded that the City's allegations were sufficient to state plausible equal protection claims. *Id.* at 79.

Of import here, the Court observed that there is "little daylight" between this case and *Trump v. Hawaii*, ___ U.S. ___, 138 S. Ct. 2392 (2018), and therefore "the Court is limited to the 'circumscribed judicial inquiry,' asking only if the FAM changes 'can reasonably be understood

6

to result from a justification independent of unconstitutional grounds.'" ECF 59 at 77 (quoting *Hawaii*, 138 S. Ct. at 2420). But, as I explained, *Hawaii* "d[id] not foreclose plaintiff's equal protection claim." *Id.* at 77. I stated, *id.*:

> Perhaps plaintiff will unearth evidence during discovery demonstrating that defendants were driven by nothing more than "a bare . . . desire to harm a politically unpopular group." *Moreno*, 413 U.S. at 534. Or, perhaps defendants will produce evidence that the revisions to the FAM have a legitimate basis. But, at this juncture, there is no evidence as to why defendants amended the Manual.

On October 10, 2019, defendants filed a "Notice Of Regulatory Action," advising that the State Department had published an interim final rule amending its regulation governing the application of the public charge provision. ECF 64 ("Notice"); *see* 84 Fed. Reg. 54996 (Oct. 11, 2019).[3] In the Notice, defendants indicated that the amendments would take effect on October 15, 2019, at which point the State Department would also issue new revisions to the FAM that would supersede the January 2018 guidance. ECF 64. However, the publication of a new edition of the FAM "has been delayed," and the January 2018 guidance remains in effect. ECF 75-1 at 8.

Defendants filed an answer to the Complaint on October 20, 2019. ECF 68 (the "Answer"). Thereafter, on November 5, 2019, the Court issued a Scheduling Order, pursuant to Local Rule 103.9. ECF 69. The Scheduling Order contemplates both fact and expert discovery. It authorizes ten hours of depositions per side for fact witnesses. *Id.* at 3. But, it provides that either party may seek a modification of the discovery deadlines included in the Scheduling Order by filing a motion with the Court on or before November 19, 2019. *Id.* at 1.

On November 15, 2019, prior to the modification deadline, the City served requests for production of documents on defendants. *See* ECF 81-1 ("Plaintiff's First Set Of Requests For

---

[3] Defendants filed the Notice on October 10, 2019, but it was docketed in this case the following day.

Production To All Defendants"). The City also propounded two sets of interrogatories, one directed to President Trump and the other directed to the State Department and Secretary *Pompeo*. ECF 81-2 ("Plaintiff's First Set Of Interrogatories To President Donald J. Trump"); ECF 81-3 ("Plaintiff's First Set Of Interrogatories To Secretary Michael R. Pompeo And The State Department").

On November 18, 2019, the government filed the Motion, seeking to limit discovery to the production of the administrative record and to stay further discovery in the interim. ECF 75. The City responded to the Motion (ECF 81), and defendants replied. ECF 82.

The parties also submitted a "Joint Status Report, Including Plaintiff's Request To Modify Scheduling Order." ECF 80 ("Status Report"). In the Status Report, the parties acknowledged that they "disagree[d] on the scope and manner of discovery[.]" *Id.* at 1. The City asked the Court to shift several deadlines and requested an increase in deposition hours, to a total of fifty hours per side for fact witnesses. *Id.* at 4. In contrast, defendants reaffirmed their belief that "the Court's review of this action should proceed based on the record compiled by the Department of State . . . without additional discovery." *Id.*

On December 11, 2019, defendants moved for an extension of time to respond to plaintiff's discovery requests, which were otherwise due on December 16, 2019. ECF 83. The Court granted the motion, extending the deadline to respond to plaintiff's discovery requests to January 30, 2020, with the proviso "that, by 12/18/2019, plaintiff may move to rescind this Order as improvidently granted." ECF 84. Plaintiff filed a letter with the Court on December 13, 2019, objecting to the extension of time and requesting a hearing to address the scope of discovery in this case. ECF 85. Defendants oppose the request for a hearing prior to the resolution of the Motion. ECF 86. I scheduled a telephonic conference for December 19, 2019. *See* Docket.

8

## II.  Discussion

According to defendants, "[t]he only 'discovery' that is either necessary or appropriate in this action is the production of the agency record." ECF 75-1 at 6. The APA, defendants maintain, "governs the City's constitutional claims as well as its statutory claims, and both types of challenges are to be evaluated based on the agency record." *Id.* at 10.

Defendants concede that the APA permits extra-record discovery in limited circumstances, such as where there is a strong showing that the agency acted in bad faith, but they contend that this assessment must be made based on the administrative record. *Id.* Further, in the government's view, allowing discovery with respect to the City's constitutional claims "would be especially improper," because the City challenges "policies pertaining to the exclusion and admission of aliens, which are a core prerogative of the Executive Branch." *Id.* at 12. And, defendants assert that discovery directed at the Executive Branch raises separation-of-powers concerns that weigh in favor of cabining discovery to the administrative record. *Id.* at 10-14.

The City has not sought extra-record discovery on its APA claims and has indicated that it will review the administrative record before deciding whether to do so. ECF 81 at 6. But, the City argues that it is entitled to discovery on its equal protection claims and that its discovery is narrowly tailored to the needs of this case. *Id.* at 2-7. It suggests that the Court's Memorandum Opinion "blesse[d]" discovery, notwithstanding the circumscribed judicial review applicable to policies concerning the admissibility of foreign nationals. *Id.* at 6. Further, the City observes that neither the President nor high-level Executive Branch officials are immune from judicial process.

I address these contentions, in turn.

**A.**

The APA provides for judicial review of a final agency action. 5 U.S.C. §§ 702, 704; *see Ergon-W. Va., Inc. v. EPA*, 896 F.3d 600, 609 (4th Cir. 2018); *Roland v. U.S. Citizenship and Immigration Servs.*, 850 F.3d 625, 629 n.3 (4th Cir. 2017). Pursuant to the APA, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B); or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706 (2)(C). These provisions are "cumulative" in that "an agency action which is supported by the required substantial evidence may in another regard be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.) (citation omitted).

Notably, judicial review of agency action is deferential, and the agency's decision "is entitled to a presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see Def. of Wildlife v. U.S. Dep't Interior*, 831 F.3d 339, 345 (4th Cir. 2019); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). Of course, that does not mean courts should "'rubber-stamp'" agency action. *Ohio Valley Envtl. Coal*, 556 F.3d at 192 (citation omitted); *see Judulang v. Holder*, 565 U.S. 42, 53 (2011) ("[C]ourts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking."). But, while a court must perform a "thorough, probing, [and] in-depth" review of an agency action, *Overton Park*, 401 U.S. at 415, it "is not empowered to substitute its judgment for that of the agency." *Id.* at 416; *see Ohio Valley Envtl. Coal*, 556 F.3d at 192.

10

As a general matter, "claims brought under the APA are adjudicated without a trial or discovery, on the basis of an existing administrative record[.]" *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007); *see also Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'" (citation omitted)). This "reflects the recognition that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Dep't of Commerce v. New York*, ___ U.S. ___, 139 S. Ct. 2551, 2573 (2019) (citation omitted).

Under the APA, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706(2). Ordinarily, this inquiry "is limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *New York*, 139 S. Ct. at 2573 (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978)); *see Overton Park*, 401 U.S. at 420. Hence, "the focal point for judicial review" under the APA "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). "The whole administrative record includes pertinent but unfavorable information, and an agency may not exclude information on the ground that it did not 'rely' on that information in its final decision." *Tafas v. Dudas*, 530 F. Supp. 2d 786, 793 (E.D. Va. 2008) (collecting cases).

But, there are cases that do not fit the mold. To accommodate those cases, courts have recognized several narrow exceptions to the APA's record rule. *Tafas*, 530 F. Supp. 2d at 795; James N. Saul, *Overly Restrictive Administrative Records and the Frustration of Judicial Review*, 38 Envtl. L. 1301, 1308 (2008) (cataloguing exceptions). Discovery beyond the record may be

appropriate where the record is incomplete; where additional information would provide helpful context; where supplemental information would assist the court in determining whether the agency failed to consider relevant factors; and, where the record's integrity has been impugned. *See Saul, supra*, at 1308-11.

To the extent relevant, "a 'strong showing of bad faith or improper behavior' . . . may justify extra-record discovery." *New York*, 139 S. Ct. at 2573-74 (quoting *Overton Park*, 401 U.S. at 420). This is a high bar. *See New York*, 139 S. Ct. at 2574; *Prof'l Massage Training Ctr., Inc. v. Accreditation All. Of Career Sch. and Colls.*, 781 F.3d 161, 177-78 (4th Cir. 2015); *Tafas*, 530 F. Supp. 2d at 797 (collecting cases). Therefore, mere allegations of bad faith are inadequate to overcome the presumption of regularity accorded to agency action. *See Mullins v. U.S. Dep't of Energy*, 50 F.3d 990, 993 (Fed. Cir. 1995). Rather, a plaintiff must put forth a "strong showing" of impropriety to peer beyond the record. *New York*, 139 S. Ct. at 2574; *see also Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 339 (D.C. Cir. 2011).

The case law regarding the propriety of allowing extra-record discovery for constitutional claims asserted alongside APA claims is unsettled. *See State v. Ross*, 358 F. Supp. 3d 965, 1047 (N.D. Cal. 2019) (describing the case law as a "morass"); *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 41 (D.D.C. 2018) (characterizing this body of law as "sparse and in some tension"); *Chiayu Chang v. U.S. Citizenship & Immigration Servs.*, 254 F. Supp. 3d 160, 161 (D.D.C. 2017) (noting "some disagreement among district courts" on this issue). Some courts have applied the APA's bar on extra-record discovery to a constitutional claim, concerned that permitting discovery would incentivize plaintiffs to manufacture constitutional defects when challenging an agency action in order to circumvent the APA's restrictive procedures. *See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1237-38 (D.N.M. 2014).

Others have taken the view that distinguishing between a plaintiff's APA and constitutional claims would flout Congress's intent in enacting the APA. *See Ketcham v. U.S. Nat'l Park Serv.*, No. 16-17, 2016 WL 4268346, at *1-2 (D. Wyo. Mar. 29, 2016). Still others have denied discovery because there was significant overlap between the plaintiff's APA and constitutional claims. *See Alabama-Tombigbee Rivers Coal. v. Norton*, No. CV-01-S-0194-S, 2002 WL 227032, at *3-6 (N.D. Ala. Jan. 29, 2002).

However, another group of courts has recognized that extra-record discovery may be appropriate where the plaintiff mounts a constitutional challenge to agency action. *See Porter v. California*, 592 F.2d 770, 780 (5th Cir. 1979); *Stone v. Trump*, 400 F. Supp. 3d 317, 351 n.26 (D. Md. 2019); *Grill v. Quinn*, No. CIV S-10-0757 GEB GGH PS, 2012 WL 174873, at *2, 5 (E.D. Cal. Jan. 20, 2012); *All. for Nat. Health U.S. v. Sebelius*, 714 F. Supp. 2d 48, 59 n.20 (D.D.C. 2010); *Tafas*, 530 F. Supp. 2d at 802; *Natl. Med. Enter. v. Shalala*, 826 F. Supp. 558, 565 n.11 (D.C.C. 1993), *aff'd*, 43 F.3d 691 (D.C. Cir. 1995); *Rydeen v. Quigg*, 748 F. Supp. 900, 905 (D.D.C. 1990), *aff'd mem.*, 937 F.3d 623 (Fed. Cir. 1991), *cert. denied*, 502 U.S. 1075 (1992); *P.R. Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 327-28 (D.P.R. 1999). Notably, this view accords with the foundational tenet of constitutional adjudication that "where constitutional rights are in issue," courts must ensure that "the controlling legal principles [are] applied to the *actual facts of the case.*" *Pickering v. Bd. of Ed. of Twp. of High Sch. Dist. 205, Will Cty.*, 391 U.S. 563, 578 n.2 (1968) (Douglas, J., concurring) (emphasis added) (collecting cases).

The case of *Webster v. Doe*, 486 U.S. 592 (1988), further cautions against conflating APA and constitutional claims. In *Webster*, the plaintiff, a Central Intelligence Agency ("CIA") security agent, challenged the CIA's decision to terminate him on the ground that his homosexuality "posed

a threat to national security." *Id.* at 594-95. In particular, the plaintiff asserted that his discharge was arbitrary and capricious, in violation of 5 U.S.C. § 706, and violated his rights protected by the First, Fourth, Fifth, and Ninth Amendments to the Constitution. *Id.* at 596. The Supreme Court concluded that the plaintiff's termination was not reviewable under the APA because the National Security Act ("NSA") "exude[d] deference to the [CIA] Director" and thus "foreclose[d] the application of any meaningful judicial standard of review." *Id.* at 601. However, the Court proceeded to analyze the plaintiff's constitutional claims separately, concluding that they were justiciable because the NSA did not expressly foreclose judicial review of constitutional claims. *Id.* at 603-04. Significantly, the Court acknowledged that the plaintiff could seek discovery on his constitutional claim despite the CIA's "extraordinary needs" for confidentiality. *Id.* at 604.

Defendants maintain that the case of *Department of Commerce v. New York*, ___ U.S. ___, 139 S. Ct. 2551 (2019), confines the City's constitutional claims to the administrative record. ECF 75-1 at 11. But, the government's reliance on that case is miscast.

As relevant here, the Supreme Court in *New York* addressed whether the district court erred in granting the plaintiffs extra-record discovery under the APA. The Court acknowledged that, under "a narrow exception" to the APA's procedural strictures, a "'strong showing of bad faith or improper behavior . . . may justify extra-record discovery.'" *New York*, 139 S. Ct. at 2573-74 (quoting *Overton Park*, 401 U.S. at 420). But, it held that the district court acted "premature[ly]" when it "invoked that exception in ordering extra-record discovery here." *Id.* at 2574. According to the Court, the district court should only have ordered the agency to complete the record. *Id.*

Significantly, and as the City points out (ECF 81 at 4), the *New York* Court did not pass upon the plaintiffs' equal protection challenge, nor consider the proper scope of discovery on those claims. Indeed, those issues were not before the Court, because the district court had previously

14

found in favor of the government on those claims and that ruling was not appealed. *New York v. U.S. Dep't Commerce*, 351 F. Supp. 3d 502, 671 (S.D.N.Y. 2019), *rev'd in part*, 139 S. Ct. 2551 (2019).

Defendants insist that "[t]his is not a reasonable reading" of *New York*. ECF 82 at 5. They posit that "[t]he Court explicitly discussed the plaintiffs' constitutional equal protection claims, which were based on a theory 'that the Secretary [of Commerce] was motivated by discriminatory animus.'" *Id.* (brackets in ECF 82) (quoting *New York*, 139 S. Ct. at 2564). But, the government's cherry-picked quote does not support its position. Tellingly, the full sentence, which appears in the fact section of the Supreme Court's opinion, states: "On the equal protection claim, however, the District Court concluded that respondents had not met their burden of showing that the Secretary was motivated by discriminatory animus." *New York*, 139 S. Ct. at 2564. Thus, *New York* does not foreclose discovery here.

As I see it, the welter of cases underlines the need for a flexible approach, tailored to the facts and claims of the case. *See Jiahao Kuang v. U.S. Dep't of Def.*, No. 8-cv-03698-JST, 2019 WL 293379, at *2 (N.D. Cal. Jan. 23, 2019) (limiting decision to "the context of the specific circumstances before" the court); *Bellion Spirits*, 335 F. Supp. 3d at 43 (declining to adopt a brightline rule). And, on the particulars of this case, the APA does not preclude discovery on plaintiff's constitutional challenge to the FAM changes.

The City's APA and constitutional claims assert distinct defects with the revisions to the Manual. According to plaintiff, the FAM changes violate the APA because the State Department failed to provide a reasoned explanation for its action (ECF 1, ¶¶ 174-77); the revisions are impermissibly retroactive (*id.* ¶¶ 179-82); and, the State Department failed to satisfy the APA's notice-and-comment requirements. *Id.* ¶¶183-86. These claims can be properly adjudicated based

15

on the administrative record, which should contain all the information necessary to determine whether the FAM is arbitrary and capricious, implemented in a backward-looking manner, or procedurally invalid.

In contrast, the City's constitutional challenge asserts that the FAM changes violate equal protection because defendants were "motivated by animus" towards "immigrants, particularly immigrants from Latin American, African, and Asian countries." *Id.* ¶ 189. Subject to the qualifications discussed, *infra*, evaluating whether an official act was motivated by animus cannot be determined solely by examining the administrative record. *See New York v. U.S. Dep't Commerce*, 345 F. Supp. 3d 444, 451-52 (S.D.N.Y. 2018) (rejecting defendants' argument that the court's equal protection analysis was limited to the administrative record). For one thing, "discriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Furthermore, the administrative record that the agency assembles may not include direct evidence of impermissible animus. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (directing courts to consider "circumstantial and direct evidence of intent"); *Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010) (observing that "discriminatory intent is rarely susceptible to direct proof"). In short, no sound reason exists to limit the City's equal protection claims to the administrative record merely because the City also asserts that the FAM changes are invalid on other grounds.

Moreover, the cases in which courts have denied extra-record discovery are qualitatively different from the one *sub judice*. For the most part, they involve challenges to an agency adjudication or rule promulgated after formal or informal proceedings. *See Bellion Spirits*, 335 F. Supp. 3d at 36-37 (distiller claimed agency's ruling that its proposed advertisements were misleading violated the Frist Amendment); *Chiayu Chang*, 254 F. Supp. 3d at 161 (challenge to

16

visa denial); *Jarita Mesa Livestock Grazing Ass'n*, 58 F. Supp. 3d at 1202-06 (ranchers alleged agency's grazing allotments issued after public hearing and comment period constituted retaliation, in violation of the First Amendment); *Alabama-Tombigbee Rivers Coal.*, 2002 WL 227032, at *8 (plaintiffs alleged agency's determination that species was endangered violated due process because hearings and comment period were not impartial). In such a case, the plaintiff is likely to be somewhat familiar with the agency's reasoning and process. In contrast, defendants here allegedly acted without warning or public input.

And, the few cases involving equal protection claims did not involve allegations of a suspect classification. *See Jiahao Kuang*, 2019 WL 293379, at *3 ("Here, the gravamen of Plaintiffs' claim is that the policy lacks a rational basis, not that it was motivated by xenophobic animus."); *Chiayu Chang*, 254 F. Supp. 3d at 162 (emphasizing that "[n]o suspect class is alleged regarding the equal protection claim"). The same cannot be said here, where the City asserts that defendants revised the Manual to discriminate on the basis of race.

In sum, equal protection principles, not the APA, supply the governing legal framework for assessing whether plaintiff is entitled to discovery at this time.[4]

## B.

At a minimum, the Constitution's guarantee of equal protection prohibits the government from intentionally treating one group differently than other similarly situated groups where no rational basis exists for doing so. *See, e.g., City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). And, because classifications based on race or ethnic origin are "'inherently suspect,'" official action that discriminates on these grounds is unconstitutional unless "'narrowly

---

[4] Because I only address whether the City is entitled to discovery under Count Four, I do not evaluate at this juncture whether the City is entitled to extra-record discovery under the APA.

17

tailored to further compelling governmental interests.'" *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013) (citations omitted). These principles apply to the federal government through the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).[5]

An official action that has a racially disproportionate impact is not itself unconstitutional. *Washington v. Davis*, 426 U.S. 229, 239 (1976). Rather, to establish a claim for race-based discrimination, the plaintiff must show that "a government actor intentionally discriminated against him on the basis of his race." *Williams v. Hansen*, 326 F.3d 569, 583 (4th Cir. 2003); *see also Arlington Heights*, 429 U.S. at 265 (requiring plaintiff to show that the official acted with "racially discriminatory intent or purpose").

A court must often "'smoke out'" invidious intent. *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (citation omitted); *see N.C. State Conference of NAACP v. McCrory*, 831 F.3d, 204, 214 (4th Cir. 2016). Doing so entails "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Relevant evidence may include: (1) "The historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (2) "The specific sequence of events leading up the challenged decision"; (3) "Departures from the normal procedural sequence"; (4) "Substantive departures . . ., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and (5) "The legislative or administrative

---

[5] Because the Fifth Amendment's equal protection guarantee is coextensive with the Fourteenth Amendment, the Court relies on Fourteenth Amendment jurisprudence. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) ("This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.")

18

history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 267-68 (internal citations and references omitted).

However, traditional equal protection analysis does not apply to actions pertaining to the entry of foreign nationals. Immigration matters are "'vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.'" *Mathews v. Diaz*, 426 U.S. 67, 81 n.17 (1976) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952)). And, controlling the flow of persons and goods across the border is core to our national security. *See United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) ("The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border."). Accordingly, the Supreme Court has long "recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Trump v. Hawaii*, ___ U.S. ___, 138 S. Ct. 2392, 2418 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)); *see Mathews*, 426 U.S. at 81 ("[T]he responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976) ("[T]he power over aliens is . . . subject only to narrow judicial review.").

The Supreme Court's ruling in *Kleindienst v. Mandel*, 408 U.S. 753 (1972), underscores the judiciary's limited role in reviewing these decisions. There, the Court considered a challenge to the Attorney General's refusal to allow a foreign Marxist to visit the United States on a lecture tour. *See id.* at 756-60. The Court acknowledged that the decision implicated the First Amendment rights of American citizens. But, it held that it would only ask whether the Attorney General had

19

a "facially legitimate and bona fide reason" for denying the visa. *Id.* at 770. Further, the *Mandel* Court instructed that courts should "neither look behind the exercise of that discretion, nor test it by balancing its justification against the [constitutional] interests" of the injured party. *Id.*

Similarly, in *Fiallo v. Bell*, 430 U.S. 787 (1977), the Court addressed an equal protection challenge to a provision of the INA that denied preferential naturalization status to illegitimate children whose natural fathers were American citizens. *Id.* at 789. The plaintiffs sought to invalidate the provision, which they contended facially discriminated on the basis of sex and illegitimacy. *Id.* at 791. The Court rejected the plaintiffs' argument that the statute failed rational basis scrutiny, concluding that "Congress obviously has determined that preferential status is not warranted for illegitimate children and their natural fathers, perhaps because of a perceived absence in most cases of close family ties as well as a concern with the serious problems of proof that usually lurk in paternity determinations." *Id.* at 799. The Court admonished that "it is not the judicial role . . . to probe and test the justifications" given for the policy. *Id.*

The Supreme Court recently reaffirmed this narrow standard of review in *Hawaii*, 138 S. Ct. 2392, which involved an equal protection challenge to an executive policy banning the entry of individuals from six predominantly Muslim countries. There, in regard to the so-called "travel ban," the Court explained that "[a] conventional application of *Mandel*, asking only whether the policy is facially legitimate and bona fide, would put an end to our review." *Id.* at 2420. Although the Court stated that it would "look behind the face of the Proclamation," it did so only "to the extent of applying rational basis review." *Id.* Under that standard, the Court considered "whether the entry policy is plausibly related to the Government's stated objective to protect the country and improve vetting processes." *Id.* And, it would "uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.*

20

Concerning rational basis review, the Court observed that it "hardly ever strikes down a

policy as illegitimate under rational basis scrutiny." *Id.* The Court stated, *id.*:

> On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a "bare . . . desire to harm a politically unpopular group." *Department of Agriculture v. Moreno*, 413 U.S. 528, 534, 93 S. Ct. 2821, 37 L.Ed.2d 782 (1973). In one case, we invalidated a local zoning ordinance that required a special permit for group homes for the intellectually disabled, but not for other facilities such as fraternity houses or hospitals. We did so on the ground that the city's stated concerns about (among other things) "legal responsibility" and "crowded conditions" rested on "an irrational prejudice" against the intellectually disabled. *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 448-450, 105 S. Ct. 3249, 87 L.Ed.2d 313 (1985) (internal quotation marks omitted). And in another case, this Court overturned a state constitutional amendment that denied gays and lesbians access to the protection of antidiscrimination laws. The amendment, we held, was "divorced from any factual context from which we could discern a relationship to legitimate state interests," and "its sheer breadth [was] so discontinuous with the reasons offered for it" that the initiative seemed "inexplicable by anything but animus." *Romer v. Evans*, 517 U.S. 620, 632, 635, 116 S. Ct. 1620, 134 L.Ed.2d 855 (1996).

Applying rational basis, the Court refused to strike down the policy because there was

"persuasive evidence that the entry suspension has a legitimate grounding in national security

concerns, quite apart from any religious hostility[.]" *Id.* at 2421. According to the Court, "[t]he

Proclamation [wa]s expressly premised on legitimate purposes: preventing entry of nationals who

cannot be adequately vetted and inducing other nations to improve their practices." *Id.* And, it

"reflect[ed] the results of a worldwide review process undertaken by multiple Cabinet officials and

their agencies." *Id.* Thus, because it was not "impossible" to connect the policy to "'legitimate

state interests,'" nor was it "'inexplicable by anything but animus,'" the Court concluded that the

policy was constitutional. *Id.* at 2420-21.

21

Faithful adherence to *Mandel*, *Fiallo*, and *Hawaii* compels the conclusion that the City is *not entitled to discovery* as to its equal protection claims.[6] Applying those cases, the Court must "uphold the [Manual] so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 138 S. Ct. at 2420. Conversely, the Court may invalidate the Manual only if "it is impossible to discern a relationship" between the FAM and "legitimate state interests," or if the changes to the Manual are "inexplicable by anything but animus." *Id.* at 2420-21. Notably, this assessment can be made on the basis of the administrative record.

On the one hand, the record may contain "persuasive evidence that the [revision to the FAM] has a legitimate grounding . . . quite apart from any [racial or anti-immigrant] hostility[.]" *Id.* at 2421. If so, the inquiry ends. Indeed, even if there is extrinsic evidence of animus, the Manual passes constitutional muster so long as it rests on a "justification independent of unconstitutional grounds." *Id.* at 2420. Further, I must accept the government's stated explanation; "'it is not the judicial role to probe and test the justifications' of immigration policies.'" *Id.* at 2420 (citation omitted). Alternatively, the administrative record could lack "persuasive evidence" that the changes to the Manual have "a legitimate grounding . . . quite apart from any [racial or anti-immigrant] hostility." *Id.* at 2421. In such a case, it might be "impossible" to tether the Manual to "legitimate state interests" or understand the FAM changes as "'inexplicable by anything but animus.'" *Id.*

---

[6] To be sure, in my earlier Memorandum Opinion (ECF 59), I commented that "[p]erhaps plaintiff will unearth evidence during discovery . . . ." *Id.* at 77. However, I also indicated that *Hawaii* is controlling. *Id.*

Accordingly, whether the record is thick or thin, it is all that is necessary to resolve the City's equal protection claims. It follows that it is not appropriate to allow plaintiff to seek discovery from the government on this basis.

## C.

Principles concerning separation of powers further counsel against allowing plaintiff to request discovery from the President and high-ranking executive officials at this juncture.

Of course, it is clear beyond cavil that the President is not above the law. *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 382 (2004) (citing *United States v. Nixon*, 418 U.S. 683, 715 (1974)). To the contrary, "when the President takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997). Nor is the President immune from judicial process. *See id.* at 704-705; *Nixon v. Fitzgerald*, 457 U.S. 731, 753-54 (1982) ("It is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States."); *United States v. Nixon*, 418 U.S. at 706 ("[N]either the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances.").

That said, "[t]he President occupies a unique position in the constitutional scheme." *Nixon v. Fitzgerald*, 457 U.S. at 749. This position requires courts to exercise "judicial deference and restraint" in lawsuits involving the Office of the Presidency. *Id.* at 753. Therefore, before exercising jurisdiction over the President, a court "must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 754.

23

The case of *Cheney v. U.S. District Court for District of Columbia*, 542 U.S. 367 (2004), is instructive. There, the plaintiffs filed civil suits directly against various government officials, including Vice President Cheney, alleging that the National Energy Policy Development Group ("NEPDG") was subject to disclosure requirements under federal law. *Id.* at 373-74. After the district court had allowed discovery to proceed against the Vice President in order to establish exactly who attended NEPDG meetings, the Vice President sought a writ of mandamus to vacate the discovery orders. *Id.* at 375-76. The D.C. Circuit rejected the Vice President's request for mandamus, reasoning that he could object to individual discovery requests on the grounds of executive privilege. *Id.* at 376-77.

The Supreme Court reversed. *Id.* at 392. It stated, *id.* at 389-90:

> Executive privilege is an extraordinary assertion of power "not to be lightly invoked." *United States v. Reynolds*, 345 U.S. 1, 7, 73 S. Ct. 528, 97 L.Ed. 727 (1953). Once executive privilege is asserted, coequal branches of the Government are set on a collision course. The Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives. This inquiry places courts in the awkward position of evaluating the Executive's claims of confidentiality and autonomy, and pushes to the fore difficult questions of separation of powers and checks and balances. These "occasion[s] for constitutional confrontation between the two branches" should be avoided whenever possible. *United States v. Nixon, supra*, at 692, 94 S. Ct. 3090.

The upshot, the Court explained, is that, where possible, courts should "explore other avenues, short of forcing the Executive to invoke privilege, when they are asked to enforce against the Executive Branch unnecessarily broad subpoenas." *Id.* at 390.

Here, plaintiff has propounded interrogatories to the President pertaining to the FAM changes. For example, the City has asked the President to "[i]dentify all information, facts, data, and research reviewed, relied upon, and/or considered by President Trump or the Executive Office of the President concerning the economic impact of legal immigration prior to preparing the Draft Executive Order." ECF 81-3 at 7. And, the City asks the President to "[i]dentify all persons within

24

the Executive Office of the President who participated in developing the January 2018 Revisions to the FAM," and "[f]or each such person (1) state their role in developing the revised [FAM] and (2) state the date(s) of their participation in developing the revised [FAM]." *Id.*

I take no position on whether the interrogatories propounded by plaintiff are "unnecessarily broad." However, plaintiff's discovery plainly implicates executive privilege. Thus, staying discovery until after plaintiff has had the opportunity to review the administrative record comports with the Supreme Court's instruction to "explore other avenues" before wading into constitutionally fraught discovery disputes. *See Karnoski v. Trump*, 926 F.3d 1180, 1203-07 (9th Cir. 2019) (granting writ of mandamus and vacating discovery order "because the district court did not fulfill its obligation 'to explore other avenues, short of forcing the Executive to invoke privilege'").

### III.    Conclusion

For the foregoing reasons, I shall vacate the Scheduling Order (ECF 69), and I shall grant the Motion (ECF 75) in part and deny it in part. In particular, I shall grant the Motion to the extent that plaintiff seeks discovery with respect to its equal protection claims. However, I shall deny the Motion with respect to the APA claims. Discovery will begin with the government's production of the administrative record. And, as to the APA claims, after plaintiff reviews the administrative record, plaintiff may seek leave of Court to pursue extra-record discovery if it has a good faith basis for making such a request.

An Order follows, consistent with this Memorandum Opinion.

Date: December 19, 2019                            _____/s/_____
                                                  Ellen L. Hollander
                                                  United States District Judge

25